Christopher Sproul (State Bar No. 126398)
csproul@enviroadvocates.com
Brian Orion (State Bar No. 239460)
borion@enviroadvocates.com
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Jason Flanders (State Bar No. 238007)
jrf@atalawgroup.com
ATA Law Group
490 43rd Street, Suite 108
Oakland, CA 94609
Telephone: (916) 202-3018

Attorneys for Plaintiffs
ECOLOGICAL RIGHTS FOUNDATION and
SANTA BARBARA CHANNELKEEPER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION and SANTA BARBARA CHANNELKEEPER, <br><br> Plaintiffs, <br><br> v. <br><br> HOT LINE CONSTRUCTION, INC., <br><br> Defendant. | Civil Case No. <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> CASE UNDER THE CLEAN WATER ACT AND RESOURCE CONSERVATION AND RECOVERY ACT |

## INTRODUCTION AND JURISDICTION

1.     Ecological Rights Foundation ("EcoRights") and Santa Barbara Channelkeeper ("Channelkeeper" and together with EcoRights, the "Plaintiffs")) bring this action against Hot Line Construction, Inc. ("Hot Line") under section 505(a)(1) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1) and section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B).

2.     Hot Line owns or operates numerous corporation yards and service centers (the "Facilities") that are unlawfully discharging toxic pollutants into California waterways. Particularly concerning are Hot Line's discharges of chemicals present in the treated wooden utility poles stored at the Facilities. These poles are treated with the wood preservative pentachlorophenol, which contains several other chemicals, including polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans ("dioxins"). Dioxins are persistent organic pollutants that, at extremely low levels, cause cancer, reproductive and developmental harm, and interfere with the endocrine system. Dioxins are the hazardous chemical components of Agent Orange, the infamous defoliant used by the U.S. military in Vietnam.

3.     The CWA authorizes citizens to bring civil actions against any person who is in violation of an effluent standard or limitation established under the CWA. Hot Line is in violation of the CWA as a result of its discharge of dioxins and other pollutants into waters of the United States without CWA authorization. RCRA authorizes citizens to bring civil actions against any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. Hot Line is in violation of RCRA as a result of its past and present handling, storage, treatment, transportation, or disposal of solid waste at the Facilities in a manner which may present an imminent and substantial endangerment to health or the environment.

4.     This Court has subject matter jurisdiction over the claims for violations set

forth in this Complaint pursuant to: CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1); RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B); and 28 U.S.C. section 1331 (an action for declaratory, injunctive and other relief arising under the laws of the United States).

5.      The Facilities at issue include the Hot Line corporation yards/service centers located at 701 Robert Keister Road, Santa Barbara, California, immediately adjoining the Southern California Edison ("SCE") Pardee Substation Helistop, Santa Clarita, California (and located within the larger SCE premises), and any additional Hot Line corporation yards/service centers located next to the SCE facilities listed in the Table 1 set forth at the end of this Complaint (and located within the larger SCE premises).

6.      This Complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's violations of the CWA and RCRA.

7.      On November 26, 2019, the Plaintiffs served a citizen suit notice letter ("Notice Letter") on Hot Line regarding violations of the CWA and RCRA at the Facilities, and of Plaintiffs' intention to file suit against Hot Line. Plaintiffs also sent copies of said Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the U.S. Attorney General, the Executive Director of the State Water Resources Control Board ("State Board"), the Chairs of the Regional Water Quality Control Boards for the State of California Central Coast Regional Water Quality Control Board (Region 3), State of California Los Angeles Regional Water Quality Control Board (Region 4), State of California Central Valley Regional Water Quality Control Board (Region 5), State of California Lahontan Regional Water Quality Control Board (Region 6), State of California Colorado River Regional Water Quality Control Board (Region 7), State of California Santa Ana Regional Water Quality Control Board (Region 8), and the State of California San Diego Regional Water Quality Control Board (Region 9), as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). In addition, Plaintiffs also sent copies of the Notice

Letter to the California Department of Resources Recycling and Recovery.

8.     Neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations of the CWA and RCRA alleged in the Notice Letter. Claims for civil penalties asserted in this action are not barred by any prior administrative penalty under CWA section 309(g), 33 U.S.C. § 1319(g).

9.     This Court has personal jurisdiction over the Defendant. Hot Line is a California corporation doing business in California, including within the United States Central District of California.

## VENUE

10.    Venue in the Central District of California is proper pursuant to CWA section 505(c)(1), 33 U.S.C. § 1365(c)(1), because the sources of the effluent standards or limitations being violated are the Facilities, which are located within the Central District of California.

11.    Venue in the Central District of California is proper pursuant to RCRA section 7002(a), 42 U.S.C. § 6972(a)(1)(B), because the alleged violations occurred at the Facilities, which are located in the Central District of California, and the alleged endangerment may occur in the Central District of California.

12.    In addition, venue in the Central District of California is proper because Hot Line maintains offices located within the Central District of California at 909 Mission Rock Road, Santa Paula, California , and 12250 Temescal Canyon Road, Corona, California .

## THE PARTIES

13.    EcoRights is a non-profit public benefit corporation with offices in Garberville, California and members throughout California. Among other work it does, EcoRights focuses on protecting surface waters and groundwater from pollution and degradation. EcoRights represents citizens who are striving to protect soil and waterways from pollution and secure the multitude of public and private benefits that follow from clean soil and from pure water: reduced incidences of cancer and birth defects, safe

drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, food uncontaminated by toxic chemicals, and economic prosperity from commercial, sport and subsistence fishing; and other commercial activities that depend on clean soil and pure water.

14. EcoRights' members live and recreate in proximity to the Facilities at which Hot Line has released, disposed, and discharged toxic chemicals. EcoRights' members use waters into which Hot Line has discharged contaminated storm water runoff from the Facilities listed in Table 1 attached hereto. These waters include, but are not limited to, the Pacific Ocean, Goleta Slough, Goleta Beach, Carneros Creek, Tecolotito Creek, San Pedro Creek, the Santa Clara River, the Santa Clara River Estuary, and McGrath State Beach and Campground. EcoRights' members are concerned about harm to wildlife and water quality and are being adversely affected by Hot Line's discharges to waters of the United States and past and present handling, storage, treatment, transportation, and/or disposal of solid waste alleged herein.

15. Channelkeeper is a grassroots, 501(c)(3) non-profit organization, whose mission is to protect and restore the Santa Barbara Channel and its watersheds through science-based advocacy, education, field work and enforcement.

16. Channelkeeper's members live and recreate in proximity to the Facilities at which Hot Line has disposed of toxic chemicals. Channelkeeper's members use waters into which Hot Line has discharged contaminated storm water runoff from the Facilities listed in the Notice Letter appended to this Complaint. These waters include, but are not limited to, the Pacific Ocean, Goleta Slough, Goleta Beach, Carneros Creek, Tecolotito Creek, and San Pedro Creek, and tributaries to and wetlands adjacent to these waters. Channelkeeper's members use these waters for recreation, fishing, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. Channelkeeper's members are concerned about harm to wildlife and water quality and are being adversely affected by Hot Line's discharges to waters of the United States and past and present handling, storage, treatment, transportation, and/or disposal of solid waste alleged herein.

17.     Hot Line is a corporation organized under the laws of the State of California.

## STATUTORY BACKGROUND

**I.     Clean Water Act**

18.     CWA § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

19.     The 1987 amendments to the CWA (enacted via the Water Quality Act of 1987) make clear that an NPDES permit is required for discharges associated with industrial activities or for discharges which a State has determined contribute to a violation of a water quality standard or constitute a significant contributor of pollutants to waters of the United States. CWA § 402(p)(1) & (2), 33 U.S.C. § 1342(p)(1) & (2).

20.     EPA defines the term stormwater discharge associated with industrial activity to mean "the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to the manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14).

21.     EPA's regulations list several categories of industrial facilities that "are considered to be engaging in 'industrial activity.'" *Id*. These categories include, *inter alia*, "(vi) Facilities involved in the recycling of materials" and classified as Standard Industrial Classification code ("SIC Code") 5093, "(viii) Transportation facilities classified as Standard Industrial Classifications 40, 41, 42 (except 4221–25), 43, 44, 45, and 5171 which have vehicle maintenance shops [or] equipment cleaning operations . . . ." and "(xi) [various light industry facilities] under Standard Industrial Classifications 20, 21, 22, 23, 2434, 25, 265, 267, 27, 283, 285, 30, 31 (except 311), 323, 34 (except 3441), 35, 36, 37 (except 373), 38, 39, and 4221–25." 40 C.F.R. § 122.26(b)(14)(vi), (viii) & (xi).

22.     In addition to defining "industrial activity" with reference to specific SIC Codes, the regulations also contain a narrative description of activities that constitute "industrial activity," including:

> industrial plant yards; . . . material handling sites; . . . sites used for the storage and maintenance of material handling equipment; . . . shipping and receiving areas; . . . storage areas (including tank farms) for raw materials, and intermediate and final products; and areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water.

*Id*. at § 122.26(b)(14).

23.     EPA regulations require the submission of an application for an NPDES permit by any person who discharges pollutants and does not have an effective permit to discharge pollutants to waters of the United States. 40 C.F.R. § 122.21(a). In addition, CWA section 402(p)(4)(A) imposes a deadline of February 4, 1990 for industrial dischargers of storm water to apply for NPDES permits. *See* 33 U.S.C. § 1342(p)(4)(A) ("[A]pplications for permits for [industrial] discharges shall be filed no later than 3 years after the date of enactment" of CWA section 402(p)).

24.     CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

25.     CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $37,500 per day per violation for all CWA violations occurring from and after December 6, 2013 through November 2, 2015, and of $54,833 per day per violation for all CWA violations occurring after November 2, 2015, where penalties are assessed on or after February 6, 2019, pursuant to CWA section 309(d), 33 U.S.C. §1319(d), and the

EPA Adjustment of Civil Monetary Penalties for Inflation Regulation, 40 C.F.R. § 19.4 (Tables 1 and 2).

## II.     The General Industrial Storm Water Permit

26.     CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers located in California.

27.     The State Board adopted the National Pollution Discharge Elimination System ("NPDES") General Permit for Storm Water Discharges Associated With Industrial Activities, Order NPDES No. CAS000001, in Order No. 2014-0057-DWQ, effective July 1, 2015 ("2015 Permit"). The 2015 Permit replaced the predecessor version of the California industrial storm water general permit, NPDES General Permit No. CAS000001, adopted by the State Board in Order No. 97-03-DWQ ("1997 Permit"). The 2015 Permit and 1997 Permit are collectively referred to herein as the "General Permit."[1]

28.     The CWA and its implementing regulations require any person who discharges or proposes to discharge pollutants into waters of the United States in California to submit an NPDES permit application to the State Board. 40 C.F.R. §§ 122.21(a), 122.26(a)(ii); 33 U.S.C. § 1342(p)(2)(b). The General Permit requires existing facilities subject to its terms, such as the Facilities, to file a Notice of Intent ("NOI") for coverage under the General Permit and to thereafter comply with its procedural and substantive requirements. Any violation of the General Permit or its terms (all of which constitute "effluent limitations," 33 U.S.C. § 1365(f)) is a violation of the CWA

---

[1] Both of these versions of NPDES Permit No. CAS000001 have essentially the same terms and conditions.

actionable in a citizen suit brought pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1).

29.     The General Permit defines nine categories of activities considered to be "industrial activity." These include: (a) Recycling facilities such as scrap metal yards under SIC Code 5093; (b) Transportation facilities, including: (i) terminals which provide maintenance and service for motor vehicles under SIC Code 4231; and (ii) facilities involved in operating and maintaining airports, flying fields, and airport terminal services under SIC Code 4581 and facilities involved in furnishing nonscheduled air transportation under SIC Code 4522; (c) Facilities involved in handling sand and gravel for construction uses under SIC Code 1442; and (d) Facilities engaged in metal fabrication activities, such as those involving cutting, grinding, welding, and assembling metal parts under SIC Codes 3317, 3444, 3452, 3449, 3494, 3496, 3498, and 3499. *See* General Permit, Attachment A.

30.     The Fact Sheet accompanying the General Permit discusses how to classify a facility when multiple different activities are occurring there. It relies on the 1987 SIC Manual ("SIC Manual"), which accompanied the publication of the SIC Codes, and says:

> This General Permit provides regulatory coverage for all facilities with industrial activities described in Attachment A where the covered industrial activity is the Discharger's primary industrial activity. *In some instances, a Discharger may have more than one primary industrial activity occurring at a facility.*
>
> The 1987 SIC manual uses the term "establishment" to determine the primary economic activity of a facility. The manual instructs that *where distinct and separate economic activities are performed at a single location, each activity should be treated as a separate establishment (and, therefore,*

*separate primary activity)*. For example, the United States Navy (primary SIC code 9711) may conduct industrial activities subject to permitting under this General Permit, such as landfill operations (SIC code 4953), ship and boat building and repair (SIC code 3731, and flying field operations (SIC code 4581).

Fact Sheet at 9 (emphasis added). This language makes clear that each "distinct and separate economic activity" within a facility is treated as a separate "establishment" (and therefore, a separate "primary activity"). The SIC Manual also instructs that:

Where distinct and separate economic activities are performed at a single physical location (such as construction activities operated out of the same physical location as a lumber yard), each activity should be treated as a separate establishment where: (1) no one industry description in the classification includes such combined activities; (2) the employment in each such economic activity is significant; and (3) separate reports can be prepared on the number of employees, their wages and salaries, sales or receipts, and other types of establishment data.

SIC Manual at 12. Under the SIC Manual, SIC Codes are assigned to each establishment based on the primary activity of that establishment. *Id*. at 11. Therefore, read together, the Fact Sheet and the SIC Manual make clear that a given facility can have multiple SIC Codes, each of which applies to each distinct and separate economic activity at the facility (i.e., each establishment). This is demonstrated by the example of a Navy base provided in the Fact Sheet. Although the activity of the Navy as a whole is classified as within SIC Code 9711 ("Establishments of the armed forces, including the National Guard, primarily engaged in national security and related activities."), separate portions of a Naval base may be separately classified, if the Navy conducts "discrete and separate

economic activity" in such areas (*e.g.*, landfill operations, ship building, and airfield operations).

31.     In addition to the categories of "industrial activity" defined with reference to specific SIC Codes, the General Permit also includes a general description of activities that constitute "industrial activity," including the following:

> industrial plant yards; . . . material handling sites; . . . sites used
> for the storage and maintenance of material handling
> equipment; . . . shipping and receiving areas; . . . storage areas
> (including tank farms) for raw materials, and intermediate and
> finished products; and areas where industrial activity has taken
> place in the past and significant materials remain.

*See* General Permit, Attachment C (defining "Storm Water Discharge Associated With Industrial Activity").

32.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

33.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in the Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

34.     In addition to absolute prohibitions, the General Permit contains a variety of

substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").

35.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

## III.    The Resource Conservation and Recovery Act.

36.    RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), prohibits any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, from contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

## STATEMENT OF FACTS

### I.    Hot Line Conducts Distinct and Separate Economic Activities at the Facilities Falling Within the Definition of "Industrial Activity."

37.    Hot Line is a high voltage electrical contractor that provides various services to SCE in the latter's maintenance of an electrical supply grid, the wires for which are suspended by utility poles that are treated with various wood preservatives.

38.    On information and belief, Hot Line conducts activities that fall within one

or more of the categories of "industrial activity" set forth above at all of the Facilities.

39.     As noted, the General Permit and EPA's regulations cover recycling activities under SIC Code 5093, which refers to "Establishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials." At the Facilities, Hot Line stores (a) new wooden utility poles and cross-arms (collectively, "Poles"), and (b) (i) used wooden utility poles and cross-arms, (ii) wood chips, splinters, sawdust, and debris from the cutting of wooden utility poles and cross-arms, and (iii) other treated wood waste (collectively, "TWW"). On information and belief, Hot Line conducts metals recycling activities in the form of breaking down used Poles and TWW, separating metal parts (such as cross-arms, insulators, and transformers) and other scrap metal into bins, and then selling the scrap metal at wholesale.

40.     On information and belief, Hot Line has generated substantial revenue from these scrap metal recycling activities at the Facilities over the time period covered by this Complaint. Based on the nature of the activities at the Facilities, including the presence of substantial quantities of Poles and other metal equipment, the presence of numerous dumpsters that are used for recycling of metals stripped from Poles, and the substantial revenue derived by Hot Line for the recycling of scrap metal from the Facilities, these Facilities conduct scrap metal recycling activities within SIC Code 5093, thus triggering the need for coverage under the General Permit for the Facilities.

41.     No single industry description in the classification includes both these metals recycling activities and any other activities relating to Hot Line's construction or electricity distribution/transmission system maintenance services. On information and belief, Hot Line can prepare separate reports on the number of employees, their wages and salaries, sales or receipts, and other types of establishment data with respect to these metals recycling activities. In addition, these metal recycling activities are the same types of activities that a metal scrap recycling facility would engage in if it were a standalone metal scrap processing facility. At the Facilities, Hot Line receiving waste materials, strips them of metal parts, sorts the metal parts into recycling bins, and sells those parts at

wholesale to third parties. As noted, on information and belief, Hot Line has generated substantial revenue from these metals recycling activities across all Facilities over the time period covered by this Complaint. As such, this activity constitutes a "distinct and separate economic activity" at the Facilities (and therefore, a separate establishment), with the "primary activity" of recycling under SIC Code 5093. Under the General Permit and its Fact Sheet, this triggers the need for General Permit coverage.

42.     In addition to the industrial activities falling within these specific SIC Codes, the Plaintiffs also allege that the Facilities constitute:

- "industrial plant yards" because the Facilities consist of large yards where Hot Line conducts a variety of industrial activities and stores a variety of industrial materials and equipment, as highlighted above;

- "material handling sites" because Hot Line handles a wide variety of material at the Facilities, including Poles, TWW, and metal materials;

- "sites used for the storage and maintenance of material handling equipment" because the Facilities house material handling equipment, namely, equipment used for the movement, storage, control and protection of materials, goods and products, such as transport equipment, forklifts, stationary lifts, cranes, trolleys, pallet jacks, and industrial trucks;

- "shipping and receiving areas" because the Facilities contain receiving areas where Hot Line receives large quantities of raw materials, intermediate and finished products, vehicles, and other equipment used in the service of the electrical transmission and distribution system;

- "storage areas . . . for raw materials, and intermediate and finished products" because Hot Line store raw materials (including aggregates, wood, and metal) and intermediate and finished products (including Poles, TWW, transformers, metal spools, metal pipe, and others); and

- areas where "industrial activity has taken place in the past and significant materials remain" because, as discussed below, significant materials (namely, dioxins,

furans, pentachlorophenol, various metals, and other pollutants) remain on the Facilities.

43.     Accordingly, the Facilities meet the narrative description of "industrial activity" set forth in EPA's regulations, the General Permit, Attachment C. As a result, these Facilities are conducting "industrial activity" triggering the need for General Permit coverage, regardless of whether or not the activities at the Facilities otherwise fall within the SIC Codes that trigger coverage under the General Permit.

## II.   Hot Line is Violating the CWA By Discharging Pollutants from Point Sources to Waters of the United States without an NPDES Permit.

44.     Because CWA discharge prohibitions apply to the Facilities, Hot Line is violating CWA section 301(a), 33 U.S.C. § 1311(a), by discharging pollutants from point sources into waters of the United States without NPDES permit authorization.

### A.   Hot Line is "Discharging Pollutants" from the Facilities.

45.     The Facilities serve as staging grounds for contract work on SCE's electrical grid. Hot Line stores Poles and TWW in outdoor, uncovered areas where they are exposed to storm water. These Poles and TWW are treated with the wood preservative pentachlorophenol, which contains several other chemicals, including dioxins. Poles are stored outdoors in uncovered areas, on racks and directly on the ground. TWW (including used wooden utility poles) are stored outdoors in uncovered areas, on racks, directly on the ground, or in treated wood waste bins that are open and uncovered, and thus are exposed to storm water. The bins at the Facilities are not watertight, so the contaminants mobilized in the water drip onto the pavement or soils beneath the bins.

46.     The chemicals used to treat Poles drip and wash off during precipitation events from the treated Poles and TWW, impacting site soils, surface water bodies, and groundwater. During precipitation events, the Poles and TWW discharge contaminants, which can be visible in storm water as a cloudy emulsion or as an oily rainbow "sheen" that takes its appearance from the oil-based carrier fluid used to treat the Poles.

47.     In addition, the Facilities house and store a variety of motor vehicles and

other transportation equipment in outdoor areas where they are exposed to storm water runoff. Outdoor service vehicles track dust, particulate matter, and other contaminants to areas on and off the premises at the Facilities. These vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

48.    Finally, Hot Line also stores various construction materials and equipment at the Facilities in outdoor, uncovered areas which serve as sources of loading to storm water runoff from the Facilities.

49.    Chemical and industrial wastes found in Hot Line's storm water discharges from the Facilities include but are not limited to the following: pentachlorophenol, dioxins, various petroleum hydrocarbons and polycyclic aromatic hydrocarbons, and various metals, and fine soils or sediments containing these contaminants. These all constitute "pollutants" under the CWA. *See* 33 U.S.C. § 1362(6).

50.    These pollutants are being "discharged" from the Facilities. The "discharge" of a pollutant means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Under CWA regulations, this includes "discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works." 40 C.F.R. § 122.2. The Plaintiffs' investigations have revealed that dioxins and other pollutants are picked up by storm water on the Facilities. From there, these pollutants are transported either directly into waters of the United States or through Municipal Separate Storm Sewer Systems ("MS4s") into waters of the United States, including but not limited to San Pedro Creek, Carneros Creek, Tecolotito Creek, Goleta Slough, the Santa Clara River, and the Pacific Ocean.

51.    In addition, pollutants are also discharged from the Facilities by tracking from Hot Line's motor vehicle fleet onto roadways. Once dioxins and pentachlorophenol contaminated soils or sediment is transported into public streets, storm water picks up these contaminants and transports them into MS4s and other conveyances that lead to

waters of the United States.

**B.      Hot Line is Discharging Pollutants from a "Point Source."**

52.      Storm water runoff from the Facilities is conveyed into receiving waters via various pipes. These conveyance pipes are "point sources" under the CWA. *See* 33 U.S.C. § 1362(14).

**C.      Polluted Discharges From the Facilities Reach "Waters of the United States."**

53.      As noted above, the polluted discharges from the Facilities reach waters of the United States. These include, but are not limited to, the waters listed in paragraph 50 above.

**D.      Hot Line Does Not Have NPDES Authorization for Discharges from the Facilities.**

54.      Despite the fact that Hot Line is obligated to obtain General Permit coverage for the Facilities, on information and belief, Hot Line has not filed an NOI to be covered by and comply with the terms of the General Permit with respect to the Facilities. Nor does Hot Line has any individual NPDES permits authorizing its discharges of contaminated storm water from the Facilities.

**E.      The Dates of Hot Line's Violations.**

55.      Hot Line has discharged and is continuing to discharge pollutants to waters of the United States as described above. While Hot Line should be aware of each day that it has discharged storm water from the Facilities (as the General Permit requires it to monitor such discharges), the Plaintiffs allege that Hot Line has discharged storm water containing excessive levels of pollutants from the Facilities to waters of the United States during at least every significant local rain event over 0.1 inches of rainfall in the last five years preceding the Notice Letter. Significant local rain events are reflected in the rain gauge data available at https://data.nodc.noaa.gov/cgi-bin/iso?id=gov.noaa.ncdc:C00313. Each discharge of pollutants from the Facilities to waters of the United States without NPDES permit authorization constitutes a separate CWA violation. Hot Line's violations

will continue each day pollutants are discharged without a permit in violation of CWA requirements.

**III.    Discharges in Violation of BPT/BAT/BCT Effluent Limitations.**

56.    CWA section 301(b), 33 U.S.C. § 1311(b), prohibits the discharge of pollutants from point sources that violate the effluent limitations imposed by that subsection. Specifically, CWA section 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A), prohibits the discharge of pollutants from point sources that exceed a level commensurate with the application of best practicable control technology currently available ("BPT"). CWA section 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A), prohibits the discharge of pollutants from point sources that exceed a level commensurate with the application of best available technology economically achievable ("BAT"). CWA section 301(b)(2)(E), 33 U.S.C. § 1311(b)(2)(E), prohibits the discharge of pollutants from point sources that exceed a level commensurate with the application of best conventional pollutant control technology ("BCT"). EPA has published Benchmark Values set at the maximum level of pollutant loading generally expected if an industrial facility is employing BPT, BAT and BCT.[2]

57.    The Facilities have failed to employ measures that constitute BPT, BAT and BCT for corporation yard and electrical service facilities, such as: moving polluting generating activities under cover or indoors; capturing and effectively filtering or otherwise treating all storm water prior to discharge; routing storm sewer discharges to publicly owned treatment works (following treatment necessary to meet pretreatment standards) (where deemed a permissible activity by the operators of publicly owned treatment works); using regenerative sweepers and periodically power washing the Facilities to reduce the build-up of pollutants on-site; washing tires or employing other measures to prevent off-site tracking of pollutants; and other like measures for reducing

---

[2] These Benchmark Values can be found at https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_fs.pdf.

storm water pollutant discharges to the limits of available, economically achievable technology.

58.     Because Hot Line is discharging pollutants from the Facilities in the absence of the implementation of BPT/BAT/BCT, Hot Line is violating the effluent limitations imposed by CWA section 301(b). While Hot Line should be aware of each day that it has discharged storm water from the Facilities, Plaintiffs allege that Hot Line has discharged storm water containing excessive levels of pollutants from the Facilities to waters of the United States during at least every significant local rain event over 0.1 inches of rainfall in the last five years preceding the Notice Letter. Significant local rain events are reflected in the rain gauge data available at https://data.nodc.noaa.gov/cgi-bin/iso?id=gov.noaa.ncdc:C00313.

59.     Hot Line's unlawful discharges of storm water from the Facilities with levels of pollutants exceeding BPT, BAT and BCT levels of control continue to occur during all significant rain events. Each discharge of storm water and non-storm water from the Facilities after the effective date of the BPT, BAT and BCT requirements constitutes a separate violation of the CWA. Hot Line is subject to civil penalties for violations of the CWA within the past five years preceding the Notice Letter.

**IV.     Discharges in Violation of the General Permit.**

60.     The Facilities discharge storm water associated with the industrial activities that is contaminated with pollutants without NPDES authorization under the General Permit. The General Permit only authorizes such discharges conditioned on compliance with the terms of the General Permit. Each of these permit terms constitutes an "effluent limitation" within the meaning of CWA section 505(f), 33 U.S.C. § 1365(f). Plaintiffs allege that the Facilities' storm water discharges have violated several of these permit terms, thereby violating CWA effluent limitations. Even if Hot Line sends one or more NOIs to the State Board and acquires NPDES permit authorization under the General Permit, the violations described herein will remain ongoing, as Hot Line has not met, and will not in the future meet, the requirements of the General Permit.

## A.     Discharges in Excess of BAT/BCT Levels.

61.     The Effluent Limitations of the 2015 Permit, § V.A., the 1997 Permit, Waste Discharge Requirements, § B.3 prohibit Hot Line from discharging pollutants from the Facilities above the level commensurate with the application of BAT/BCT. As noted, EPA and the State Board have published Benchmark Values set at the maximum level of pollutant loading generally expected if an industrial Facility is employing BAT and BCT. In the 2015 Permit, the State Board has established Numeric Action Limits ("NALs"), which serve a similar purpose. As discussed above, Hot Line has failed to employ measures at the Facilities that constitute BAT and BCT for corporation yard and electrical service facilities, such as: moving polluting generating activities under cover or indoors; capturing and effectively filtering or otherwise treating all storm water prior to discharge; routing storm sewer discharges to publicly owned treatment works (following treatment necessary to meet pretreatment standards) (where deemed a permissible activity by the operators of publicly owned treatment works); using regenerative sweepers and periodically power washing the Facilities to reduce the build-up of pollutants on-site; washing tires or employing other measures to prevent off-site tracking of pollutants; and other like measures for reducing storm water pollutant discharges to the limits of available, economically achievable technology.

62.     While Hot Line should be aware of each day that it has discharged storm water from the Facilities (as the General Permit requires Hot Line to monitor such discharges), the Plaintiffs allege that Hot Line has discharged storm water containing excessive levels of pollutants from the Facilities to waters of the United States during at least every significant local rain event over 0.1 inches of rainfall in the last five years preceding the Notice Letter. Significant local rain events are reflected in the rain gauge data available at https://data.nodc.noaa.gov/cgi-bin/iso?id=gov.noaa.ncdc:C00313.

63.     Hot Line's unlawful discharges of storm water from the Facilities with levels of pollutants exceeding BAT and BCT levels of control continue to occur presently and will in the future continue during all significant rain events. Each discharge of storm

water and non-storm water from the Facilities after the effective date of the BAT and BCT requirements constitutes a separate violation of the General Permit and the CWA. Hot Line is subject to civil penalties for violations of the General Permit and the CWA within the past five years preceding the Notice Letter.

64.    Hot Line's continued discharge of storm water containing levels of pollutants above BAT- and BCT-based levels of control necessarily means that it has not developed and/or implemented sufficient BMPs at the Facilities to prevent storm water flows from coming into contact with the sources of contaminants at the Facilities or otherwise to control the discharge of pollutants from the Facilities. Accordingly, Hot Line has not developed and/or implemented an adequate SWPPP or Monitoring and Implementation Plan ("MIP") at each of the Facilities, as required by the terms of the General Permit.

**B.    Discharges that Have Impaired Receiving Waters.**

65.    The Discharge Prohibitions of the General Permit, § III prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance, as well as those that adversely impact human health or the environment. The Receiving Water Limitations of the General Permit, § VI prohibits storm water discharges that cause or contribute to an exceedance of applicable Water Quality Standards. Applicable Water Quality Standards are set forth in the California Toxics Rule ("CTR")[3] and the California Regional Water Quality Control Board Basin Plans for the applicable regions, including Regions 3, 4, and 8.[4] The water quality objectives of each Basin Plan constitute "the

---

[3] The CTR is set forth at 40 C.F.R. § 131.38 ("This section promulgates criteria for priority toxic pollutants in the State of California for inland surface waters and enclosed bays and estuaries") and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31682.

[4] The Basin Plan for each watershed region is published by each applicable California Regional Water Quality Control Board and can be found at each Regional Board's website, available at:
https://www.waterboards.ca.gov/about_us/contact_us/rwqcbs_directory.html.

allowable limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area." Cal. Water Code § 13050(h). Applicable water quality standards for each Region at issue here include, but are not limited to, those set forth in Table 1 with respect to each Facility.

66.     The *Water Quality Control Plan for the Central Coast Basin* ("Region 3 Basin Plan") sets forth water quality standards and prohibitions applicable to Hot Line's storm water discharges for Facilities located within Region 3's jurisdiction, including but not limited to, those set forth in Table 1. These water quality standards and prohibitions are set forth at Chapter 3, and include, but are not limited to, "The suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses," "All waters shall be maintained free of toxic substances in concentrations which are toxic to, or which produce detrimental physiological responses in, human, plant, animal, or aquatic life," municipal supply beneficial use waters shall not contain concentrations of organic chemicals "in excess of the maximum contaminant levels for primary drinking water standards specified in California Code of Regulations, Title 22, Division 4, Chapter 15, Article 5.5, Section 64444, Table 64444-A" nor concentrations of inorganic chemicals "in excess of the maximum contaminant levels for primary drinking water standards specified in California Code of Regulations, Title 22, Division 4, Chapter 15, Sections 64431 and 64433.2," and "No individual pesticide or combination of pesticides shall reach concentrations that adversely affect beneficial uses. There shall be no increase in pesticide concentrations found in bottom sediments or aquatic life. For waters where existing concentrations are presently nondetectable or where beneficial uses would be impaired by concentrations in excess of nondetectable levels, total identifiable chlorinated hydrocarbon pesticides shall not be present at concentrations detectable within the accuracy of analytical methods prescribed in Standard Methods for the Examination of Water and Wastewater, latest edition, or other equivalent methods

approved by the Executive Officer."

67.     The *Water Quality Control Plan for the Los Angeles Region* ("Region 4 Basin Plan") sets forth water quality standards and prohibitions applicable to Hot Line's storm water discharges for Facilities located in Region 4, including but not limited to, those set forth in Table 1. For example, the Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life," and that "[t]oxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health."

68.     The *Water Quality Control Plan for the Santa Ana River Basin* ("Region 8 Basin Plan") sets forth water quality standards and prohibitions applicable to Hot Line's storm water discharges for Facilities located within Region 8's jurisdiction, including but not limited to, those set forth in Table 1. These water quality standards and prohibitions are set forth at Chapter 3, and include, but are not limited to, that "Toxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to level which are harmful to human health. The concentrations of contaminants in waters which are existing or potential sources of drinking water shall not occur at levels that are harmful to human health. The concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses;" and "Inland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses as a result of controllable water quality factors."

69.     The levels of pollutants in Hot Line's storm water discharges have caused pollution, contamination, or nuisance in violation of the Discharge Prohibitions of the General Permit, § III. Additionally, the levels of pollutants in Hot Line's storm water discharges have caused or contributed to receiving waters not attaining one or more applicable Water Quality Standards, including attainment of the designated beneficial uses of the receiving waters, in violation of the Receiving Water Limitations of the

General Permit, § VI.

70.    Each day that Hot Line has discharged storm water from the Facilities, its storm water contained levels of pollutants that caused or contributed to exceedance of one or more of the applicable Water Quality Standards. While Hot Line should be aware of each day that it has discharged storm water from the Facilities (as the General Permit requires it to monitor such discharges), the Plaintiffs allege that it has discharged storm water from the Facilities during at least every significant local rain event over 0.1 inches of rainfall that have caused or contributed to Water Quality Standards not being met in the applicable receiving waters over the last five years preceding the Notice Letter. Significant local rain events in the last five years are otherwise available at https://data.nodc.noaa.gov/cgi-bin/iso?id=gov.noaa.ncdc:C00313.

71.    Hot Line's unlawful discharges from the Facilities continue to occur presently and will in the future continue to occur during all significant rain events over 0.1 inches of rainfall. Each discharge from the Facilities that causes or contributes to an exceedance of an applicable Water Quality Standard constitutes a separate violation of the General Permit and the CWA. Hot Line is subject to penalties for violations of the General Permit and the CWA within the past five years preceding the Notice Letter.

**C.    Violation of General Permit Conditions Related to Development and Implementation of an Adequate Storm Water Pollution Prevention Plan.**

72.    The 1997 Permit, Section A: Storm Water Pollution Prevention Plan Requirements, ¶ 1 requires dischargers covered by the General Permit and commencing industrial activities before October 1, 1992 to develop and implement an adequate SWPPP by October 1, 1992. Section A ¶ 1 of the General Permit also requires dischargers to make all necessary revisions to existing SWPPPs promptly, and in any case no later than August 1, 1997. The 2015 Permit contains essentially identical SWPPP requirements, but with a new set of minimum BMPs and additional Advanced BMPs. *See* 2015 Permit § X.A-I.

73.    The SWPPP must include, among other requirements, the following: (a)

COMPLAINT FOR DECLARATORY                23
AND INJUNCTIVE RELIEF

Specification of BMPs designed to reduce pollutant discharge to BAT and BCT levels, including BMPs already existing and BMPs to be adopted or implemented in the future, 1997 Permit at 17, Section A: Stormwater Pollution Plan Requirements, ¶ 8; 2015 Permit § X.A-I; and (b) Revisions to the SWPPP within 90 days after a Facilities manager determines that the SWPPP is in violation of any requirements of the Industrial Stormwater Permit. *Id*. at 23, 1997 Permit Section A: SWPPP Requirements, ¶ 10.d.; 2015 Permit § X.A-I.

74.     Hot Line has failed to adopt SWPPPs for the Facilities meeting these requirements. Hot Line's failure to prepare an adequate SWPPP for each Facility and/or to revise the SWPPPs in all the above respects constitute violations of the General Permit, § X. Hot Line will continue to be in violation every day that it fails to develop and implement an adequate SWPPP for each of the Facilities. Hot Line is subject to penalties for violations of the General Permit and the CWA occurring within the past five years preceding the Notice Letter.

**D.     Failure to Develop and Implement an Adequate Monitoring and Implementation Plan and Perform Annual Comprehensive Site Compliance Evaluations as Required by the General Permit.**

75.     Under the 2015 Permit, dischargers are required to prepare and implement a MIP as part of their SWPPP. 2015 Permit, § I. The MIP requirements in the 2015 Permit specify visual observation procedures and locations, sampling procedures, locations, and methods that dischargers must comply with. 2015 Permit, Sections I; XI. The 1997 Permit's Monitoring and Reporting Program ("MRP") provisions require similar actions.

76.     Pursuant to the monitoring and reporting requirements of the General Permit, Facilities operators must conduct and record visual observations of all drainage locations at the Facilities for authorized non-storm water, unauthorized non-storm water, and storm water discharges. Facilities operators must also implement responsive measures to eliminate unauthorized non-storm water discharges and reduce or prevent pollutants from contacting non-storm water discharges and to reduce or prevent

pollutants in storm water discharges. Facilities operators must document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. Facilities operators must maintain records of observation dates, locations observed, observations, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. General Permit, § XI.

77.    In addition to conducting visual observations, Facilities operators are required to collect and sample storm water samples during qualifying storm events. General Permit, § XI.

78.    To achieve the objectives of the monitoring program, Facilities operators must comply with certain procedural requirements, including explaining monitoring methods; providing a description of the visual observation and sampling methods, location, and frequency; and identifying the analytical methods and corresponding method of detection limits used to detect pollutants in storm water discharges. General Permit, § XI. Facilities operators must retain records of all storm water monitoring information and copies of all reports for at least five years. *Id*. § XI.J. Facilities operators must submit an Annual Report by July 1 each year to the Regional Water Board that includes a summary of visual observations and sampling results, laboratory reports, the Annual Comprehensive Site Compliance Evaluation Report, an explanation of why a Facility did not implement any required activities, and specified records. *Id*. § XI.C; § XVI.

79.    Hot Line has been operating the Facilities with an inadequately developed and/or inadequately implemented MIP or MRP in violation of the substantive and procedural requirements set forth above. Hot Line's monitoring program has not ensured that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the General Permit. The monitoring program has not resulted in practices at the Facilities that adequately reduce or prevent pollutants in storm water as required by the General Permit. Hot Line's MIPs or MRPs

have not effectively identified compliance problems at the Facilities or resulted in effective revision of the SWPPP to address such pollution problems as required by General Permit sections X and XI.

80.     Hot Line has not submitted annual reports to the applicable Regional Board in the last five years preceding the Notice Letter. Hot Line has failed to sample storm water from all discharge points at the Facilities, including gaps in berms or other locations. Hot Line has failed to analyze its discharges for all toxic chemicals and other pollutants likely to be present in each Facility's storm water discharges in significant amounts. Hot Line has failed to complete all required visual observations. Accordingly, Hot Line has violated the monitoring and reporting provisions as specified by General Permit section XI every day for the last five years preceding the Notice Letter.

81.     As a result of Hot Line's failure to adequately develop and/or implement an adequate MIP and MRP at the Facilities, Hot Line has been in daily and continuous violation of the General Permit and the CWA on each and every day for the last five years preceding the Notice Letter. These violations are ongoing. Hot Line will continue to be in violation of the Permit's monitoring and reporting requirements every day it fails to adequately develop and implement an effective MIP and MRP at the Facilities. Hot Line is subject to penalties for each violation of the General Permit and the CWA occurring for the last five years preceding the Notice Letter.

## V.     Hot Line's Handling, Storage, and Disposal of Solid Waste May Present an Imminent and Substantial Endangerment to Health or the Environment.

### A.     The Toxic Effects of Exposure to Dioxins in Humans and Wildlife.

82.     The chemicals in the pentachlorophenol-based wood treatment mixture that is used to treat the Poles and TWW stored at the Facilities are highly toxic and are known to the State of California, the federal government and the World Health Organization ("WHO") to cause cancer, immunotoxicity, birth defects and other reproductive toxicity. Currently existing published, peer reviewed literature shows that pentachlorophenol is routinely contaminated with dioxins. Dioxins are manufacturing impurities that are found

in virtually all samples of technical grade pentachlorophenol. For example, a study published by the California State Water Resources Control Board (that focused on contamination at power pole treatment sites) analyzed concentrations of several dioxins congeners in commercial chlorophenol products. Hence, any handling, storage, or disposal of pentachlorophenol-contaminated wastes derived from the Poles or TWW can reasonably be expected to also include the handling, storage, or disposal of dioxins.

83.     In assessing cancer hazard from dioxins, it is safe to rely on a linear, no-threshold model for genotoxic chemicals. A linear no-threshold model for cancer risk assessment is a standard toxicological method used to assess cancer risk. For example, under the California Code of Regulations, the California Office of Environmental Health Hazard Assessment ("OEHHA") assumes that "the absence of a carcinogenic threshold dose shall be assumed and no-threshold models shall be utilized" when assessing cancer risk from a particular carcinogen. OEHHA has determined that, in the absence of convincing data which shows a threshold below which there is no risk of cancer, it is standard toxicological practice to assume no threshold exists for cancer hazard. Under the linear no-threshold model, exposure to extremely low levels of a carcinogen increases the quantitative risk of contracting cancer, even if that risk is very small. Based on currently existing published, peer reviewed studies, there is no significant evidence to show that there is a threshold below which there is no cancer risk from exposure to certain dioxins. Data exists which demonstrates biological effects of dioxins in the nanogram and picogram range, *i.e.*, at levels substantially below those previously found to be toxic for these chemicals.

84.     Based on a review of current, published, peer reviewed literature, dioxins, when discharged into an aquatic environment, can be ingested and concentrated in the fatty tissues of aquatic organisms. This literature demonstrates that dioxins bio-accumulate and bio-magnify in organisms. These chemicals degrade very slowly and they bind to fatty substances. What this means is that if a fish eats many microscopic organisms, each of which have ingested a low level of dioxin, the dioxins from each

microscopic organism will remain in the fatty tissues and fluids of the fish, resulting in a much greater concentration of these chemicals in the fish. Similarly, any fish that feeds on fish that have eaten microscopic organisms that have ingested dioxins will have even greater concentrations of these chemicals in its fatty tissues and fluids. This same bio-magnifying process applies up any food chain, especially resulting in high concentrations of these chemicals in the fatty tissues and fluids of animals at the top of an aquatic food chain, such as osprey, bald eagles, salmon, raccoons, bear, seals, whales and humans. This bio-magnified amount concentrated in fatty tissues and fluids is commonly referred to as the "body burden" of these chemicals.

85.     It is the generally accepted practice within the scientific community to assess the toxicological effects of dioxins based on the relative potencies of the individual dioxin congeners compared to the potency of the most potent toxic chemical of this class, 2,3,7,8 tetrachlorodibenzo-p-dioxin. These relative potencies have been set by various organizations including the WHO.

86.     An extensive body of literature on the carcinogenicity and developmental, reproductive and immunotoxicity of dioxins and related compounds in laboratory studies exists. These studies provide adequate evidence that 2,3,7,8 tetrachlorodibenzo-p-dioxin is a carcinogen in laboratory animals based on long-term bioassays conducted in both sexes of rats and mice. All studies have produced positive results, leading to the conclusion that tetrachlorodibenzo-p-dioxin is a multistage carcinogen increasing the incidence of tumors at sites distant from the site of treatment and at doses well below the maximum tolerated dose. 2,3,7,8 tetrachlorodibenzo-p-dioxin has been shown to be a carcinogen in hamsters, which are relatively resistant to the effects of dioxins. Recent data have shown 2,3,7,8 tetrachlorodibenzo-p-dioxin to be a liver carcinogen in small fish.

87.     Peer reviewed studies of human populations exposed to dioxins and related compounds has strengthened the inference, based on all the evidence from mechanistic, animal, and epidemiological studies that these compounds are appropriately characterized

as human carcinogens. The International Agency for Research on Cancer ("IARC"), the cancer research arm of the WHO, has classified 2,3,7,8 tetrachlorodibenzo-p-dioxin as a known human carcinogen. The IARC did this as part of a broadly and extensively peer reviewed process.

88.    Dioxins can cause developmental and reproductive toxicity in both animals and humans. The potential for dioxins and related compounds to cause reproductive and developmental toxicity in animals has been recognized for many years and there is extensive, peer reviewed literature regarding these effects.

89.    A wide variety of developmental events, crossing three vertebrate classes and several species within each class, can be perturbed by dioxins, suggesting that dioxins have the potential to disrupt a large number of critical developmental events at specific developmental stages. Some of these changes can disrupt organ system structure and irreversibly impair organ function. A general finding in fish, bird, and mammalian species is that the embryo or fetus is more sensitive to dioxins-induced mortality than the adult. In mammals, postnatal functional alterations involving learning behavior and the developing reproductive system are sensitive to prenatal dioxin exposure at low levels (in the parts per billion range or lower). The developing immune system is also highly sensitive to extremely low dioxins levels. Alterations in developing systems and diminished prenatal viability and growth have been observed at maternal dioxins body burdens and/or daily dioxins doses during gestation above 100 nanograms per kilogram of body weight in virtually every species tested. These doses of dioxins are not prenatally toxic. Higher dose levels can be demonstrated to result in prenatal mortality.

90.    Individual species vary in their sensitivity to any particular dioxins effect. The evidence available to date indicates that humans most likely fall in the middle of the range of sensitivity for individual effects among animals. In dioxins-exposed men, subtle changes in biochemistry and physiology, such as enzyme induction, altered levels of circulating reproductive hormones, or reduced glucose tolerance, have been detected in a limited number of available studies. These findings, coupled with knowledge derived

from animal experiments, suggest the potential for adverse impacts on human metabolism and developmental and/or reproductive biology and, perhaps other effects in the range of current human exposures at nanograms per kilogram (parts per trillion) levels. As body burdens of dioxins-like compounds increase, the probability and the severity, as well as the spectrum of human noncancer effects most likely increase. Hence, any additional increase in body burden of dioxins-like compounds increases the risk of harmful toxicological effects.

91.     The immune system is a particularly vulnerable target for the toxicity of dioxins. The ability of an animal to resist and/or control viral, bacterial, parasitic, and neoplastic diseases is determined by both nonspecific and specific immunological functions, which can be adversely affected by very low levels of dioxins in body tissues.

92.     Evidence has accumulated to demonstrate that the immune system is a target for toxicity of dioxins. The evidence has derived from numerous studies in various animal species. Animal studies suggest that some immunotoxic responses may be evoked at very low levels of dioxin exposure, which indicates the potential for similar risk to humans.

93.     In summary, exposure to dioxins can increase the body burden of these chemicals, particularly in species like humans who are at the top of long food chains. Any increase in body burdens of these chemicals increases the human risk of several toxic end points including cancer, developmental toxicity, reproductive toxicity, and possibly immunotoxicity. Because of the present high body burdens of these compounds in humans and wildlife, any increment in dosage will generate an increased risk of toxicity in humans. Because there is such a wide range of species of animals for which exposure to dioxins-like compounds has been shown to disrupt prenatal development and to cause embryo/fetal mortality, exposure to dioxins is likely to increase the risk of embryo/fetal mortality in fish, birds, and marine mammals. Exposure to dioxins can increase the risk that wildlife, including fish, birds, and mammals will suffer decreased immune system function, and thus bear an increased risk that they will contract, or

succumb to viral, bacterial, parasitic, and neoplastic infections and diseases. As body burdens of these chemicals increase, so does the risk that all of the above mentioned species will suffer the above referenced toxic endpoints.

94.     Because the toxic chemicals in the pentachlorophenol mixture used to treat the Poles and TWW are so long lived and because they bio-accumulate in living organisms and biomagnify up the food chain, many species, including fish, birds, amphibians, reptiles, and mammals, including humans, that participate in the food chain downstream of the Poles and TWW, bear an increased risk of suffering the toxic endpoints discussed above.

**B.     The Receiving Waters for Discharges of Pollutants from the Facilities.**

95.     The storm water that Hot Line discharges from the Facilities flows into various waterways used by humans and wildlife. In addition, the soils and sediments tracked from the Facilities are carried by storm water runoff into storm drains off-site that flow into various waterways used by humans and wildlife. These uses are described in the paragraphs below. Given the toxicity of the pentachlorophenol, dioxins, and other pollutants in the wastes handled, stored, and disposed of at the Facilities, and present in the storm water runoff from the Facilities and/or in storm water from areas off-site to which soils and sediments from the Facilities have been tracked, such runoff impairs or places at risk the uses described below in a fashion that may present an imminent and substantial endangerment to human health and the environment.

**1.     The Goleta Slough and Related Waters.**

96.     With respect to the Hot Line Facility located at 701 Robert Keister Road, Santa Barbara, California (the "Santa Barbara Facility"), the Santa Barbara Facility discharges to the MS4, which flows to San Pedro Creek, Carneros Creek, Tecolotito

Creek, the Goleta Slough[5], Goleta Beach, and the Pacific Ocean. The principal resources affected by Hot Line's discharges from the Santa Barbara Facility are San Pedro Creek, Carneros Creek, Tecolotito Creek, Goleta Beach Park, the Goleta Slough, and the Pacific Ocean, and their attendant salt marshes, wetlands, and nearby land habitat, and the Santa Barbara Facility itself to the extent it is frequented by birds and other species.

97.     The Goleta Slough and the area immediately surrounding it, in the area downstream from the discharge point for the Santa Barbara Facility, contains a variety of habitat types, including: estuarine, riverine, and palustrine wetlands; coastal bluff scrub; introduced grassland; coastal sage scrub; and Southern coastal oak woodland. Species that inhabit the Goleta Slough and the area immediately surrounding it in the area downstream from the discharge point for the Santa Barbara Facility include ducks, shorebirds, rails, herons, raptors, mice, voles, raccoons, weasels, skunk, snakes, and invertebrates. The Goleta Slough and the area of Carneros Creek and Tecolotito Creek downstream from the discharge point from the Santa Barbara Facility is designated critical habitat for the tidewater goby, a small fish native to lagoons of the California coast, which is listed as threatened under the Endangered Species Act, 16 U.S.C. § 1531 *et seq*. ("ESA"). Goleta Beach Park and the area immediately surrounding it downstream from the discharge point for the Santa Barbara Facility serve as seasonal habitat for the western snowy plover, an endangered coastal bird species.

98.     The Goleta Slough and Goleta Beach, downstream from the discharge point for the Santa Barbara Facility, are important recreational areas. Goleta Slough, downstream from the discharge point for the Santa Barbara Facility, is a popular location for kayaking, paddle boarding, swimming, bird watching, walking, hiking, bike riding, and other forms of outdoor recreational activity. Goleta Beach, downstream from the

---

[5] Unless otherwise noted, as used herein, the term "Goleta Slough" means the slough and the portions thereof with separate regulatory status, such as the Goleta Slough State Marine Conservation Area, and their attendant salt marshes, wetlands, and nearby land habitat.

discharge point for the Santa Barbara Facility, is used for swimming, fishing, surfing, walking, bird watching, and general enjoyment of the beach. In addition, the Goleta Pier, which is located at Goleta Beach downstream from the discharge point for the Santa Barbara Facility, is used for fishing.

99.    The Region 3 Basin Plan identifies the following beneficial uses for the Goleta Slough: Water Contact Recreation; Non-Contact Water Recreation; Wildlife Habitat; Warm Fresh Water Habitat; Migration of Aquatic Organisms; Spawning, Reproduction, and/or Early Development; Preservation of Biological Habitats of Significance; Rare, Threatened, or Endangered Species; and Estuarine Habitat.

100.    The Region 3 Basin Plan identifies the following beneficial uses for San Pedro Creek:  Municipal and Domestic Supply, Agricultural Supply, Groundwater Recharge, Water Contact Recreation, Non-Contact Water Recreation, Wildlife Habitat, Warm Fresh Water Habitat, Migration of Aquatic Organisms, Fresh Water Replenishment, and Commercial and Sport Fishing.

101.    The Region 3 Basin Plan identifies the following beneficial uses for Carneros Creek: Municipal and Domestic Supply, Agricultural Supply, Groundwater Recharge, Water Contact Recreation, Non-Contact Water Recreation, Wildlife Habitat, Warm Fresh Water Habitat, and Cold Fresh Water Habitat.

102.    The Region 3 Basin Plan identifies the following beneficial uses for Tecolotito Creek: Municipal and Domestic Supply, Groundwater Recharge, Water Contact Recreation, Non-Contact Water Recreation, Wildlife Habitat, Cold Fresh Water Habitat, Warm Fresh Water Habitat, Migration of Aquatic Organisms, Fresh Water Replenishment, and Commercial and Sport Fishing.

### 2.    The Santa Clara River and Related Waters.

103.    With respect to the Hot Line Facility located immediately adjacent to the SCE Pardee Substation Helistop, Santa Clarita, California (and located within the larger SCE premises) ("Santa Clarita Facility"), the Santa Clarita Facility discharges to the MS4, which flows to the Santa Clara River, which flows to McGrath State Beach and

Campground, the Santa Clara Estuary, and the Pacific Ocean.

104.   The principal resources affected by Hot Line's discharges from the Santa Clarita Facility are the Santa Clara River, McGrath State Beach and Campground, the Santa Clara Estuary, and the Pacific Ocean, and their attendant salt marshes, wetlands, and nearby land habitat, and the Santa Clarita Facility itself to the extent it is frequented by birds and other species.

105.   The Santa Clara River is one of the last rivers in Southern California that remains relatively natural. The Santa Clara River and its floodplain in the area downstream from the discharge point from the Santa Clarita Facility provide shelter and food for endangered fish and birds, including the least Bell's vireo, a bird species listed under the ESA that uses the Santa Clara River for nesting during the breeding season, and the southwestern willow flycatcher, a bird species listed under the ESA. The Santa Clara River and its floodplain in the area downstream from the discharge point from the Santa Clarita Facility are also used by reptiles (including the California coast horned lizard, a California species of special concern), and amphibians, including the California red legged frog, an ESA listed species. This area is also used by a variety of other species, including coyotes, bobcats, rabbits, mountain lions and black bears. The Santa Clara River in the area downstream from the discharge points from the Santa Clarita Facility is a priority site for recovery of Southern California Steelhead, as one of the most likely to sustain independently viable populations, and as critical for ensuring viability of the species as a whole. In addition to steelhead, many other special-status wildlife, fish, and avian species have also been documented at the Santa Clara River Estuary, which is downstream from the discharge points from the Santa Clarita Facility, including but not limited to tidewater goby, California least tern, and the western snowy plover. McGrath State Beach and Campground, which is downstream from the discharge points from the Santa Clarita Facility, is also important habitat for a variety of plant and animal species, being situated at the intersection of nine important ecosystems. These ecosystems include the Pacific Ocean, sandy beach, coastal dunes, and McGrath Lake – a coastal freshwater

back dune lake, riparian woodland, freshwater marsh, and brackish marsh.

106.   The Region 4 Basin Plan identifies the following beneficial uses for the Santa Clara River: Municipal and Domestic Supply; Industrial Service Supply; Industrial Process Supply; Agricultural Supply; Groundwater Recharge; Fresh Water Replenishment; Commercial and Sport Fishing; Cold Fresh Water Habitat; Warm Fresh Water Habitat; Estuarine Habitat; Marine Habitat; Wildlife Habitat; Preservation of Biological Habitats of Significance; Rare, Threatened, or Endangered Species; Migration of Aquatic Organisms; Spawning, Reproduction, and/or Early Development; and Wetland Habitat.

## VI.   Use and Enjoyment of the Affected Areas by EcoRights, Channelkeeper, and Their Members.

107.   Many of EcoRights' and Channelkeeper's members, employees and volunteers live in and around the areas described in the above paragraphs that are adversely impacted by polluted storm water discharges from the Facilities and contaminated soils and sediments tracked from the Facilities and carried by storm water runoff into storm drains off-site that flow into various waterways. The Plaintiffs' members, employees and volunteers work at jobs they perform in close proximity to the areas adversely impacted by polluted storm water discharges from the Facilities and contaminated soils and sediments tracked off of the Facilities.

108.   EcoRights and Channelkeeper members, employees and volunteers fish in the Pacific Ocean off the Goleta Pier, which receives polluted storm water discharges from, and contaminated soils and sediments tracked off of, the Santa Barbara Facility. EcoRights and Channelkeeper members, employees and volunteers have concrete plans to continue to do so in the future.

109.   EcoRights and Channelkeeper members, employees and volunteers travel to the areas and waters adversely affected by polluted storm water discharges from, and contaminated soils and sediments tracked off of, the Facilities, including the Goleta Slough, San Pedro Creek, and the Santa Clara River Estuary, to watch wildlife such as

birds, fish, mammals, reptiles, and amphibians. EcoRights and Channelkeeper members, employees and volunteers have concrete plans to travel in the future to watch these birds and other wildlife such as fish, mammals, reptiles, and amphibians.

110.  For example, EcoRights members regularly visit the Santa Clara River Estuary, located downstream from the discharge point for the Santa Clarita Facility, to conduct bird watching and to volunteer to lead hikes on behalf of the Ventura Audubon Society. Chemicals discharged from the Facilities, and present in the soils and sediments tracked off of the Facilities, including dioxins, are highly toxic to the reproductive health and viability of the species of birds and other wildlife that EcoRights and Channelkeeper members enjoy during their visits to these locations.

111.  The Plaintiffs' members, employees and volunteers have used, use and will in the future use the waters and their near shorelines, which are adversely affected by polluted storm water discharges from, and contaminated soils and sediments tracked off of, the Facilities, for numerous recreational purposes. The areas used for these recreational purposes include the Goleta Slough, Carneros Creek, San Pedro Creek, Santa Clara River Estuary, and the Pacific Ocean. The Plaintiffs' members, employees and volunteers have concrete plans to continue to make use of these areas in the future. The Plaintiffs' members, employees and volunteers kayak and paddle board within Goleta Slough and have concrete plans to continue to do so in the future. The Plaintiffs' members, employees and volunteers sail and boat within Goleta Slough and have concrete plans to continue to do so in the future. Plaintiffs' members, employees and volunteers swim in the ocean at the beach immediately adjacent to the mouth of the Santa Clara River Estuary, in the Goleta Slough, and at Goleta Beach (and surf at Goleta Beach and at the mouth of the Santa Clara River Estuary), and have concrete plans to continue to do so in the future. Plaintiffs' members, employees and volunteers enjoy spending time at the beach at Goleta Beach, the beach immediately adjacent to the mouth of the Santa Clara River Estuary and have concrete plans to continue to do so in the future. Plaintiffs' members, employees and volunteers bicycle along the shoreline of the affected waters,

including the Goleta Slough, San Pedro Creek, and Newport Bay, and have concrete plans to continue to do so in the future. Plaintiffs' members, employees and volunteers jog and walk their dogs along the shoreline of the affected waters and have concrete plans to continue to do so in the future. Plaintiffs' members, employees and volunteers drive along the shorelines of the areas and on bridges over them, including along Newport Bay,

112.   The Plaintiffs' members use the affected areas for scientific research and study. EcoRights members participate in a professional capacity in water quality monitoring and sampling within the Santa Clara River and the Santa Clara Estuary, in each case, downstream of the location where the Santa Clarita Facility discharges to the Santa Clara River. As part of these efforts, EcoRights members regularly travel to these areas, collect water samples and have them analyzed for use in monitoring the health and condition of these areas. As part of this process, EcoRights members invariably come into contact with water from the Santa Clara River and its tributaries. This water contacts their skin.

113.   During these visits, Plaintiffs' members track the presence of important species of plants and animals, including rare and endangered species of birds, fish, reptiles, and amphibians, for conservation purposes. These members also observe the presence of birds, fish, reptiles, and amphibians for aesthetic purposes. These observations provide great personal enjoyment and enrichment to Plaintiffs' members.

114.   Channelkeeper members participate in a professional capacity in water quality monitoring and sampling within the Goleta Slough downstream of the location where the Santa Barbara Facility discharge to Goleta Slough. As part of these efforts, Channelkeeper members regularly travel to these areas, collect water samples and have them analyzed for use in monitoring the health and condition of these areas. As part of this process, Channelkeeper personnel and volunteers invariably come into contact with water from Goleta Slough and its tributaries, including Carneros Creek and Tecolotito Creek. This water contacts their skin.

115.   EcoRights and Channelkeeper members, employees and volunteers have an

economic stake in the environmental quality of the affected areas. EcoRights and Channelkeeper members, employees and volunteers own or rent real property in close proximity to Goleta Slough, San Pedro Creek, Goleta Beach, and the Santa Clara River. EcoRights and Channelkeeper members, employees and volunteers spend money on gas in order to be in close proximity to Goleta Slough, Goleta Beach, and the Santa Clara River Estuary. EcoRights and Channelkeeper members, employees and volunteers attach monetary value to their health and to their appreciation of the natural environment. They have spent money on both. EcoRights and Channelkeeper members, employees and volunteers have spent money to travel to places where they are able to fish, bird watch, observe marine mammals, and obtain a general aesthetic and spiritual sense of a healthy, clean, natural environment. Human health and aesthetic and spiritual enjoyment of the natural environment have a real dollar and cents value for EcoRights and Channelkeeper members, employees and volunteers. EcoRights and Channelkeeper members have spent money to rent, buy and maintain equipment, such as kayaks and paddle boards, that they take out on Goleta Slough.

116.   Channelkeeper administers monitoring and educational programs focusing on Marine Protected Areas ("MPAs") off the Santa Barbara coast, including the Campus Point MPA located very near Goleta Slough. These programs include the Channelkeeper MPA Watch program. The MPA Watch program trains and engages volunteers to help record and track human activities in and adjacent to the MPAs off the Santa Barbara coast, including Campus Point MPA. As part of the MPA Watch program, Channelkeeper members, employees and volunteers travel to and tour the Campus Point MPA aboard the *R/V Channelkeeper*, a 31-foot JC lobster boat that serves as Channelkeeper's research vessel. The data collected by MPA Watch is critical in providing context for and facilitating interpretation of biological monitoring data, while also identifying any social and economic benefits that result from MPAs (*i.e.*, from increased recreation and tourism). The MPA Watch program also aids compliance and enforcement efforts to ensure that MPA regulations are followed.

117.    Channelkeeper's MPA-related programs serve to engage the community and raise awareness to promote stewardship of MPAs. A function of these MPA tours is to attract new members to Channelkeeper's programs. New members contribute financially to the organization. They also provide volunteer labor that helps the organization meet its goals of patrolling and protecting the affected waters, its tributaries, and nearby parts of the Pacific coast, and maintaining Channelkeeper's property, including the *R/V Channelkeeper*.

118.    Since well before the filing of the complaint in this action, Channelkeeper has monitored water quality according to an annual schedule. These water quality monitoring programs include the water quality monitoring described above taking place within Goleta Slough. Channelkeeper has concrete plans to continue this annual monitoring schedule at designated times for years to come. Channelkeeper personnel and volunteers take water samples at sites within Goleta Slough and have them analyzed. As part of this process, Channelkeeper personnel and volunteers invariably come into contact with water from Goleta Slough and its tributaries, including Carneros Creek and Tecolotito Creek. This water contacts their skin.

119.    EcoRights and Channelkeeper members, paid staff and volunteers who work for EcoRights and Channelkeeper also come into contact with the water and suspended sediment when they kayak and paddle board within Goleta Slough. EcoRights and Channelkeeper members, paid staff and volunteers who work for EcoRights and Channelkeeper also come into contact with the water and suspended sediment when they swim in the ocean at the beach immediately adjacent to the mouth of the Santa Clara River Estuary, in the Goleta Slough, and at Goleta Beach.

**VII.   How Hot Line's Toxic Discharges Cause Harm to the Interests of EcoRights, Channelkeeper, and Their Members.**

120.    The environment that Plaintiffs' members, employees and volunteers enjoy in the areas downstream of the discharge points from the Facilities is harmed by Hot Line's discharges of pollutants and disposal of toxic solid waste from the Facilities that

then flow into receiving waters. The health of Plaintiffs' members, employees and volunteers further may be endangered by these discharges. Hot Line's discharges of pollutants/disposal of solid waste from the Facilities is a public and private nuisance within the meaning of Cal. Civ. Code § 3470 in that Hot Line's discharges are "injurious to health, are indecent or offensive to the senses, and interfere with the comfortable enjoyment of life and property." By discharging contaminated storm water/disposing of toxic solid waste from their Facilities in an improper and illegal manner, Hot Line has externalized a cost of their business and forced that cost onto the people who live in and around the affected areas, including EcoRights and Channelkeeper members, employees and volunteers. The disposal of solid waste and the discharge of pollutants from Hot Line's Facilities has diminished the value of real property in and around the affected areas. This reduces the value of real property that EcoRights and Channelkeeper's members own in the areas impacted by the discharges from the Facilities.

121.   Discharges of pollutants and disposal of toxic solid waste from the Facilities contributes to the degradation of the local aquatic environments in the affected areas and inhibits their recovery. Hot Line's discharge of pollutants from the Facilities threatens and impairs the viability of fish and aquatic species of all trophic levels: minnows; tidewater goby; halibut; marine mammals such as otters, seals, and sea lions; and water birds such as kingfishers, brown pelicans, ducks, geese, bald eagles and cormorants. Defendant's discharges of pollutants to the affected waters threatens the viability, contributes to the impairment, and inhibits the recovery of these valuable natural resources.

122.   This in turn makes less secure an important source of revenue and volunteer labor for Channelkeeper. The less wildlife to observe, the less desirable are Channelkeeper's MPA tours at Campus Point MPA near the Goleta Slough, which in turn means that Channelkeeper has less opportunity to gain revenue and volunteer labor via this method it uses to attract new members and volunteers.

123.    When EcoRights and Channelkeeper's members experience the affected areas as they regularly drive, walk, jog, dog walk, hike, and bicycle along those water bodies, and kayak, swim, surf, bodysurf, and paddle board in these water bodies – now and concretely in the future – their knowledge that the areas are polluted by Hot Line's discharges disturbs them, causes them emotional pain, and thus diminishes the aesthetic, emotional and spiritual enjoyment they would otherwise obtain from viewing and contemplating the affected waters. This is one way that Hot Line's pollution of these areas harms EcoRights' and Channelkeeper's members – it causes them emotional distress. When EcoRights' and Channelkeeper's members observe aquatic wildlife in, or birds in flight above, the areas impacted by Hot Line's discharges, their recreational and spiritual enjoyment of this wildlife is diminished by knowing that the areas are polluted by Hot Line's discharges and that local wildlife is being harmed by this pollution. EcoRights' and Channelkeeper's members' enjoyment value is diminished relative to the cost of living (or visiting) the impacted areas. In this way, pollution of the impacted areas cheats EcoRights and Channelkeeper members out of some of the value they would otherwise obtain from the money they spend on their mortgages, rent, and automobiles. Pollution of the impacted areas interferes with the quiet enjoyment that EcoRights and Channelkeeper members would otherwise obtain from their property, both real and personal.

124.    Because the Plaintiffs' members, employees and volunteers come into contact with the water and sediments in the affected waters, pollution from the Facilities increases the risk that their skin will come directly into contact with dioxins and other pollutants. This increases the risk that Plaintiffs' staff and volunteers will ingest or absorb dioxins that have been discharged from the Facilities. As a result of Hot Line's illegal discharges of contaminated storm water/toxic solid waste from their Facilities, Plaintiffs' members, employees and volunteers – when working for Plaintiffs or when recreating on, in, or around the affected waters – face increased risk of suffering toxic endpoints caused by exposure to dioxins, as described above.

125.    Some EcoRights and Channelkeeper members, employees and volunteers have attempted to reduce this risk by altering their behavior – by wearing gloves, protective clothing, or avoiding water contact. Typically, other EcoRights and Channelkeeper members and volunteers do not alter their behavior, and simply bear the increased risk of suffering the toxic endpoints discussed above. Either way, EcoRights and Channelkeeper members, employees and volunteers bear a cost that Hot Line has improperly externalized and imposed on them through its illegal discharge of pollutants and disposal of solid waste into the affected environments.

126.    Goleta Slough and Goleta Beach near the Goleta Pier is home to several species of fish and shellfish that are or could be local food sources for EcoRights and Channelkeeper members and volunteers. These species include perch, mackerel, bass, and halibut, mussels, and clams. EcoRights and Channelkeeper members and volunteers catch and eat fish that have been resident in water, and that have consumed prey, that is polluted in part by solid waste that Hot Line has discharged from their Facilities. The bio-accumulation and bio-magnification processes described above, help carry Hot Line's persistent toxics – such as dioxins – up the food chain. Some EcoRights and Channelkeeper members, employees and volunteers avoid consuming, or reduce their consumption of these local fish in order to avoid or reduce the risk of suffering the dioxins-associated toxic endpoints discussed above. Typically, other EcoRights and Channelkeeper members and volunteers – despite elevated risk and diminished enjoyment – simply bear that risk and do not alter their consumption of these local fish. Either way, EcoRights and Channelkeeper members, employees and volunteers bear a cost that Hot Line has externalized and imposed on them through their illegal discharge of pollutants and disposal of toxic solid waste into the affected environments.

**VIII.  How this Action Redresses the Harm Hot Line Cause to EcoRights, Channelkeeper, and Their Members.**

127.    Hot Line's unpermitted discharges of pollutants to the affected areas, and its disposal of toxic solid waste, makes the affected areas less beautiful, less healthy, less

safe, less secure, less enjoyable, less emotionally and spiritually fulfilling, and less economically valuable than would be the case if Hot Line complied with the CWA and RCRA at the Facilities. This is a cost that Hot Line has improperly externalized onto the people who live in the affected areas, including those EcoRights and Channelkeeper members, employees and volunteers who live in those areas. This has harmed EcoRights and Channelkeeper members' real and personal property, their economic interests, their personal senses of emotional and spiritual well-being, and their personal senses of human dignity. Were Hot Line required to comply with the CWA and RCRA – the principal objective of Plaintiffs' citizen suit – then these externalities would gradually be reduced or eliminated. If Plaintiffs are successful in this action Hot Line will be required to bring its discharges from the Facility to waters of the United States into compliance with the CWA and thus reduce its discharges of pollutants to the affected receiving waters. This would benefit EcoRights and Channelkeeper's members, employees and volunteers in reducing the harms and the externalities – outlined above – that they currently suffer as a result of Hot Line's discharge of pollutants from the Facilities.

## CLAIMS

### FIRST CLAIM FOR RELIEF

### Discharges of Contaminated Storm Water Without NPDES Permit Authorization in Violation of 33 U.S.C. § 1311(a)

128. Plaintiffs re-allege and incorporate all the preceding paragraphs as if fully set forth herein.

129. CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless authorized by the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

130. Hot Line does not have NPDES permit authorization for storm water discharges from the Facilities into waters of the United States.

131. Since November 26, 2014, Hot Line has been discharging polluted storm water from the Facilities without NPDES permit authorization during every significant

rain event (*i.e.*, all rainfall events generating 0.1 inches or more of rain) in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

132. Hot Line will continue to be in violation of CWA section 301(a)'s discharge prohibition each day the discharge storm water from the Facilities without obtaining an NPDES permit.

133. Each day since November 26, 2014 that Hot Line has discharged pollutants in storm water without an NPDES permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

134. By committing the acts and omissions alleged above, Hot Line is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

135. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and Plaintiffs' members, for which harm it has no plain, speedy or adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### Violation of RCRA
### 42 U.S.C. § 6972(a)(1)(B)

136. Plaintiffs re-allege and incorporate all the preceding paragraphs as if fully set forth herein.

137. Through its ownership and operation of the Facilities, Hot Line is a past and present generator of solid waste. Hot Line has contributed and is contributing to the past and present handling, storage, treatment, transportation and disposal of solid waste at the Facilities in a manner that may present an imminent and substantial endangerment to health and the environment.

138. An action for relief against Hot Line for the imminent and substantial endangerment described in this Complaint is authorized by RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). Hot Line's acts and omissions that may be posing an

imminent and substantial endangerment within the meaning of RCRA section 702(a)(1)(B), as alleged above, are continuing. If allowed to continue, these acts and omissions will irreparably harm Plaintiff.

## REMEDY

139.   Plaintiffs have no plain, speedy, and adequate remedy, in the ordinary course of law, other than the relief sought in this Complaint, because there is no other mechanism for compelling Hot Line to take the action necessary under the CWA and RCRA to abate its unlawful discharges of pollutants to waters of the United States and handling, storage, and disposal of solid waste that may be posing an imminent and substantial endangerment to health and the environment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court grant the following relief:

a.   Declare that Hot Line has violated and is in continued violation of the CWA and RCRA as alleged herein;

b.   Enjoin Hot Line from discharging pollutants from the Facilities to waters of the United States and from handling, storing, or disposing of solid wastes in a manner that may pose an imminent and substantial endangerment to health and the environment;

c.   Enjoin Hot Line to apply for and secure NPDES permit authorization under the General Permit or an individual NPDES permit;

d.   Enjoin Hot Line from violating the substantive and procedural requirements of the CWA, General Permit, or an individual NPDES permit, as applicable;

e.   Order Hot Line to pay civil penalties of $37,500 per day per violation for all CWA violations occurring from November 26, 2014 to November 2, 2015, and of $54,833 per day per violation for all CWA violations occurring after November 2, 2015 pursuant to section 309(d) of the Clean Water Act, 33 U.S.C. §1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

f.      Award Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, in accord with CWA section 505(d), 33 U.S.C. § 1365(d), and RCRA section 7002(f), 42 U.S.C. § 6972(f); and

g.      Award such other relief as this Court may deem appropriate.


Dated: May 29, 2020                    Respectfully submitted,

                                       *Christopher A. Sproul*

              By:

                                       Christopher Sproul
                                       Counsel for Ecological Rights Foundation and
                                       Santa Barbara Channelkeeper

# **TABLE 1**

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| 1. | 3 / Central Coast | 103 David Love Place, Goleta, CA 93117 | San Pedro Creek; Carneros Creek; Tecolotito Creek | San Pedro Creek: MUN, AGR, GWR, REC-1, REC-2, WILD, COLD, WARM, MIGR, FRSH, COMM<br><br>Carneros Creek: (not found in Basin Plan - see Tecolotito Creek)<br><br>Tecolotito Creek: MUN, GWR, REC-1, REC-2, WILD, COLD, WARM, MIGR, FRSH, COMM | San Pedro Creek; Carneros Creek; Goleta Beach Park; Goleta Slough State Marine Conservation Area; Pacific Ocean |
| 2. | 3 / Central Coast | 701 Robert Keister Road, Santa Barbara, CA 93117 | San Pedro Creek; Carneros Creek; Tecolotito Creek | San Pedro Creek: MUN, AGR, GWR, REC-1, REC-2, WILD, COLD, WARM, MIGR, FRSH, COMM<br><br>Carneros Creek: (not found in Basin | San Pedro Creek; Carneros Creek; Goleta Beach Park; Goleta Slough State Marine Conservation Area; Pacific Ocean |

[1] MUN = Municipal and Domestic Supply; AGR = Agricultural Supply; PROC = Industrial Process Supply; IND = Industrial Service Supply; GWR = Groundwater Recharge; FRSH = Fresh Water Replenishment; NAV = Navigation; POW = Hydropower Generator; REC-1 = Water Contact Recreation; REC-2 = Non-Contact Water Recreation; COMM = Commercial and Sport Fishing; AQUA = Aquaculture; WARM = Warm Fresh Water Habitat; COLD = Cold Fresh Water Habitat; SAL = Inland Saline Water Habitat; MAR = Marine Habitat; WILD = Wildlife Habitat; BIOL = Preservation of Biological Habitats of Significance; RARE = Rare, Threatened, or Endangered Species; MIGR = Migration of Aquatic Organisms; SPWN = Spawning, Reproduction, and/or Early Development; SHELL = Shellfish Harvesting; WET = Wetland Habitat.

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| | | | | Plan - see Tecolotito Creek) Tecolotito Creek: MUN, GWR, REC-1, REC-2, WILD, COLD, WARM, MIGR, FRSH, COMM | |
| 3. | 4 / Los Angeles | SCE Pardee Substation Helistop, Santa Clarita, CA 91355 | Santa Clara River | Santa Clara River: MUN, IND, PROC, AGR, GWR, FRSH, COMM, WARM, COLD, EST, MAR, WILD, BIOL, RARE, MIGR, SPWN, WET | Santa Clara River; McGrath State Beach and Campground; Santa Clara Estuary Natural Preserve; Pacific Ocean |
| 4. | 4 / Los Angeles | 10060 Telegraph Road, Ventura, CA 93004 | Brown Barranca; Santa Clara River | Brown Barranca: MUN, IND, PROC, AGR, GWR, FRSH, COMM, WARM, COLD, EST, MAR, WILD, BIOL, RARE, MIGR, SPWN, WET  Santa Clara River: MUN, IND, PROC, AGR, GWR, FRSH, COMM, WARM, COLD, EST, MAR, WILD, BIOL, RARE, MIGR, SPWN, WET | Brown Barranca; Santa Clara River; McGrath State Beach and Campground; Santa Clara Estuary Natural Preserve; Pacific Ocean |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| 5. | 8 / Santa Ana | 1325 & 1241 S Grand Ave, Santa Ana, CA 92705 | San Diego Creek; Tustin Channel; Peters Canyon Channel; Santa Ana River | San Diego Creek: GWR, REC-1, REC-2, WARM, WILD, RARE, EST<br><br>Peters Canyon Channel: AGR, REC-1, REC-2, WARM, WILD, RARE<br><br>Santa Ana River: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN<br><br>Tustin Channel: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN | San Diego Creek; Santa Ana River; Peters Canyon Trail; Peters Canyon Channel; Irvine Ranch Water District San Joaquin Marsh and Wildlife Sanctuary; Bonita Creek; Upper Newport Bay State Marine Conservation Area; The Narrows; Lower Newport Bay; Newport Harbor; Newport Beach; Pacific Ocean |
| 6. | 4 / Los Angeles | 1721 22nd St, Santa Monica, CA 90404 | Ballona Creek (via MS4) | Ballona Creek: NAV, AQUA, EST, MAR, WILD, RARE, MIGR, SPWN, SHELL, WET | Ballona Creek; Ballona Wetlands Ecological Reserve; Marina Del Rey; Ballona Lagoon; Del Rey Lagoon; Venice Beach; Pacific Ocean |
| 7. | 8 / Santa Ana | 1351 E Francis St, Ontario, CA 91761 | Cucamonga Creek (via MS4); Santa Ana River | Cucamonga Creek: MUN, IND, PROC, GWR, POW, REC-1, REC-2, (luke)WARM, COLD, WILD, RARE, SPWN<br><br>Santa Ana River: MUN, AGR, IND, | Cucamonga Creek; Santa Ana River; Prado Reservoir and wetlands; Santa Ana Rivermouth; Huntington State Beach; Pacific Ocean |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| | | | | GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN | |
| 8. | 8 / Santa Ana | 1851 W Valencia Dr, Fullerton, CA 92833 | Fullerton Creek; Coyote Creek; San Gabriel River | Fullerton Creek: REC-1, REC-2, WARM, WILD  Coyote Creek: MUN, REC-1, REC-2, WARM, WILD, RARE  San Gabriel River: IND, AGR, GWR, FRSH, COMM, WARM, COLD, EST, MAR, WILD, RARE, MIGR, SPWN, WET | San Gabriel River; Seal Beach; Belmont Shore Beach; Pacific Ocean |
| 9. | 4 / Los Angeles | 13025 Los Angeles St, Irwindale, CA 91706 | San Gabriel River | San Gabriel River: IND, AGR, GWR, FRSH, COMM, WARM, COLD, EST, MAR, WILD, RARE, MIGR, SPWN, WET | San Gabriel River; Seal Beach; Belmont Shore Beach; Pacific Ocean |
| 10. | 4 / Los Angeles | 2800 E Willow St, Long Beach, CA 90806 | Los Cerritos Channel | Los Cerritos Channel: IND, NAV, COMM, SAL, EST, WILD, RARE, MIGR, SPWN, SHELL, WET | Los Cerritos Channel; Alamitos Bay; San Gabriel Rivermouth; Seal Beach; Belmont Shore Beach; Pacific Ocean |
| 11. | 4 / Los Angeles | 9901 Geary Ave, Santa Fe Springs, CA 90670 | San Gabriel River | San Gabriel River: IND, AGR, GWR, FRSH, COMM, WARM, COLD, | San Gabriel River; Seal Beach; Belmont Shore Beach; Pacific Ocean |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| | | | | EST, MAR, WILD, RARE, MIGR, SPWN, WET | |
| 12. | 4 / Los Angeles | 3589 Foothill Dr, Thousand Oaks, CA 91361 | Malibu Creek; Westlake Lake; Santa Clara River | Malibu Creek: WARM, COLD, WILD, RARE, MIGR, SPWN, WET<br><br>Westlake Lake: NAV, WARM, WILD<br><br>Santa Clara River: MUN, IND, PROC, AGR, GWR, FRSH, COMM, WARM, COLD, EST, MAR, WILD, BIOL, RARE, MIGR, SPWN, WET | Malibu Creek; Westlake Lake; Santa Clara River; McGrath State Beach and Campground; Santa Clara Estuary Natural Preserve; Pacific Ocean |
| 13. | 6V / Lahontan | 12353 Hesperia Rd, Victorville, CA 92395 | Mojave River; Spring Valley Lake | Mojave River: MUN, AGR, GWR, REC-1, REC-2, COMM, WARM, COLD, WILD, SPWN<br><br>Spring Valley Lake: MUN, AGR, GWR, REC-1, REC-2, COMM, WARM, COLD, WILD, SPWN | Mojave River; Mojave River Narrows Regional Park |
| 14. | 4 / Los Angeles | 1924 E Cashdan St, Compton, CA 90220 | Compton Creek; Los Angeles River | Compton Creek: GWR, WARM, WILD, WET | Compton Creek; Los Angeles River; Pacific Ocean |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| | | | | Los Angeles River: MUN, IND, PROC, GWR, NAV, COMM, WARM, COLD, EST, MAR, WILD, RARE, MIGR, SPWN, WET | |
| 15. | 4 / Los Angeles | 800 W Cienega Ave, San Dimas, CA 91773 | San Dimas Wash; San Gabriel River | San Dimas Wash: MUN, GWR, WARM, COLD, WILD, RARE, WET<br><br>San Gabriel River: IND, AGR, GWR, FRSH, COMM, WARM, COLD, EST, MAR, WILD, RARE, MIGR, SPWN, WET | San Gabriel River; Seal Beach; Belmont Shore Beach; Pacific Ocean |
| 16. | 4 / Los Angeles | 1440 S California Ave, Monrovia, CA 91016 | Santa Anita Wash; Sawpit Wash; Rio Hondo; Los Angeles River | Santa Anita Wash: GWR, WARM, WILD, RARE<br><br>Sawpit Wash: WILD<br><br>Rio Hondo: GWR, WARM, WILD, RARE, WET<br><br>Los Angeles River: MUN, IND, PROC, GWR, NAV, COMM, WARM, COLD, EST, MAR, WILD, RARE, | Rio Hondo; Mungi Lake; Pacific Ocean |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| | | | | MIGR, SPWN, WET | |
| 17. | 6V / Lahontan | 42060 10th St W, Lancaster, CA 93534 | Lancaster MS4; Amargosa Creek | Lancaster MS4: MUN, AGR, GWR, FRSH, REC-1, REC-2, COMM, WARM, COLD, SAL, WILD, BIOL, RARE, WQE, FLD<br><br>Amargosa Creek: MUN, AGR, GWR, FRSH, REC-1, REC-2, COMM, WARM, COLD, WILD | Amargosa Creek; Pacific Ocean |
| 18. | 9 / San Diego | 24487 Prielipp Rd, Wildomar, CA 92595 | Warm Springs Creek; Murrieta Creek; Santa Margarita River | Murrieta Creek: MUN, AGR, IND, PROC, GWR, REC-2, WARM, WILD | Warm Springs Creek; Murrieta Creek; Santa Margarita River; Pacific Ocean |
| 19. | 8 / Santa Ana | 7333 Bolsa Ave, Westminster, CA 92683 | Westminster Channel; Bolsa Chica Channel; Huntington Harbor; Bolsa Bay | Westminster Channel: REC-1, REC-2, BIOL, WILD, RARE, SPWN, MAR, EST<br><br>Bolsa Chica Channel: REC-1, REC-2, BIOL, WILD, RARE, SPWN, MAR, EST<br><br>Huntington Harbor: NAV, REC-1, REC-2, COMM, WILD, RARE, SPWN, MAR | Huntington Harbor; Bolsa Bay; Bolsa Chica Ecological Reserve; Bolsa Chica Basin State Marine Conservation Area; Bolsa Bay State Marine Conservation Area; Bolsa Chica basin and Bolsa Chica wetlands; Bolsa Chica State Beach; Sunset Beach; Seal Beach National Wildlife Refuge; Pacific Ocean |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| | | | | Bolsa Bay: REC-1, REC-2, COMM, BIOL, WILD, RARE, SPWN, MAR, SHELL | |
| 20. | 6V / Lahontan | 26364 Pine Ave, Rimforest, CA 92378 | West Fork City Creek; East Twin Creek; Highland Creek; Santa Ana River | West Fork City Creek: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN<br><br>East Twin Creek: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN<br><br>Highland Creek: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN<br><br>Santa Ana River: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN | West Fork City Creek; East Twin Creek; Highland Creek; Santa Ana River; Prado Reservoir and wetlands; Santa Ana Rivermouth; Huntington State Beach; Pacific Ocean |
| 21. | 4 / Los Angeles | 505 Maple Ave, Torrance, CA 90503 | Dominguez Channel; Los Angeles Harbor | Dominguez Channel: COMM, EST, MAR, WILD, RARE, MIGR, SPWN<br><br>Los Angeles Harbor: IND, NAV, | Dominguez Channel; Los Angeles Harbor; Pacific Ocean |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| | | | | COMM, EST, MAR, WILD, RARE, MIGR, SPWN, SHELL, WET | |
| 22. | 8 / Santa Ana | 1900 E Taft Ave, Orange, CA 92867 | Marlboro Channel; Collins Channel; Santa Ana River | Santa Ana River: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN<br><br>Collins Channel: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN | Collins Channel; Santa Ana River; Santa Ana Rivermouth; Huntington State Beach; Pacific Ocean |
| 23. | 5F / Central Valley | 2425 S Blackstone St, Tulare, CA 93274 | Tulare Canal; Elk Bayou | N/A | Tulare Canal; Elk Bayou; Elk Bayou Park |
| 24. | 8 / Santa Ana | 7951 Redwood Ave, Fontana, CA 92336 | Unnamed stream and canal to east of Facility; Santa Ana River | Santa Ana River: MUN, AGR, IND, GWR, REC-1, REC-2, WARM, WILD, RARE, SPWN | Unnamed stream and canal to east of Facility; Santa Ana River; Prado Reservoir and wetlands; Santa Ana Rivermouth; Huntington State Beach; Pacific Ocean |
| 25. | 8 / Santa Ana | 14155 Bake Parkway, Irvine, CA | Serrano Creek; San Diego Creek | Serrano Creek: GWR, REC-1, REC-2, WARM, WILD, RARE<br><br>San Diego Creek: GWR, REC-1, REC-2, WARM, WILD, RARE, EST | Serrano Creek; San Diego Creek; Irvine Ranch Water District San Joaquin Marsh and Wildlife Sanctuary; Bonita Creek; Upper Newport Bay State Marine Conservation Area; The Narrows; Lower Newport Bay; Newport Harbor; |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
| | | | | | Newport Beach; Pacific Ocean |
| 26. | 4 / Los Angeles | 17512 Yukon Ave, Torrance, CA 90504 | Dominguez Channel; Los Angeles Harbor | Dominguez Channel: COMM, EST, MAR, WILD, RARE, MIGR, SPWN<br><br>Los Angeles Harbor:  IND, NAV, COMM, EST, MAR, WILD, RARE, MIGR, SPWN, SHELL, WET | Dominguez Channel; Los Angeles Harbor; Pacific Ocean |
| 27. | 8 / Santa Ana | 26100 Menifee Road, Romoland, CA 92585 | San Jacinto River; Canyon Lake | San Jacinto River: MUN, AGR, IND, PROC, GWR, REC-1, REC-2, WARM, COLD, WILD, RARE, SPWN<br><br>Canyon Lake: MUN, AGR, GWR, REC-1, REC-2, COMM, WARM, WILD | San Jacinto River; Canyon Lake; Lake Elsinor; Pacific Ocean |
| 28. | 7 / Colorado River | 36100 Cathedral Canyon Drive, Cathedral City, CA 92234 | Palm Canyon Wash; Whitewater River; Salton Sea | Palm Canyon Wash: AGR, GWR, REC-1, REC-2, WARM, WILD<br><br>Whitewater River: MUN, AGR, GWR, REC-1, REC-2, WARM, COLD, WILD, POW<br><br>Salton Sea: AQUA, REC-1, REC-2, | Palm Canyon Wash; Whitewater River; Salton Sea |

| No. | Region | Address | Receiving Waters for Storm Water Discharges from Facilities | Receiving Water Beneficial Uses[1] | Natural Resources Impacted by the Handling, Storage, and Disposal of Solid Waste from Facilities |
|---|---|---|---|---|---|
|  |  |  |  | WARM, WILD, RARE |  |