UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION et al., | Civil Case No.:  5:20-cv-01108-AB-KK |
| Plaintiffs, | [~~PROPOSED~~] **ORDER ENTERING CONSENT DECREE** |
| v. | **(Resource Conservation and Recovery Act 42 U.S.C. §§ 6901 *et seq* .)** |
| HOT LINE CONSTRUCTION, INC. et al., | |
| Defendants. | **SEE CHANGES.** |

Good cause appearing, and Plaintiffs Ecological Rights Foundation and
Santa Barbara Channelkeeper and Defendant Southern California Edison having
stipulated and agreed, IT IS HEREBY ORDERED that the parties' Consent
Decree, attached hereto as Exhibit 1, is **ENTERED**. The Court shall retain
jurisdiction over this matter for purposes of dispute resolution and enforcement of
the Consent Decree until termination of the Consent Decree as set forth therein.
The parties are to file a Stipulation of Dismissal within 10 days. The status
conference set for November 12, 2021 is **VACATED**.

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

Dated:   November 9        , 2021     _____

Hon. André Birotte Jr.
United States District Judge

# EXHIBIT 1

Christopher Sproul (State Bar No. 126398)
csproul@enviroadvocates.com
Brian Orion (State Bar No. 239460)
borion@enviroadvocates.com
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Jason Flanders (State Bar No. 238007)
jrf@atalawgroup.com
ATA LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (916) 202-3018

Attorneys for Plaintiffs
ECOLOGICAL RIGHTS FOUNDATION and
SANTA BARBARA CHANNELKEEPER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION and SANTA BARBARA CHANNELKEEPER<br><br>Plaintiffs,<br><br>v.<br><br>HOT LINE CONSTRUCTION, INC. AND SOUTHERN CALIFORNIA EDISON COMPANY<br><br>Defendants. | Civil Case No. 5:20-cv-01108-AB-KK<br><br>STIPULATION TO ENTER CONSENT DECREE AND DISMISS PLAINTIFFS' CLAIMS AGAINST SOUTHERN CALIFORNIA EDISON COMPANY WITH PREJUDICE; [PROPOSED] ORDER<br><br>(Resource Conservation and Recovery Act 42 U.S.C. §§ 6901 *et seq.*) |

**WHEREAS**, Plaintiff Ecological Rights Foundation ("EcoRights") is a non-profit public benefit corporation dedicated to the preservation, protection, and restoration of the environment, the wildlife and the natural resources of all waters of California, and Plaintiff Santa Barbara Channelkeeper ("SBCK") is a non-profit public benefit corporation whose mission is to protect and restore the Santa Barbara Channel and its watersheds through science-based advocacy, education, field work and enforcement;

**WHEREAS**, Defendant Southern California Edison Company ("SCE") is an electric utility servicing roughly 15 million people across its approximately 50,000 square mile service area throughout Southern and Central California.  In support of providing electrical service, SCE owns and operates over 12,600 miles of transmission lines, 91,300 miles of distribution lines, and 1,430,000 electric utility poles in the field, as well as other assets, including those certain Facilities (as defined below) where SCE stores and maintains utility poles and other wood materials treated with pentachlorophenol;

**WHEREAS**, in Civil Case No. 5:20-cv-01108-AB-KK, on or about June 8, 2020, EcoRights and SBCK filed a First Amended Complaint for Declaratory and Injunctive Relief and Civil Penalties in the United States District Court for the Central District of California ("District Court"), naming SCE as a Defendant and, on or about September 9, 2020, EcoRights and SBCK filed the operative Second Amended Complaint for Declaratory and Injunctive Relief and Civil Penalties ("Complaint");

**WHEREAS**, EcoRights and SBCK's Complaint alleges that SCE has discharged pollutants to waters of the United States without a National Pollutant Discharge Elimination System ("NPDES") permit authorization in violation of Clean Water Act ("CWA") section 301(a), 33 U.S.C. § 1311(a), at the Facilities. The Complaint further alleges that SCE has contributed or is contributing to the past or present handling, storage, treatment, transportation or disposal of pentachlorophenol and dioxins, that may present an imminent and substantial endangerment to health or the environment, in

violation of Resource Conservation and Recovery Act ("RCRA") section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B);

**WHEREAS**, EcoRights and SBCK represent that they have notified the State of California and U.S. Environmental Protection Agency ("EPA") of their intent to file suit pursuant to 33 U.S.C. § 1365(a) and 42 U.S.C. § 6972(b), on November 26, 2019, which letter was supplemented on May 27, 2020 (collectively, the "Notice Letter");

**WHEREAS**, SCE denies the occurrence of the violations alleged in the Notice Letter and the Complaint, including because neither the CWA nor RCRA are applicable under the law or circumstances. SCE further denies that its Facilities (or operations thereon) are causing or otherwise contributing to an imminent and substantial endangerment pursuant to RCRA. SCE does not admit any liability arising out of the allegations or occurrences alleged in the Notice Letter or the Complaint. SCE maintains that at all times it has not been required to have an NPDES permit for the subject Facilities and has not otherwise violated the CWA. SCE further maintains that it has complied with all applicable provisions of RCRA and that the subject Facilities are not causing an imminent and substantial endangerment;

**WHEREAS**, by order dated October 28, 2021, the Court dismissed Plaintiffs' CWA claims against SCE in this case with prejudice;

**WHEREAS**, the Parties enter into this Consent Decree in an effort to efficiently and cost-effectively resolve the RCRA claims against SCE in the Action (as defined below). The terms in this Consent Decree are negotiated solely for the purpose of this settlement and are not an admission by any of the Parties as to: (i) the applicability of any law or regulation, (ii) the basis for and/or applicability of any Pollutant Action Levels, Facility-specific Pollutant Action Levels or Infiltration BMP Pollutant Action Levels (as defined below) for any purpose other than for use within the scope of this negotiated settlement, (iii) the legal entitlement to, and/or the factual basis supporting, any payments made pursuant to this Consent Decree; and/or (iv) any independent legal requirement for

the use of any best management practice, sampling technique or frequency, and/or the installation of any infrastructure or deployment of any treatment technologies; and

**WHEREAS**, EcoRights, SBCK, and SCE (each a "Party" and collectively referenced herein as the "Parties") acknowledge that this Consent Decree has been negotiated by the Parties in good faith, will avoid the continued expense, uncertainty, and time of litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

## I. DEFINITIONS

1. Whenever the terms listed below are used in this Consent Decree, the definitions below shall apply. To the extent a term with initial capitalization is used in this Consent Decree, but not defined below, the term shall have the meaning provided for in this Consent Decree.

"Action" means the Complaint, Notice Letter, and all operative pleadings and orders on file in Civil Case No. 5:20-cv-01108-AB-KK.

"Consent Decree" means this Consent Decree and any attachments or documents incorporated by reference.

"Day" means a calendar day. In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State of California holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

"Dioxins" means polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans.

"Dioxins TEQ" means the value for all polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans congeners calculated according to World Health

Organization 2005 Toxic Equivalency Factors and the Bioaccumulation Equivalency
Factors according to the March 1995 Great Lakes Water Quality Initiative for all
purposes except for the Infiltration BMP Pollutant Action Levels (as defined below). For
purposes of the Infiltration BMP Pollutant Action Levels, the Dioxins TEQ means all
polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans congeners
calculated according to World Health Organization 2005 Toxic Equivalency Factors
only.

"Dry Season" means the five-month period beginning May 1st of any given year
and ending September 30th of the same year.

"Effective Date" means the effective date of this Consent Decree, which shall be
the date on which this Consent Decree is approved and entered by the Court.

"Facilities" or "Facility" means the twenty-six (26) SCE facilities listed in Exhibit
A to this Consent Decree.

"Facility-specific Pollutant Action Level" means the product of multiplying the
Facility-specific Dilution Factor (as derived and defined in Paragraph 20 below) times a
Pollutant Action Level, to the extent that a Facility-specific Dilution Factor is relevant for
a particular Facility. Where there is no applicable Facility-specific Dilution Factor, or
where a dilution factor has not yet been calculated by SCE for a Facility, then the
Facility-specific Pollutant Action Level shall be equal to the Pollutant Action Level.

"Housekeeping BMPs" means the stormwater source control measures and best
management practices identified in Paragraphs 6 to 15 of this Consent Decree.

"Infiltration BMP Pollutant Action Levels" means 1 ug/L for pentachlorophenol
and $3 \times 10^{-5}$ ug/L for the Dioxins TEQ.

"Municipal Separate Storm Sewer System" ("MS4") means any publicly owned
system for the collection, conveyance and discharge of stormwater runoff.

"Pole Area" or "Pole Areas" means all locations at a Facility where
pentachlorophenol-treated wood utility poles or other pentachlorophenol-treated wood

materials, such as crossarms, are stored uncovered.  For purposes of clarity, the presence of pentachlorophenol-treated wood utility poles in service does not make any portion of a Facility a Pole Area that would not otherwise qualify as a Pole Area.

"Pollutant" or "Pollutants" means pentachlorophenol and Dioxins.

"Pollutant Action Levels" mean 15 ug/L for pentachlorophenol and $2.8 \times 10^{-8}$ ug/L for the Dioxins TEQ.  Pollutant Action Level means either 15 ug/L for pentachlorophenol or $2.8 \times 10^{-8}$ ug/L for the Dioxins TEQ.

"SCE Representative" means an employee, agent, consultant, or contractor of SCE or anyone authorized to act on SCE's behalf.

"Termination Date" means the date no later than seven (7) years after the Effective Date when this Consent Decree shall terminate unless this Consent Decree terminates earlier in accordance with Section X (Partial or Full Termination).

"Treated Wood Waste" or "TWW" means any waste material that SCE intends to discard consisting of wood that has been treated with pentachlorophenol, including but not limited to utility poles, utility pole crossarms, portions of utility poles or utility pole crossarms, sawdust, wood chips, or similar debris generated when cutting or otherwise handling pentachlorophenol-treated utility poles or crossarms.

"Treatment/Structural BMPs" means the stormwater source control measures and best management practices identified in Paragraph 16 of this Consent Decree.

"Wet Season" means the seven-month period beginning October 1st of any given year and ending April 30th of the following year.

## II. DISMISSAL AND JURISDICTION

2.    <u>Dismissal</u>. Within ten (10) Days of the Effective Date, the Parties shall file with the District Court a Stipulation and Order that shall provide that the Complaint shall be dismissed with prejudice pursuant to <u>Federal Rule of Civil Procedure 41(a)(2)</u> concurrently with the District Court's retention of jurisdiction for the enforcement of this

Consent Decree as provided herein.

3.    <u>Venue and Continuing Jurisdiction</u>. For purposes of this Consent Decree only, the Parties stipulate that venue is proper in the District Court and none of the Parties contests the exercise of jurisdiction by the District Court for purpose of overseeing implementation of the Consent Decree, any dispute resolution or enforcement pursuant to Section VIII, or in response to any motion to modify the Consent Decree pursuant to <u>Federal Rule of Civil Procedure 60</u>.

## III. WORK TO BE PERFORMED

### Preparation of Stormwater Maps for Each Facility

4.    Within ninety (90) Days after the Effective Date, SCE shall provide Plaintiffs with a "Facility Stormwater Map" for each Facility identifying all Pole Areas and any locations where stormwater runoff from the Pole Areas is collected and discharged.  The maps shall include the following information, as applicable: (i) identification of any drop inlets, sumps, and/or catch basins receiving stormwater from Pole Areas, (ii) the corresponding stormwater discharge points for stormwater generated within each Pole Area, (iii) ground type(s) (pervious or impervious), (iv) the direction and pattern of surface stormwater flows at the Facilities, (v) berms, dikes, walls and all other structures controlling the flow of surface water or any stormwater storage or treatment infrastructure (as well as the capacity of such infrastructure if capacity information is readily available); and (vi) where stormwater samples are collected. In addition, at a minimum, the maps for the Facilities shall also identify the Facilities' boundaries, the paved area(s) where TWW is generated or stored, each storm drain inlet that will be subject to inspection pursuant to Paragraph 9, driveways subject to inspection pursuant to Paragraphs 11 and 12, paved areas subject to the requirements of Paragraph 13, and whether stormwater from a Facility discharges to an MS4.  Within ninety (90) Days after SCE implements any additional Treatment/Structural BMP(s) at a Facility

pursuant to this Consent Decree, SCE shall update the Facility Stormwater Map for the affected Facility to reflect the new Treatment/Structural BMP(s), and any resulting new or relocated discharge points for stormwater runoff from Pole Areas, and shall provide such updated maps with the next Annual Report as provided in Paragraph 25.

## Housekeeping BMPs

5.      Within ninety (90) Days after the Effective Date, and throughout the duration of this Consent Decree, unless and until a Facility is terminated in accordance with Section X (PARTIAL OR FULL TERMINATION) of this Consent Decree, SCE shall implement Housekeeping BMPs at each Facility. The Housekeeping BMPs shall be designed and implemented at each Facility to reduce the potential for Pollutants to become entrained in stormwater flows or blow off the Facility, and to keep all paved areas of the Facility as clean as practicable to reduce the potential for TWW to be tracked off the Facility onto surface streets. The Housekeeping BMPs shall include the measures specified in Paragraphs 6 to 15 below.

6.      Site Sweeping and Cleaning of the Facilities. SCE shall implement the following site sweeping and cleaning measures at all uncovered portions of the Facility yards, as applicable:

(i)      SCE shall sweep and clean all paved areas according to the following schedule: (a) once a month during the Wet Season, and (b) once in September of each year;

(ii)      on an annual basis before the start of the Wet Season, but after the annual sweeping in September mandated by this Paragraph 6, SCE shall conduct an inspection of each Facility and, to the extent warranted by the inspection, perform additional site cleaning as needed, including a power/pressure wash of paved areas;

(iii)      SCE shall not discharge any fluids or solids generated by sweeping or other site cleaning at the Facilities to storm drain inlets or waterways;

(iv)    SCE shall collect and dispose of all wastes generated during cleaning and sweeping at the Facilities in a manner that complies with all local, state, and federal laws; and

(v)    SCE shall designate and provide appropriate training to the employees or contractors responsible for implementing site sweeping and cleaning to ensure compliance with these Consent Decree terms.

7.    <u>TWW Collection & Management</u>.  SCE will manage TWW as follows:

(i)    Prior to cutting TWW in an outdoor location at the Facility, SCE will place visqueen, or other method of capturing TWW sawdust and debris, underneath TWW to be cut to collect sawdust or debris generated from such cutting operations. After cutting, SCE will sweep, vacuum or otherwise clean the visqueen, or other method of capturing TWW sawdust and debris, to remove any TWW sawdust or debris and place the sawdust or debris in a TWW storage bin for offsite disposal;

(ii)    When TWW sawdust or debris is generated at a Facility, SCE will also promptly sweep, vacuum or otherwise clean any area at the Facility where TWW sawdust or debris have fallen to remove TWW sawdust or debris and place it within a TWW storage bin for offsite disposal;

(iii)    Within one (1) year of the Effective Date, SCE will place TWW storage bins with water-impermeable covers at five (5) or more Facilities. Within three (3) years after the Effective Date, all TWW storage bins at the Facilities will have water-impermeable covers. Each TWW storage bin with a water-impermeable cover at a Facility shall be maintained in a closed position except when TWW is being placed therein or retrieved for offsite disposal;

(iv)    During wet weather events, SCE will affix a temporary water-resistant cover on any TWW storage bin at a Facility that does not yet have a water-impermeable cover;

(v)    Any TWW at a Facility shall be either: (a) placed in a TWW storage bin prior to the end of the workday or (b) stored in a Pole Area until it is transferred to a TWW storage bin for offsite disposal; and

(vi)  Operations generating TWW shall be confined to designated paved areas at each Facility, as reflected on the maps prepared pursuant to Paragraph 4.

8.    Storm Drain Covers.  During the Dry Season, on each stormwater drop inlet that receives stormwater runoff from Pole Areas, SCE shall install a solid material cover to prevent dust and solids from collecting in the inlet. These covers may be removed prior to the start of any forecasted precipitation with a likelihood of occurrence of 50% or greater as determined by the applicable National Oceanic and Atmospheric Administration forecast.  Covers shall not be required during the Wet Season.

9.    Storm Drain Inlet Inspection and Cleaning. Annually, prior to the beginning of the Wet Season, SCE shall inspect the storm drain inlets at each Facility. To the extent warranted by this inspection, SCE shall clean each drain inlet as needed using a vacuum or other effective cleaning device/method in order to remove dust and solids that have entered the storm drain inlets. As necessary, SCE shall clean out the drain inlet at the Facilities following significant storm events and shall properly dispose of any solids removed from storm drain inlets or catch basins. SCE shall inspect the drain inlets at each Facility during the Wet Season at least monthly and, as needed, properly remove and dispose of any solids identified in the storm drain that could materially affect its functioning.

10.    Wet Weather Visual Observations During Stormwater Sampling. Each time stormwater sampling is required by this Consent Decree at a Facility, SCE shall observe the potential discharge location(s), including the perimeter of the Facility, to determine if and where discharge of stormwater from Pole Areas is occurring. During such wet weather visual observations, appropriately trained SCE Representatives shall monitor for the presence of visually observable oil sheens in any stormwater discharges and/or

discolored or turbid stormwater discharges and consider any such observations as it implements the Treatment/Structural BMP(s) identified in Paragraph 16.

11. <u>Visual Inspections</u>. Appropriately trained SCE Representatives shall conduct visual inspections at each Facility at least monthly during the Wet Season and at least once during the Dry Season. Such visual inspections shall include Pole Areas and areas where TWW may be generated or stored, and driveways where vehicles exit from Facility yards. All designated stormwater discharge points shall also be inspected for accumulation of debris, sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials that may affect stormwater quality discharging from the Facility. Such inspections shall further include observations of any Treatment/Structural BMP identified in Paragraph 16 and any Alternative BMP Proposal (as defined below) approved in accordance with Paragraph 18 that is implemented at the Facility to ensure that it is in good condition and working order, and shall verify that Housekeeping BMPs are being implemented to the extent practicable.

12. <u>Inspection for Offsite Tracking</u>. SCE shall inspect the driveways where vehicles exit from Facility yards and immediately adjacent areas of adjoining streets at each Facility once per month during the Wet Season and at least once during the Dry Season to determine whether solids are being tracked offsite from the Facilities onto adjoining streets by vehicle traffic. If SCE observes offsite tracking of solids from the Facilities, SCE will, to the extent practicable, sweep areas where tracking has been observed.

13. <u>Inspection of Paved Areas</u>. SCE shall inspect the paved portions of the Pole Areas and areas where TWW is generated or stored at each Facility on an annual basis and implement spot repairs on an as-needed basis to eliminate material cracks that could trap Pollutants and/or to maintain stormwater drainage from the Facilities within designed or designated flow paths.

14.    <u>Training</u>. At least annually, and prior to the Wet Season following the hiring of new SCE employees directly involved in stormwater management, inspection or grounds cleaning at the Facilities, SCE shall conduct training to explain the requirements of the Consent Decree to the extent applicable to such employee. Training shall focus on the employee's role in implementing various Consent Decree measures including, for example, implementation of Housekeeping BMPs at the Facilities. If necessary, this training shall be conducted bilingually (*i.e.*, Spanish/English or other pertinent language) to the extent that an employee is not reasonably able to comprehend training in English. For non-employee SCE Representatives involved in stormwater management, inspection or grounds cleaning governed by the terms in this Consent Decree, SCE shall ensure the SCE Representative is familiar with and complies with the applicable provisions of this Consent Decree.

15.    <u>Housekeeping Logs</u>. SCE shall develop and use standardized log forms to track the dates on which site sweeping, cleaning, inspections and visual observations are performed in accordance with Paragraphs 6, 9, 10, 11, 12 and 13, and note any identified concerns and responsive actions taken by SCE.

**Treatment/Structural BMP Program**

16.    <u>Treatment/Structural BMP Obligation</u>. At each Pole Area at a Facility, SCE shall implement one or more of the Treatment/Structural BMPs described in the following subparagraphs (i) through (v), which shall be designed and reasonably expected to avoid or minimize discharge of Pollutants in any stormwater runoff from Pole Areas. At each Pole Area, SCE shall have sole discretion to choose which of the following Treatment/Structural BMP(s) to implement.

(i)    <u>Infiltration</u>: Implement structural improvements (e.g., infiltration basins, dry wells, ditches, trenches or functionally equivalent infrastructure) in accordance with applicable regulatory requirements and sized, at a minimum, to infiltrate

stormwater runoff from a Facility's Pole Area(s) during an 85th percentile, 24-hour storm at the Facility ("Infiltration BMP").  SCE shall install pre-treatment infrastructure as necessary to treat runoff from the Pole Area(s) generated from, at a minimum, an 85th percentile, 24-hour storm to meet the Infiltration BMP Pollutant Action Levels and to remove oil as necessary to ensure the effectiveness of the treatment prior to discharge to the Infiltration BMP.  SCE shall only install an Infiltration BMP under the following conditions:  (a) the area being treated by the Infiltration BMP has a slope less than 15%; (b) there is no local, state or federally directed cleanup of groundwater contamination within 150 feet of the Infiltration BMP site; (c) the Infiltration BMP site has a hydrologic soil group type of A, B, or C as defined by the United States Department of Agriculture Natural Resources Conservation Services; and (d) the depth to groundwater at the Infiltration BMP site is greater than 30 feet.

      A.   <u>Infiltration BMP Demonstration</u>. Within thirty (30) Days after the Effective Date, SCE shall provide Plaintiffs with a list of Facilities where it is considering installation of an Infiltration BMP during the first year following the Effective Date. Within fourteen (14) Days of receipt of this list from SCE, Plaintiffs shall select from the list two (2) Facilities at which it prefers SCE to conduct a technology demonstration of an Infiltration BMP described in this Paragraph 16(i). In the event SCE subsequently determines in its sole discretion that a Facility selected by Plaintiffs is not suitable for installation of an Infiltration BMP, or a Force Majeure event occurs that prevents or substantially delays the installation, SCE shall promptly notify Plaintiffs and provide an updated list of Facilities. Within fourteen (14) Days of receipt of such updated list, Plaintiffs shall select a different Facility from the updated list for demonstration of an Infiltration BMP. During the first year following the Effective Date, SCE shall install an Infiltration BMP at each of the two (2) Facilities selected for demonstration.  The demonstration will be considered successful after laboratory results of samples of stormwater discharged from the Pole Area(s) to the demonstration Infiltration BMP,

taken during four (4) consecutive stormwater sampling events occurring during the Facility's normal business hours (unless SCE, at its sole discretion, elects to collect samples during non-business hours), reflect attainment of the Infiltration BMP Pollutant Action Levels.  Once the Infiltration BMP demonstration is determined to be successful, no further sampling of that Infiltration BMP installation will be necessary at the Facility where that BMP has been installed.

B.    Subsequent Infiltration BMP Installations. Once a successful demonstration has been achieved for a specific Infiltration BMP design, SCE shall take confirmation samples of stormwater discharged to each subsequent installation of the specific Infiltration BMP during two (2) consecutive stormwater sampling events occurring during the Facility's normal business hours (unless SCE, at its sole discretion, elects to collect samples during non-business hours), to confirm attainment of the Infiltration BMP Pollutant Action Levels.  To the extent this confirmation sampling indicates a need to modify or adjust the pretreatment of stormwater prior to discharge to the Infiltration BMP, SCE shall make such adjustment(s) no later than the start of the next Wet Season following the sampling that indicated need for adjustment. Once two (2) consecutive confirmation samples indicate the pretreatment of discharge to an Infiltration BMP has attained the Infiltration BMP Pollutant Action Levels, no further sampling of that Infiltration BMP will be necessary.

(ii)    Covered Storage: Implement structural improvements that are designed to shield pentachlorophenol-treated wood materials stored at a Facility's Pole Area(s) from contact with stormwater, such as with a roof, fixed and/or moveable sides, paved surface and berms. SCE shall provide Plaintiffs copies of the design plans for each Facility where the Covered Storage Treatment/Structural BMP will be implemented no later than (5) days before implementation.

(iii)    Sanitary Sewer: In accordance with a publicly owned treatment works' ("POTW") requirements, discharge, at a minimum, the stormwater runoff volume

produced during an 85th percentile, 24-hour storm event from a Facility's Pole Area(s) into a POTW's sewer system. Upon SCE's notification that an agency deemed the application for a discharge pursuant to this Paragraph 16(iii) complete, SCE shall provide Plaintiffs with a copy of such complete application within ten (10) Days.

(iv)    Permit or Order: Discharge stormwater from a Facility's Pole Area(s) as required or authorized by a regulatory agency permit, order, decree or equivalent requirement (*e.g.*, Waste Discharge Requirements), provided that compliance with the relevant requirements precludes an offsite imminent and substantial endangerment from any release of stormwater. Upon SCE's notification that an agency deemed the application for a discharge pursuant to this Paragraph 16(iv) complete, SCE shall provide Plaintiffs with a copy of such complete application within ten (10) Days.

A.    A permit issued by the United States Environmental Protection Agency for a Class V underground injection control well shall not qualify for purposes of this Paragraph 16(iv) Treatment/Structural BMP.

B.    Should SCE obtain coverage under (1) the State Water Resources Control Board's NPDES General Permit for Stormwater Discharges Associated with Industrial Activities, (2) a Facility-specific NPDES permit that addresses stormwater discharges from the Facility, or (3) a company-specific or industry-specific NPDES permit applicable to the Facilities that addresses stormwater discharges from the Facilities, such NPDES permit shall qualify for purposes of this Paragraph 16(iv) Treatment/Structural BMP.  In the event such NPDES permit coverage is obtained, unless there is a direct conflict between the NPDES permit terms and the Housekeeping BMPs, SCE shall continue to comply with the Housekeeping BMPs in accordance with the terms of this Consent Decree. Should SCE seek to obtain a facility-specific, company-specific or industry-specific NPDES permit coverage as provided in (B)(2) or (B)(3) above, SCE shall ensure that EcoRights and SBCK are included among the people to receive public notice in accordance with the regulating agency's NPDES permitting procedure.

C.     Except for those permits or equivalent requirements provided for in Paragraphs 16(iii) or 16(iv)(B) of this Consent Decree, following issuance of a regulatory agency permit, order or decree regulating the discharge of stormwater from a Facility's Pole Area(s), to the extent SCE intends to rely on such permit, order or decree for purposes of compliance with this Paragraph 16(iv), SCE shall meet and confer with EcoRights and, for Facilities located within Santa Barbara County, SBCK, as to whether SCE's discharge of stormwater from a Facility, in compliance with such permit, order, decree or equivalent requirement, adequately precludes any offsite imminent and substantial endangerment from the discharge of stormwater from that Facility's Pole Area(s). Any dispute between the Parties as to whether such permit, order, decree or equivalent requirement qualifies for purposes of this Paragraph 16(iv) Treatment/Structural BMP shall be resolved pursuant to the process set forth in Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE).

(v)    <u>Filtration and Treatment</u>: Prior to discharge, route all stormwater from a Facility's Pole Area(s) through a stormwater filtration and treatment BMP (e.g., media filter, biofilter) sized to capture and treat, at a minimum, runoff from an 85th percentile, 24-hour design storm event at the Facility ("Filtration and Treatment BMP"). The Filtration and Treatment BMP shall be designed to reduce Pollutants in stormwater runoff from the Pole Area(s) to, or below, Facility-specific Pollutant Action Levels.

A.     <u>Filtration and Treatment BMP Demonstration</u>. Within thirty (30) Days after the Effective Date, SCE shall provide Plaintiffs with a list of three (3) Facilities where it is considering installation of a Filtration and Treatment BMP pursuant to this Consent Decree. Within fourteen (14) Days of receipt of this list from SCE, Plaintiffs shall select from the list two (2) Facilities at which it prefers SCE to conduct a technology demonstration of a Filtration and Treatment BMP as described in this Paragraph 16(v).  In the event SCE subsequently determines in its sole discretion that a Facility selected by Plaintiffs is not suitable for installation of a Filtration and Treatment

BMP, or a Force Majeure event occurs that prevents or substantially delays the installation, SCE shall promptly notify Plaintiffs and provide an updated list of Facilities. Within fourteen (14) Days of receipt of such updated list, Plaintiffs shall select a different Facility from the updated list for demonstration of a Filtration and Treatment BMP. During the term of this Consent Decree, SCE shall install a Filtration and Treatment BMP at each of the two (2) Facilities selected for demonstration.  The demonstration will be considered successful after laboratory results of samples of stormwater discharged from the Pole Area(s) to the demonstration Filtration and Treatment BMP, collected during four (4) consecutive stormwater sampling events, on different days, occurring during the Facility's normal business hours (unless SCE, at its sole discretion, elects to collect samples during non-business hours), reflect attainment of the Facility-specific Pollutant Action Levels.  Once the Filtration and Treatment BMP demonstration is determined to be successful, no further sampling of that Filtration and Treatment BMP installation will be necessary.

B.    Subsequent Filtration and Treatment BMP Installations. Once a successful demonstration has been achieved for a specific Filtration and Treatment BMP design, SCE shall take confirmation samples of stormwater discharged to each subsequent installation of the specific Filtration and Treatment BMP during two (2) consecutive stormwater sampling events occurring during the Facility's normal business hours (unless SCE, at its sole discretion, elects to collect samples during non-business hours), to confirm attainment of the Facility-specific Pollutant Action Levels.  To the extent this confirmation sampling indicates a need to modify or adjust the Filtration and Treatment BMP, SCE shall make such adjustment(s) no later than the start of the next Wet Season following the sampling that indicated need for adjustment.  Once two (2) consecutive confirmation samples, collected on different days, indicate the Filtration and Treatment BMP has attained the Facility-specific Pollutant Action Levels, no further sampling of that Filtration and Treatment BMP installation will be necessary.

17.    <u>Treatment/Structural BMPs Implementation Timeframe</u>.

A.    SCE shall implement one or more of the Treatment/Structural BMPs identified in Paragraph 16 at the Pole Area(s) of not less than five (5) of the Facilities within one year following the Effective Date. Thereafter, SCE shall implement one or more of the Treatment/Structural BMPs referred to in Paragraph 16 at the Pole Area(s) of not less than five (5) of the Facilities prior to the end of each subsequent year ending on each subsequent anniversary of the Effective Date until Treatment/Structural BMPs have been implemented at each Pole Area or until all Facilities have been terminated from the requirements of this Consent Decree pursuant to the terms of Section X (PARTIAL OR FULL TERMINATION). If Plaintiffs intervene in any regulatory permitting process pursued by SCE needed to meet the requirements of Paragraph 16—by submitting comments, seeking a meeting with regulators, or otherwise—any resulting delay shall be a Force Majeure event (pursuant to Paragraph 43) provided that SCE was otherwise diligently pursuing such permits.

B.    SCE shall have sole discretion to choose the Facilities where Treatment/Structural BMPs will be implemented in each year, except that SCE agrees to implement its preferred Treatment/Structural BMP(s) at the Goleta Facility located at 103 David Love Place, Goleta, CA, within two (2) years after the Effective Date and at the Santa Ana Facility located at 1241 S. Grand Avenue, Santa Ana, CA, within three (3) years after the Effective Date.

18.    <u>Alternative BMPs</u>. SCE may develop and employ alternative BMPs for Pole Area(s) and gather stormwater runoff Pollutant level data concerning their effectiveness. If the data gathered by SCE shows that alternative BMPs are effective to meet Facility-specific Pollutant Action Levels in stormwater runoff from the Pole Area(s) that is discharged to an MS4 or, the Infiltration BMP Pollutant Action Levels, in stormwater runoff from the Pole Area(s) that is infiltrated onsite, and SCE decides to implement those alternative BMPs to meet the requirements of this Consent Decree, SCE shall

prepare and present a report to EcoRights and SBCK proposing to add alternative BMPs for purposes of compliance with Paragraph 16 ("Alternative BMP Proposal"). EcoRights and SBCK shall have forty-five (45) Days after receipt of an Alternative BMP Proposal to review and provide written comment to SCE. If EcoRights and SBCK do not oppose SCE's Alternative BMP Proposal in writing within the 45-day review period, SCE may implement the Alternative BMP Proposal in lieu of one or more of the Treatment/Structural BMPs specified in Paragraph 16 for the Pole Area(s) identified in the Alternative BMP Proposal. Notwithstanding the foregoing, EcoRights and SBCK shall not unreasonably oppose an Alternative BMP Proposal if it complies with applicable legal requirements and it is demonstrated that the Alternative BMP Proposal is equivalent in effectiveness to the Treatment/Structural BMPs listed in Paragraph 16. If the Parties are unable to agree on SCE's Alternative BMP Proposal, then their dispute shall be resolved pursuant to the technical dispute resolution provisions of Section VII (TECHNICAL DISPUTE RESOLUTION).

19.    When implementing the Treatment/Structural BMPs and any approved Alternative BMP Proposal as described in Paragraphs 16 through 18, SCE shall comply with all applicable laws and regulations and shall obtain any required permits or approvals from appropriate regulatory agencies.

**Facility-specific Pollutant Action Levels**

20.    <u>Calculation and Application of Facility-Specific Pollutant Action Levels</u>. Facility-specific Pollutant Action Levels shall apply to the levels of Pollutants detected in stormwater discharges from Filtration and Treatment BMPs as set forth in Paragraph 16(v) or, as appropriate, to an Alternative BMP Proposal approved pursuant to Paragraph 18, that discharges to an MS4.  Facility-specific Pollutant Action Levels are derived by multiplying the Pollutant Action Levels by Facility-specific Dilution Factors calculated in accordance with Paragraph 20(B).

A.    SCE may calculate dilution factors pursuant to Paragraph 20(B) to apply to the levels of Pollutants detected in stormwater runoff from Pole Area(s) that is discharged to an MS4 ("Facility-specific Dilution Factors").

B.    SCE shall calculate Facility-specific Dilution Factors consistent with industry standard and practice and shall incorporate the following steps: (i) estimate runoff volume from the Pole Area(s) of a specific Facility; (ii) estimate runoff volume at the MS4 outfall for the stormwater drainage basin that receives stormwater runoff from the Facility; and (iii) calculate the ratio of total runoff volume for the surrounding stormwater drainage basin relative to the total runoff volume from the Pole Area(s) at the specific Facility. Stated via equation, dilution factors shall be calculated as follows:

$$\text{dilution factor} = \frac{\text{surrounding drainage basin area runoff volume}}{\text{Pole Area runoff volume}}$$

Calculation of the runoff volumes used in determining a Facility-specific Dilution Factor shall account for the imperviousness and soil infiltration characteristics of the relevant Pole Area(s) and the stormwater drainage basin surrounding the specific Facility. The size of the stormwater drainage basin surrounding the Facility may be estimated via the use of publicly available information, including maps, topography, and visual information. Any disputes regarding calculation and/or application of Facility-specific

Pollutant Action Levels shall be resolved pursuant to the technical dispute resolution provisions of Section VII (TECHNICAL DISPUTE RESOLUTION).

21.    _Optional Report(s) Regarding Background Concentrations of Pollutants_. If a Pollutant concentration in stormwater runoff from a Pole Area that is discharged to an MS4 exceeds a Facility-specific Pollutant Action Level, after implementation of the Filtration and Treatment BMP pursuant to Paragraph 16 or the Alternative BMP Proposal approved pursuant to Paragraph 18, SCE, at its sole discretion, may direct a third-party consultant to provide a technical report evaluating whether and to what extent off-site background Pollutant concentrations may be affecting the Pollutant concentrations detected in stormwater samples taken at a Facility ("Background Concentration Report"). Based on the data analysis in the technical report, SCE may propose an adjusted Facility-specific Pollutant Action Level for the affected Facility that takes into account the Pollutant loading from offsite sources. Upon receipt of SCE's proposal for an adjusted Facility-specific Pollutant Action Level in accordance with this Paragraph 21, and the supporting technical report, EcoRights and SBCK shall have twenty-one (21) Days to review and provide written comment to SCE. If EcoRights and SBCK do not oppose SCE's proposal for an adjusted Facility-specific Pollutant Action Level in writing within the 21-Day review period, SCE may use the adjusted Facility-specific Pollutant Action Level specified in the proposal to evaluate compliance with this Consent Decree at the affected Facility.  If EcoRights and SBCK do object to the adjusted Facility-specific Pollutant Action Level, the Parties shall resolve their differences pursuant to the technical dispute resolution provisions of Section VII (TECHNICAL DISPUTE RESOLUTION).

## IV. SAMPLING AND DATA

22.    _Sampling Parameters_. All samples shall be analyzed for pentachlorophenol utilizing EPA Method 8270C and for polychlorinated dibenzo-p-dioxins and polychlorinated dibenzofurans utilizing EPA Method HRGC/HRMS 8290 for tetra

through octa chlorinated dibenzo dioxins and furans. Sample analysis must be performed on unfiltered samples by a laboratory accredited by the State of California. SCE shall request the laboratory to achieve the lowest method detection level and lowest minimum level or reporting level that can be accomplished with the relevant method and sample matrix. For purposes of comparison to the Pollutant Action Level or Facility-specific Pollutant Action Level, SCE shall calculate the Dioxins TEQ using the equation and the Toxicity Equivalency Factors and Bioaccumulation Equivalency Factors provided in Exhibit B to this Consent Decree. For purposes of comparison to the Infiltration BMP Pollutant Action Level, SCE shall calculate the Dioxins TEQ using the equation for the Toxicity Equivalency Factors provided in Exhibit B to this Consent Decree. In calculating the Dioxins TEQ, constituents reported as ND (not detected) or DNQ (detected, not quantifiable) by the laboratory will be treated as equivalent to zero. The calculated Dioxins TEQ shall be used for comparisons to the Dioxins Infiltration BMP Pollutant Action Level, Pollutant Action Level or Facility-specific Pollutant Action Level.

23. <u>Inspections During the Term of this Consent Decree</u>. SCE shall permit representatives of EcoRights and SBCK to perform inspections of any of the Facilities that remain subject to the Consent Decree up to a combined total of five (5) inspections per calendar year prior to the Termination Date. Each inspection shall be performed by no more than three (3) representatives of EcoRights and SBCK and may include photographing and/or videotaping of inspected areas without capturing sound and avoiding images of SCE Representatives. EcoRights and SBCK shall provide SCE with a copy of all photographs and video no later than five (5) Days after the inspection. The duration of EcoRights and/or SBCK's inspection shall not exceed two (2) hours and shall be limited to the outdoor areas of the Facility yard where TWW storage bins, Treatment/Structural BMPs, Pole Areas, and storm drain inlets are located, and where stormwater runoff from such areas flows. EcoRights and/or SBCK's representatives

must remain with SCE's Representative at all times during the inspection and comply with all Facility rules and requirements. EcoRights and SBCK shall provide at least two (2) full business days advance written notice of an inspection conducted pursuant to this Paragraph 23 identifying the inspection date and start time and name of the EcoRights and/or SBCK representatives who will attend the inspection, and providing contact information for such individuals. Such notice shall be provided to the attention of Shannon Oldenburg at shannon.oldenburg@sce.com and Bridget Johnsen at bridget.johnsen@sce.com, unless and until new contact information is provided by SCE. Once EcoRights and/or SBCK provides notice of a Facility inspection, it will count as one of their five (5) inspections for the year, regardless of whether the inspection occurs. EcoRights and/or SBCK shall have the right to cancel and reschedule one (1) inspection per calendar year due to a change in weather forecast. In the event of the resurgence of the COVID 19 pandemic or other similar type situation which requires social distancing or other comparable controls, provided SCE's protocols do not change, the health and safety parameters negotiated for the January and March 2021 Facility inspections, attached hereto as Exhibit C, shall apply. In the event SCE's protocols change, the Parties shall work together to revise the health and safety paraments consistent with SCE's revised protocols.  Any dispute with respect to such revisions shall be resolved pursuant to the process set forth in Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE). Nothing herein shall be construed to prevent SCE from continuing to implement Facility and regulatory rules and requirements, or any Housekeeping BMPs or Treatment/Structural BMPs consistent with the terms of this Consent Decree during the period prior to an inspection by EcoRights and SBCK or at any other time.

24.    No Party shall withhold from any other Party any data incorporated into any required report or proposal presented or response to such report or proposal exchanged by the Parties in accordance with this Consent Decree. This Paragraph 24, however, in no

way waives the attorney-client privilege or the attorney work product doctrine as to advice and communication about such information developed by or provided to any Party or as may otherwise be applicable.

## V. REPORTING

25. <u>Contents and Schedule for Submission of Annual Reports</u>. SCE shall prepare and provide to EcoRights and SBCK a report documenting SCE's actions to comply with this Consent Decree during the prior reporting year (January 1 to December 31) by July 15 of each year that this Consent Decree is in effect ("Annual Report"), as follows:

A. <u>BMPs</u>. The Annual Report will summarize the Housekeeping BMPs, Treatment/Structural BMPs, any actions taken to address any reported exceedance(s) during the prior reporting year of either a Facility-specific Pollutant Action Level or Infiltration BMP Pollutant Action Level, and SCE's assessment of the efficacy of these actions, and the Treatment/Structural BMPs SCE plans to implement in the next reporting year, including identification of the Facilities where SCE intends to implement these Treatment/Structural BMPs. The Annual Report shall also include copies of any Facility Stormwater Map updated during the prior reporting year in accordance with Paragraph 4.

B. <u>Analysis of Sampling Data and Laboratory Reports</u>. The Annual Report shall include summary table(s) of laboratory analytical results for any stormwater samples collected pursuant to the requirements of this Consent Decree during the prior reporting year, together with comparison of the laboratory analytical results to the applicable Facility-specific Pollutant Action Levels or Infiltration BMP Pollutant Action Levels. The Annual Report will also include copies of the final laboratory reports for any stormwater samples collected pursuant to the requirements of this Consent Decree during the prior reporting year. If for any reason SCE does not collect stormwater samples as required by this Consent Decree, the Annual Report shall describe the reason(s) the sampling did not occur as required, and, as appropriate, the remedial action(s) SCE will

take to prevent recurrence.

C. <u>Dilution Factors</u>. SCE shall report any Facility-specific Dilution Factors that it applies to data included in the Annual Report and provide the calculations performed to arrive at those Facility-specific Dilution Factors.

D. <u>Regulatory Agency Documents</u>. During the term of this Consent Decree, SCE shall provide EcoRights and SBCK with copies of all permit applications except for those applications previously provided in accordance with Paragraphs 16(iii) and 16(iv) of this Consent Decree, material agency correspondence related to permit conditions, and issued regulatory agency permits and authorizations associated with the implementation of Treatment/Structural BMPs described in Paragraph 16, or an Alternative BMP Proposal approved pursuant to Paragraph18, sent or received by SCE during the prior reporting year.

E. <u>Non-confidential Summary</u>. Each Annual Report shall contain a non-confidential portion summarizing SCE actions taken in the prior year, the status of Consent Decree implementation, and plans for the following year.

26. <u>Preservation</u>. Through the Termination Date, SCE shall preserve all final data and documents required to be generated under this Consent Decree.

27. <u>Certification</u>. Annual reports submitted by SCE pursuant to this Consent Decree shall be certified substantially as follows:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to be the best of my knowledge and belief, true, accurate, and complete.

28.    <u>Informal Meet and Confer Regarding Annual Reports</u>. If EcoRights and/or SBCK have questions regarding information provided in the Annual Report, the Parties agree to informally meet and confer on a mutually agreed upon schedule in an effort to resolve any such questions.

## VI. MITIGATION PAYMENT AND REIMBURSEMENT OF COSTS

29.    <u>Environmental Mitigation Funding</u>.

A.    <u>Rationale for Payment</u>. Solely for purposes of effectuating a settlement of Plaintiffs' claims in this Action, and without any admission of fact or law including whether Plaintiffs are entitled to a mitigation payment under their claims in this Action, SCE agrees to provide a mitigation payment as set forth in this Paragraph 29.

B.    <u>Payment and Project</u>. SCE shall pay the sum of One Hundred Sixty Thousand Dollars ($160,000.00) to Coastal Quest to provide funding to a public-private partnership to strengthen enforcement and management of State Water Resources Control Board ("SWRCB") Areas of Special Biological Significance ("ASBS"). In collaboration with the SWRCB, the California Department of Fish & Wildlife's Marine Protected Area ("MPA") Management Program and the Ocean Protection Council, Coastal Quest shall use the funds received from SCE to: (i) develop a geographic information system ("GIS") map and database of coastal protected areas including ASBS, State Parks, and MPAs; (ii) better understand the current design and effectiveness of ASBS by outlining barriers and opportunities to improve management and enforcement of ASBS and water quality requirements in State Parks and MPAs, and identifying opportunities for nominating and siting new ASBS, MPAs and other coastal protected areas; and (iii) pilot test local and regional solutions within the Central Coast Regional Water Quality Control Board's region ("CCRWQCB") by applying the GIS map and database to identify how sites within the CCRWQCB can improve water quality management.

C.      Notice of Payment. Within forty-five (45) Days of the Effective Date, SCE shall tender the payment to Coastal Quest, and provide Plaintiffs with proof of payment.

30.     Reimbursement of Litigation Fees and Costs. To effectuate settlement, and without any admission of fact or law, SCE agrees to reimburse EcoRights and SBCK the amount of One Million One Hundred Seventy-Five Thousand Dollars ($1,175,000.00) to defray EcoRights and SBCK's claimed investigative, expert, consultant, and attorneys' fees and costs incurred through the Effective Date, including costs incurred as a result of investigating the activities at the Facilities, preparing the Notice Letter and Complaint, litigating this matter, and negotiating a resolution of this Action. Such payment shall be made by check or wire transfer payable to "Environmental Advocates" and remitted to the firm within sixty (60) Days after the Effective Date and SCE's timely receipt of an IRS Form W-9, and any other necessary tax forms for Environmental Advocates ("Payment Date").

31.     Oversight Costs. On or before the Payment Date, SCE shall pay EcoRights and SBCK the sum of One Hundred Twenty-Five Thousand Dollars ($125,000.00) as complete payment of oversight costs. SCE shall make payment by check or wire transfer payable to "Environmental Advocates" consistent with payment instructions to be provided by EcoRights and SBCK. The amount paid to EcoRights and SBCK pursuant to this Paragraph 31 shall be the sole payment made by SCE to EcoRights and SBCK for oversight of this Consent Decree between the Effective Date and the Termination Date, excepting any fees and cost incurred in any judicial dispute resolution as permitted under the Consent Decree. EcoRights and SBCK otherwise waive and release any and all claims for oversight costs prior to the Termination Date and covenant not to sue or otherwise pursue any judicial action to recover or seek additional oversight costs.

32.     Stipulated Penalties.

A.      SCE shall pay stipulated penalties in accordance with this Paragraph

32 for any failure to (1) timely submit payment as required under Paragraphs 30 (Fees and Costs) and 31 (Oversight Costs), or (2) timely submit an Annual Report as required under Paragraph 25.

B.    No stipulated penalties shall begin to accrue until five (5) Days after EcoRights and SBCK provide SCE with written notice of a failure to (1) timely submit payment as required under Paragraphs 30 (Fees and Costs) and 31 (Oversight Costs), or (2) timely submit an Annual Report as required under Paragraph 25.

C.    Provided SCE does not cure its failure to (1) timely submit payment as required under Paragraphs 30 (Fees and Costs) and 31 (Oversight Costs), or (2) timely submit an Annual Report as required under Paragraph 25 within the five (5) Day time period, stipulated penalties shall accrue at a rate of $750.00/day for each noncompliance beginning on the sixth Day after of receipt of the required notice until SCE cures the noncompliance or SCE triggers dispute resolution in accordance with Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE).

D.    Following SCE's curing of any noncompliance, SCE shall have thirty (30) days to pay any stipulated penalties owed.  Any stipulated penalties owed shall be payable to Coastal Quest to further fund the projects identified in Paragraph 29(B) (Mitigation Funding), and SCE shall provide EcoRights and SBCK with proof of such payment within five (5) Days of making the payment.

E.    Should SCE dispute a claim of non-compliance, and trigger dispute resolution in accordance with Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE), the accrual of stipulated penalties pursuant to this Paragraph 32 shall be tolled pending resolution of the Dispute (as defined in Paragraph 34 below).

**VII. TECHNICAL DISPUTE RESOLUTION**

33.    Technical dispute resolution shall only apply in those circumstances where

specifically identified in this Consent Decree, and in any dispute in which the Parties
subsequently agree in writing that a technical dispute should be appropriately resolved by
this Technical Dispute Resolution. In all other circumstances where there is a Dispute (as
defined in Paragraph 34 below), the dispute resolution and enforcement process set forth
in Section VIII (DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT
DECREE) shall apply. Technical dispute resolution shall proceed as follows:

A.      Unless the Parties mutually agree otherwise, the Parties shall schedule an
informal meet and confer to occur within ten (10) Days of Plaintiffs' notice of
disagreement (or such other date as mutually agreed upon) to discuss the proposed
Alternative BMP Proposal, calculation and/or application of Facility-specific Pollutant
Action Levels, or the adjusted Facility-specific Pollutant Action Level and seek to reach
an acceptable resolution of any disagreement.

B.      If the informal process does not result in a resolution, either Party may
trigger a Technical Peer Review Process by providing written notice to the other Party
within seven (7) Days of the conclusion of the informal meet-and-confer process or an
agreement not to meet-and-confer. The Technical Peer Review Process shall be
performed by three consultants, at SCE's expense, selected as follows: (i) a consultant
selected by Plaintiffs; (ii) a consultant selected by SCE; and (iii) a consultant mutually
selected by the two other consultants (the "Panel"). SCE's agreement to pay each
consultant is conditioned upon the consultant charging a reasonable market rate for
California for the type and scope of work being performed pursuant to this Consent
Decree. Each consultant on the Panel shall have relevant experience in dioxin issues and
shall have an advanced degree reasonably related to the relevant issues, such as
engineering, chemistry, geology, hydrogeology, or other similar field. The Panel shall
review the Alternative BMP Proposal, calculation and/or application of the Facility-
specific Pollutant Action Levels or proposed adjusted Facility-specific Pollutant Action
Level under dispute and shall, by majority vote, either approve, modify, or reject the

Alternative BMP Proposal, calculation and/or application of the Facility specific Pollutant Action Levels or proposed adjusted Facility-specific Pollutant Action Level. The decision of the Panel shall be final and is not subject to the dispute resolution provisions in Section VIII of this Consent Decree. Unless an alternative schedule is mutually agreed by the Parties, the Panel shall provide the Parties with a written report supporting their decision within sixty (60) Days of the selection of all three consultants. During the technical review process, the Panel shall be able to request reasonable information from the Parties (provided that it is in the reasonable possession or control of the Party and does not require additional sampling or other field work, or seek privileged information) relevant to its analysis. If the Panel requests any such information, the request shall be provided to both Parties and both Parties shall have the opportunity to provide responsive information. The Panel (and the individual panelists) shall not, however, have any ex parte communications with the Parties prior to completing its written report.

## VIII. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE

34.     Unless otherwise specifically specified by this Consent Decree, if a dispute under this Consent Decree arises or any Party believes that a breach of this Consent Decree has occurred (collectively, a "Dispute"), prior to the Termination Date, the Party raising the Dispute shall give written notice describing the nature of the Dispute to the other Parties ("Dispute Notice"). Such Dispute Notice must be provided no later than ninety (90) Days after a Party has actual knowledge of the relevant facts giving rise to the Dispute. If less than ninety (90) Days remain prior to the Termination Date, such Dispute Notice must be provided no later two (2) Days after a Party has actual knowledge of the relevant facts giving rise to the Dispute. Resolution of a particular Dispute, if timely noticed and prosecuted in accordance with the procedure and time schedule set forth in this Paragraph 34, shall, if necessary, extend beyond the Termination Date, but shall not

otherwise act to extend the Termination Date for any matter not subject to the particular Dispute.

      A.     Within fourteen (14) Days of delivering the Dispute Notice to the other Parties, or as soon as reasonably achievable thereafter as agreed by the Parties, the Parties shall meet and confer about whether a breach has occurred and, if needed, develop a mutually agreed upon plan, including implementation dates, to resolve the Dispute. Such a plan can include, but is not required to include, an agreement to engage in a mediation process—including retention of a mediator—in an effort to resolve the Dispute. Each Party shall be responsible for its own attorneys' fees and costs during the meet and confer dispute resolution process, except as provided by Paragraph 34(B), below.

      B.     If the Parties fail to timely meet and confer, or the meet-and-confer does not resolve the Dispute, after (i) at least seven (7) Days have passed after the meet-and-confer occurred, or (ii) twenty one (21) Days after delivery of the Dispute Notice to the other Parties, whichever is later, any Party may file a motion with the District Court for the limited purposes of enforcement of the terms of this Consent Decree or resolution of any Dispute otherwise arising under the terms of this Consent Decree. No Party shall be entitled to file such motion unless it has provided a Dispute Notice and used best efforts to meet and confer in good faith as provided in Paragraph 34(A). In any judicial dispute resolution proceeding between the Parties in connection with this Consent Decree and consistent with this Paragraph 34(B), the prevailing Party shall be entitled to seek its reasonable attorneys' fees and costs in such proceeding pursuant to the standards set forth by 42 U.S.C. § 6972(e) and associated applicable case law. When responding to a motion seeking attorneys' fees and/or costs, a Party is not precluded from asking the Court to consider its offers made in an attempt to resolve the Dispute prior to seeking the involvement of the Court consistent with any relevant limitation pursuant to the Federal Rules of Civil Procedure and the Local Rules.

## IX. WAIVER, RELEASE, AND COVENANT

35. <u>EcoRights and SBCK's Waiver and Release</u>. Upon the Effective Date of this Consent Decree and through and including the Termination Date (or, as applicable to any Facility, partial termination pursuant to Paragraph 40(A) or (B)), EcoRights and SBCK, on their own behalf and on behalf of board members, subsidiaries, predecessors, successors, assigns, directors, officers, agents, attorneys, representatives, and employees (collectively, the "EcoRights and SBCK Releasing Parties"), hereby forever release and discharge SCE and each of its officers, directors, present and former employees, agents, attorneys, consultants, shareholders, members, parents, subsidiaries, predecessors, successors, assigns, affiliates, and each of their respective heirs, successors, assigns, present and former employees, agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from and waive all claims in the Action and which arise from or could have arisen from the application of the CWA, RCRA or other law to the common nucleus of facts alleged in the Notice Letter and/or Complaint, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including without limitation, fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed.

36. <u>SCE's Waiver and Release</u>. Upon the Effective Date of this Consent Decree and through and including the Termination Date, SCE releases the EcoRights and SBCK Releasing Parties from and waives all claims in the Action, including without limitation, all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in the Action.

37. <u>EcoRights and SBCK's Covenant Not to Sue</u>. Except for the enforcement of this Consent Decree, beginning on the Effective Date and terminating on the Termination Date (or, as applicable to any Facility, partial termination pursuant to Paragraph 40(A) or (B)), the EcoRights and SBCK Releasing Parties shall not serve any notice of intent to sue nor file any lawsuit against SCE and/or a Released Defendant Party under any

federal, State or local environmental laws in connection with the claims released by the EcoRights and SBCK Releasing Parties in this Consent Decree. Any notice of intent to sue or lawsuit filed by EcoRights and SBCK Releasing Parties after the Termination Date shall not include any such claims occurring in the time period through and including the Termination Date.

38.    With respect to the matters released in Paragraphs 35 and 36, the Parties acknowledge that they are familiar with section 1542 of the California Civil Code, and knowingly waive all provisions of section 1542 of California Civil Code, to the extent applicable. Section 1542 provides as follows:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

The Parties recognize they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the subject matter of the released claims in Paragraphs 35 and 36, but the Parties will have fully, finally, and forever settled and released any and all such claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, without regard to the subsequent discovery or existence of such different or additional facts.

## X. PARTIAL OR FULL TERMINATION

39.    Notwithstanding any requirement or term of this Consent Decree, the Consent Decree shall terminate no later than the Termination Date.

40.    Prior to the Termination Date, the requirements of this Consent Decree shall terminate as to any Facility thirty (30) days after one or more of the following

circumstances described in subparagraphs A or B ("Termination Criteria") occurs and
SCE elects to provide notice to EcoRights and SBCK of meeting one of the Termination
Criteria.

   A. SCE has ceased all storage, cutting, and handling of
pentachlorophenol-treated wood poles and TWW at a Facility and, as appropriate,
sweeps, cleans, and power-washes the former Pole Area(s) and the area(s) where the
TWW storage bins were located prior to cessation.  If SCE resumes storage of
pentachlorophenol-treated wood poles or TWW at the Facility prior to the Termination
Date, the terms of this Consent Decree shall once again apply to the Facility until the
Termination Date or until one or more of the Termination Criteria is met.

   B. SCE has closed the Facility and, as appropriate, sweeps, cleans, and
power-washes the former Pole Area(s) and the area(s) where the TWW storage bins were
located prior to closure. If SCE reopens the Facility prior to the Termination Date, the
terms of this Consent Decree shall once again apply to the Facility until the Termination
Date or until one or more of the Termination Criteria is met.

## XI. MISCELLANEOUS PROVISIONS

  41. <u>No Admission</u>. The Parties enter into this Consent Decree for the purpose of
avoiding prolonged and costly litigation. Nothing in this Consent Decree shall be
construed as, and SCE expressly does not intend to imply, an admission as to any fact,
finding, issue of law, or violation of law, nor shall compliance with this Consent Decree
constitute or be construed as an admission by SCE of any fact, finding, conclusion, issue
of law, or violation of law. However, this Paragraph 41 shall not diminish or otherwise
affect the obligation, responsibilities, and duties of the Parties under this Consent Decree.

  42. <u>Confidential Information</u>.

   A. The Parties recognize that this Consent Decree requires or
contemplates that the Parties will exchange certain information pertaining to the

implementation, compliance with, or oversight of the terms in the Consent Decree and
which is generated in connection with the terms of the Consent Decree. In accordance
with Paragraph 25(E), SCE shall provide a summary of activities undertaken each year in
a non-confidential section of each Annual Report that Plaintiffs shall be entitled to use at
their discretion. Any other information received by a Party pursuant to this Consent
Decree from another Party, including but not limited to Stormwater Facility maps and
stormwater sampling data, as well as all photographs and video taken by Plaintiffs during
inspections pursuant to Paragraph 23 shall be considered "Confidential Information" and
shall be subject to the limitations in this Paragraph 42.

B.     EcoRights or SBCK may inform their attorneys, consultants, officers,
boards of directors, and members whether SCE's analysis of stormwater samples
performed pursuant to this Consent Decree or any other information indicates that it has
reduced Pollutant levels in stormwater runoff to Pollutant Action Levels, Facility-specific
Pollutant Action Levels or Infiltration BMP Pollutant Action Levels. To the extent that
EcoRights or SBCK communicates this information to its attorneys, consultants, officers,
boards of directors, or members, EcoRights or SBCK shall remind its attorneys,
consultants, officers, Board of Directors, or members that such information is
Confidential Information and must be handled in accordance with the requirements of
this Paragraph 42.

C.     In any dispute resolution proceeding, to the extent that Confidential
Information is material to the dispute, EcoRights or SBCK may provide the Court or
Technical Review Panel with the results of SCE's analysis of stormwater samples
performed pursuant to this Consent Decree. When filing Confidential Information with
the Court, EcoRights or SBCK shall request leave from the Court to file the Confidential
Information under seal and if leave is granted, shall only file this material under seal. If
the Court denies leave to file Confidential Information under seal, and further indicates it
will not admit the information into evidence unless it is publicly filed in a manner that

reveals its source, EcoRights or SBCK shall be allowed to file this information. When

providing Confidential Information to the Technical Review Panel, EcoRights or SBCK

shall require the Technical Review Panel to manage any such Confidential Information in

accordance with this Paragraph 42.

      D.    EcoRights or SBCK may provide anonymized sampling information to

third parties, provided that use of such data is independent of any claims (or potential

claims) against SCE, and the scope of information disclosed is limited to anonymized

sampling data reported in connection with implementation of a Treatment/Structural

BMP or an approved Alternative BMP Proposal pursuant to Paragraphs 16-18. In the

event EcoRights or SBCK intends to provides such data to any third party, or intends to

use it in a future judicial proceeding, it shall provide a copy of the anonymized

information, to SCE seven (7) Days prior to delivering the information to any third party

or including the information in a judicial proceeding. In the event that SCE objects to the

form or nature of the anonymized information, EcoRights and/or SBCK shall not provide

the information to any third-party or include the information in a judicial proceeding until

such Dispute is resolved via the dispute resolution process in Section VIII or by Court

order. Under no circumstances shall EcoRights and SBCK provide non-anonymized

sampling information to a third party or use non-anonymized sampling information in

any judicial proceeding, except in a proceeding related to enforcement of the Consent

Decree. Should EcoRights or SBCK seek to use the information in a judicial proceeding

to enforce the Consent Decree, the information shall be filed under seal.

      E.    The Parties agree that, subject to the exceptions in this Paragraph 42,

Confidential Information shall not be disclosed to any other person and only be used by a

Party for the purpose of implementing, complying with, or overseeing the terms of this

Consent Decree (which shall include sharing such Confidential Information with counsel,

consultants, experts, laboratories, and contractors, or similar entities, provided that they

are acting on behalf of a Party for the purpose of implementing, complying with, or

overseeing this Consent Decree). Notwithstanding the foregoing, nothing herein shall restrict SCE's right to share its own information as it deems appropriate. The Parties shall (i) keep all Confidential Information, and all information and evaluations derived from such Confidential Information, in confidence using a reasonable degree of care to prevent disclosure to unauthorized third-parties; (ii) limit use of Confidential Information as specified in this Paragraph 42; (iii) only reproduce or disseminate Confidential Information of another Party to the extent necessary and as permitted by this Consent Decree; and (iv) promptly inform the other Parties, in writing, of any unpermitted release or sharing of or request, including pursuant to judicial process, for, the Confidential Information.

F.      The obligations of confidentiality with respect to Confidential Information shall not apply to any such Confidential Information which (i) is publicly known or later made public through no wrongful or negligent act of the receiving and/or disclosing Party; (ii) is received free of restriction on disclosure from another source having the right to so furnish the Confidential Information; (iii) is used or disclosed in connection with enforcement of this Consent Decree and subject to a protective order entered by the District Court; (iv) is approved for release in writing by the Parties; or (v) is required to be disclosed by operation of law, subject to notice reasonably prior to the disclosure.

43.    <u>Force Majeure</u>. No Party shall be considered to be in default in the performance of any of its obligations when a delay of performance or failure to perform is due to a "Force Majeure event." A Force Majeure event is any unforeseeable event or circumstance which is not caused by a material act or omission of a Party, which results in any delay in, or total or partial failure of, performance of the affected Party after that Party has exercised due diligence to remedy, avoid or limit the impact of the event, including, without limitation, any act of God, war, fire, earthquake, flood, pandemic, weather event, social unrest, health emergency, restraint by court order or public

authority, and/or delay caused by a regulatory or government agency for reasons outside the control of a Party. A Force Majeure event does not include normal inclement weather or inability to pay.

44.    <u>Binding on the Parties</u>. The terms of this Consent Decree shall be binding on all Parties and their employees, officers, members, shareholders, attorneys, agents, divisions, subsidiaries, parent corporations, affiliates, successors in interest including subsequent purchasers, and assignees.

45.    <u>Counterparts</u>. This Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Consent Decree shall be valid as an original.

46.    <u>Severability</u>. In the event that any one of the provisions of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

47.    <u>Authority to Enter Agreement</u>. The undersigned are authorized to execute this Consent Decree on behalf of its respective Party and have read, understood and agreed to be bound by all of the terms and conditions of this Consent Decree.

48.    <u>Integration</u>. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein. This Consent Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Decree, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings and communications of the Parties, whether oral or written, respecting the matters covered by this Consent Decree. This Consent Decree may be amended or modified only by a writing signed by the Parties or its authorized representatives.

49.    <u>Agreement for the Benefit of the Parties</u>. This Consent Decree and its attachments are made for the sole benefit of the Parties, and no other person or entity

shall have any rights or remedies under or by reason of this Consent Decree, unless
otherwise expressly provided for therein.

50.    <u>Notices</u>. Any notices or documents required or provided for by this Consent
Decree or related thereto that are to be provided to EcoRights and SBCK pursuant to this
Consent Decree shall be sent by electronic mail transmission to the email addresses listed
below (unless electronic mail transmission is infeasible in which case electronic or paper
copies shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as
follows):

> Fredric Evenson
> Ecology Law Center
> PO Box 1000
> Santa Cruz, CA 95061-1000
> evenson@ecologylaw.com

> Ben Pitterle
> Santa Barbara Channelkeeper
> 714 Bond Ave.
> Santa Barbara, CA 93103
> ben@sbck.org

With copies sent to:

> Christopher Sproul (State Bar No. 126398)
> Environmental Advocates
> 5135 Anza Street
> San Francisco, California 94121
> csproul@enviroadvocates.com

> Jason R. Flanders
> Aqua Terra Aeris Law Group
> 4030 Martin Luther King Jr. Way
> Oakland, CA 94609
> jrf@atalawgroup.com

Any notices or documents required or provided for by this Consent Decree or

related thereto that are to be provided to SCE shall be sent by electronic mail transmission to the email addresses listed below (unless electronic mail transmission is infeasible in which case electronic or paper copies shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows):

> Ken Borngrebe
> Director of Environmental Services
> Southern California Edison Company2244 Walnut Grove Ave.
> Rosemead, CA 91770
> Email: Kenneth.Borngrebe@sce.com
>
> Shannon Oldenburg
> Senior Attorney—Environmental
> Southern California Edison Company
> Law Department
> 2244 Walnut Grove Ave.
> Rosemead, CA 91770
> Email: shannon.oldenburg@sce.com

With copies sent to:

> J. Tom Boer
> Hogan Lovells US LLP
> 3 Embarcadero Center
> Suite 1500
> San Francisco, CA 94111
> E-Mail: Tom.Boer@hoganlovells.com

Each Party shall promptly notify the other Parties of any change in the above-listed contact information.  Any notice provided under this Consent Decree shall be deemed received on the day it is emailed if sent by email and received three (3) Days after the date of mailing if sent by United States mail.

   51.   <u>Electronic Signatures</u>. Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

   52.   <u>Court Approval</u>. If for any reason the District Court should decline to

1  approve this Consent Decree in the form presented, the Parties shall use best efforts to

2  work together to modify the Consent Decree to address any deficiency or other objection

3  identified by the Court within thirty (30) Days so that it is acceptable to the District

4  Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable

5  manner, this Consent Decree shall be null and void.

6     53.    Representation by Counsel. This Consent Decree shall be deemed to have

7  been drafted equally by the Parties and shall not be interpreted for or against any Party on

8  the ground that any such Party drafted it. Each of the Parties agrees that it has been

9  represented by independent counsel of its choice during the negotiation of this Consent

10  Decree and has had the opportunity to review the provisions of the Decree with its

11  independent counsel in advance of execution.

12     54.    Headings and Captions. The headings and captions used in the Consent

13  Decree are for reference purposes only and shall not have any effect on the interpretation

14  of the Decree.

15

16                         Ecological Rights Foundation

17  Date: 11/03/21

18                         By: James Lamport, Executive Director

19                         Santa Barbara Channelkeeper

20  Date: 11/02/21

21                         By: TED MORTON, EXECUTIVE DIRECTOR

22

23                         Southern California Edison Company

24  Date:_____

25                         By: James W. Niemiec
                           VP, Operational Services

26

27

28
Consent Decree                    40              Civil Case No. 5:20-cv-01108-AB-KK

approve this Consent Decree in the form presented, the Parties shall use best efforts to work together to modify the Consent Decree to address any deficiency or other objection identified by the Court within thirty (30) Days so that it is acceptable to the District Court. If the Parties are unable to modify this Consent Decree in a mutually acceptable manner, this Consent Decree shall be null and void.

53.    Representation by Counsel. This Consent Decree shall be deemed to have been drafted equally by the Parties and shall not be interpreted for or against any Party on the ground that any such Party drafted it. Each of the Parties agrees that it has been represented by independent counsel of its choice during the negotiation of this Consent Decree and has had the opportunity to review the provisions of the Decree with its independent counsel in advance of execution.

54.    Headings and Captions. The headings and captions used in the Consent Decree are for reference purposes only and shall not have any effect on the interpretation of the Decree.

Ecological Rights Foundation

Date:_____

By:    James Lamport, Executive Director

Santa Barbara Channelkeeper

Date:_____

By: _____

Southern California Edison Company

Date: 3 Nov 21

By: James W. Niemiec
VP, Operational Services

Approved as to Form:

Date: Nov. 2, 2021                           Environmental Advocates

                                             *Christopher Sproul*

                                             By:    Christopher Sproul
                                             Attorney for Plaintiffs EcoRights and SBCK

Date: Nov. 3, 2021                           Hogan Lovells US LLP

                                             By:    J. Tom Boer
                                             Attorney for Defendant Southern California
                                             Edison Company

# EXHIBIT A
## Facilities List

1. 103 David Love Place
   Goleta, CA 93117

2. 10060 Telegraph Road
   Ventura, CA 93004

3. 1325 & 1241 South Grand Avenue
   Santa Ana, CA 92705

4. SCE Pardee Substation Helistop
   Santa Clarita, CA 91355

5. 1721 22nd Street
   Santa Monica, CA 90404

6. 1351 East Francis Street
   Ontario, CA 91761

7. 1851 West Valencia Drive
   Fullerton, CA 92833

8. 13025 Los Angeles Street
   Irwindale, CA 91706

9. 2800 East Willow Street
   Long Beach, CA 90806

10. 9901 Geary Avenue
    Santa Fe Springs, CA 90670

11. 3589 Foothill Drive
    Thousand Oaks, CA91361

12. 12353 Hesperia Road
    Victorville, CA 92395

13. 1924 East Cashdan Street
    Compton, CA 90220

14. 800 West Cienega Avenue
    San Dimas, CA 91773

15. 1440 South California Avenue
    Monrovia, CA 91016

16. 42060 10th Street West
    Lancaster, CA 93534

17. 24487 Prielipp Road
    Wildomar, CA 92595

18. 7333 Bolsa Avenue
    Westminster, CA 92683

19. 26364 Pine Avenue
    Rimforest, CA 92378

20. 505 Maple Avenue
    Torrance, CA 90503

21. 2425 South Blackstone Street
    Tulare, CA 93274

22. 7951 Redwood Avenue
    Fontana, CA 92336

23. 14155 Bake Parkway
    Irvine, CA 92618

24. 17512 Yukon Avenue
    Torrance, CA 90504

25. 26100 Menifee Road
    Romoland, CA 92585

26. 36100 Cathedral Canyon Drive
    Cathedral City, CA 92234

# EXHIBIT B
## Dioxins TEQ Equation, Toxicity Equivalency Factors and Bioaccumulation Equivalency Factors

$$Dioxins\ TEQ = \Sigma(C_x \times TEF_x \times BEF_x)$$

Where,

$C_x$ = concentration of dioxin or furan congener x

$TEF_x$ = TEF for congener x

$BEF_x$ = BEF for congener x

| Congener | Great Lakes Water Quality Initiative Bioaccumulation Equivalency Factors (BEF) | 2005 World Health Organization (WHO) Toxic Equivalency Factors (TEF) |
|---|---|---|
| 1,2,3,4,6,7,8-HpCDD | 0.05 | 0.01 |
| 1,2,3,4,6,7,8-HpCDF | 0.01 | 0.01 |
| 1,2,3,4,7,8,9-HpCDF | 0.4 | 0.01 |
| 1,2,3,4,7,8-HxCDD | 0.3 | 0.1 |
| 1,2,3,4,7,8-HxCDF | 0.08 | 0.1 |
| 1,2,3,6,7,8-HxCDD | 0.1 | 0.1 |
| 1,2,3,6,7,8-HxCDF | 0.2 | 0.1 |
| 1,2,3,7,8,9-HxCDD | 0.1 | 0.1 |
| 1,2,3,7,8,9-HxCDF | 0.6 | 0.1 |
| 1,2,3,7,8-PeCDD | 0.9 | 1 |
| 1,2,3,7,8-PeCDF | 0.2 | 0.03 |
| 2,3,4,6,7,8-HxCDF | 0.7 | 0.1 |
| 2,3,4,7,8-PeCDF | 1.6 | 0.3 |
| 2,3,7,8-TCDD | 1.0 | 1 |
| 2,3,7,8-TCDF | 0.8 | 0.1 |
| OCDD | 0.01 | 0.0003 |
| OCDF | 0.02 | 0.0003 |

**EXHIBIT C**
**COVID 19 Protocol**

**AGREEMENT ON THE COVID-19 PROTOCOL AND OTHER RESTRICTIONS GOVERNING PLAINTIFFS' SITE INSPECTIONS**

*Ecological Rights Foundation v. Hot Line Construction, Inc.*
Civil Case No.: 5:20-cv-01108-AB-KK

This Agreement on the COVID-19 Protocol and Other Restrictions Governing Plaintiffs' Site Inspections (**"Agreement"**) is made and effective the 12th day of January 2021 (the "Effective Date") between Ecological Rights Foundation ("EcoRights"), Santa Barbara Channelkeeper ("SBCK") and Southern California Edison Company ("SCE"). EcoRights, SBCK and SCE are sometimes individually referred to herein as a "Party" or collectively as the "Parties" and EcoRights and SBCK are collected referred to herein as "Plaintiffs."

**RECITALS**

A.    In the pending matter of *Ecological Rights Foundation v. Hot Line Construction, Inc.*, Civil Case No.: 5:20-cv-01108-AB-KK, Plaintiffs allege SCE violated the federal Clean Water Act by failing to obtain a National Pollutant Discharge Elimination System permit governing the discharge of stormwater at the 27 SCE facilities identified in their Second Amended Complaint.  Plaintiffs also allege that SCE violated the Resource Conservation and Recovery Act because SCE's past and present handling, storage, treatment, transportation and disposal of solid waste at the 27 facilities may present an imminent and substantial endangerment to human health and/or the environment.

B.    Plaintiffs provided its First Request for Entry Upon Land ("Inspection Request") on SCE October 10, 2020.  The parties held their Rule 26(f) conference on November 17, 2020, and on the same date, the Inspection Request was deemed served. SCE responded and objected to Plaintiffs Inspection Request on November 30, 2020.

C.    After Plaintiffs' first motion to compel site inspections was denied as premature [Dkt No. 35], Plaintiffs filed a second motion to compel in connection with the Inspection Request on December 11, 2020 [Dkt No. 39].

D.    In a December 30, 2021 Order Granting in Part Plaintiffs' Second Motion to Compel Site Inspections ("Order") [Dkt. No. 52], Magistrate Kato granted Plaintiffs the right to conduct the requested site inspections contingent upon complying with certain conditions, including SCE's COVID-19 restrictions.

E.    The parties exchanged correspondence about COVID-19 restrictions and precautions, and subsequently met and conferred on the topic on January 6.  Based upon that effort, it was evident that the parties had different respective interpretations of the Order with respect to the COVID-19 issues.

F.    In the interest of mutual cooperation and for the sole purpose of clearly delineating how any of the Plaintiffs' site inspections at the relevant facilities may proceed pursuant to the Order during the COVID-19 pandemic the parties agreed to negotiate specific precautions to clearly set expectations in advance of any site access.

G.     The Parties enter into this Agreement to memorialize the agreed upon COVID-19 protocol and other restrictions governing Plaintiffs' site inspections of SCE facilities conducted pursuant to the Order.

Therefore, in consideration of the mutual promises and undertakings agreed to herein, the parties agree as follows:

## AGREEMENT

1.     **COVID-19 Protocol**.

At all times while present at the facilities and throughout the site inspections authorized by the Order, Plaintiffs and their consultants and representatives (collectively, "Plaintiffs' Team") shall comply with all of the following:

(a)     Plaintiffs' Team members shall remain a distance of at least 10 feet away from any SCE employee during all times while conducting the site inspections;

(b)     No member of Plaintiffs' Team shall communicate with any SCE employees, contractors or representatives while conducting the site inspections with the following limited exceptions:  (i) as necessary to communicate and coordinate with the designated SCE site inspection escort for purposes of facilitating the site inspection; (ii) as necessary to ensure SCE receives splits of each sample collected by Plaintiffs' Team during the course of the site inspections, including samples collected immediately offsite of the SCE facilities; and (iii) as needed for protection of health and safety;

(c)     Plaintiffs' Team members shall wear face masks and gloves at all times while present at the facilities and throughout the entire duration of the site inspections.  Plaintiffs' Team members shall wear new gloves when inspecting each separate facility;

(d)     Plaintiffs' Team members shall remain outdoors at all times while conducting the site inspections, and shall not access any restrooms located on or at the facilities;

(e)     Plaintiffs' Team members shall avoid touching any portion of the facilities during the site inspections except as necessary to collect samples and walk on the facility property;

(f)     Plaintiffs' Team shall contain no more than two (2) members at any of the site inspections conducted pursuant to the Order;

(g)     Following receipt of the required 48 hours advance notice of the site inspections as required by the Order, SCE or its outside counsel shall provide Plaintiffs with copies of SCE's most current visitor questionnaire.  No later than 4 PM the day before the scheduled site inspection, Plaintiffs shall return a completed copy of the questionnaire for each Plaintiffs' Team member that will be attending the site inspection(s) via email to both    Tom    Boer    (tom.boer@hoganlovells.com)    and    Diana    Martin

2

(diana.martin@hoganlovells.com). Each of Plaintiffs' Team members shall also be subject to a wellness check upon arrival at each SCE facility. Should either of Plaintiffs' Team member's response to the questionnaire raises concerns, as determined by SCE personnel responsible for reviewing the visitor questionnaires, or should their be an unresolved issue with the onsite wellness check, Plaintiffs' Team member shall be precluded from entering SCE's facilities and participating in any site inspection(s) until such time that the issue is resolved. SCE reserves the right, in its sole and absolute discretion, to revise its visitor screening questionnaire and onsite wellness check procedure as it deems appropriate to protect its employees and contractors, provided such revisions are generally applicable to all similarly situated visitors to SCE's facilities. Plaintiffs agree to timely complete any revised version of the questionnaire in use;

(h)     No Plaintiffs' Team member that is traveling from outside of Southern California for purposes of attending any site inspection shall travel via airplane, train, bus or other form of public transportation;

(i)     Plaintiffs, including all Plaintiffs' Team members, shall comply with any additional SCE protocols that come into effect during the Term of this Agreement as defined in provision 3 below. SCE shall promptly notify Plaintiffs of changes in SCE's protocols that could affect Plaintiffs' site inspections; and

(j)     Plaintiffs, including all Plaintiffs' Team members, shall comply with all applicable federal, state and local laws, requirements, directives and ordinance related to COVID-19 both before attending and during the course of the site inspection(s).

2.     **Other Site Inspection Restrictions**.

At all times pertinent to conducting the site inspections as authorized by the Order, Plaintiffs and Plaintiffs' Team shall comply with all of the following, as well as any other restrictions set forth in Plaintiffs' First Request for Entry Upon Land, except as such restrictions may have been modified by the Order or this Agreement:

(a)     Unless SCE agrees otherwise, inspections shall occur on the date noticed, and once commenced, shall last no more than four (4) hours. Plaintiffs shall undertake reasonable efforts to notify SCE of the time Plaintiffs' Team will arrive at the SCE facility for the inspection. Plaintiffs understand and agree that a failure to provide adequate notice may delay admittance to the facility due to the need to have SCE staff available and present to escort Plaintiffs' Team;

(b)     Any videotaping of the inspections conducted by Plaintiff Team shall not include audio. Unless Plaintiffs advise SCE otherwise, Plaintiffs' Team shall use Camera Plus Pro without audio to record the site inspection(s) on their hand-held devices. To the maximum extent possible, Plaintiffs' Team members shall avoid videotaping SCE employees, contractors and representatives present at the facility during the course of the site inspection;

(c)     Plaintiffs shall provide a written sampling protocol which shall, among other things, identify the maximum number of samples to be taken at each facility,

3

the types of samples that shall will be taken, the constituents that will be tested for, and the test method that Plaintiffs intend to use. Plaintiffs shall provide such written sampling protocol sufficiently in advance of any site inspection to ensure SCE's consultant can secure all necessary equipment to obtain splits of all samples Plaintiffs' Team collect throughout the course of the site inspection;

(d)    Plaintiffs understand and agree that split samples of each sample Plaintiffs' Team collect will be taken at each of the site inspections, and that SCE shall have the right to handle and test such split samples as it determines appropriate;

(e)    Within 48 hours following the conclusion of each site inspection, Plaintiffs shall provide SCE, via email to Tom Boer and Diana Martin, with copies of all video and photographs taken during the site inspection;

(f)    Within three (3) days of Plaintiffs' or Plaintiffs' Team's receipt of results of the samples collected during the course of each site inspection, including all samples taken immediately offsite of SCE's facilities, Plaintiffs shall provide copies of the results to Tom Boer and Diana Martin via an electronic link provided by Hogan Lovells; and

(g)    Plaintiffs' Team members shall provide and wear their own safety vests, glasses, masks, gloves, hard hats, long-sleeved shirts, pants, and non-athletic-type, non-mesh, closed-toe shoes at all times during the course of the site inspections.

3.    **Term**.  The obligations herein shall be from the Effective Date until such time that COVID-19 restrictions are no longer in effect either under SCE's own health and safety requirements, or as required by federal, state or local law, requirement, directive or ordinance.

4.    **Compliance with Applicable Law**.  Notwithstanding the terms of this Agreement, the Parties must comply with, and are not releasing or waiving, compliance with any federal, state or local law, requirement, directive or ordinance governing COVID19 restrictions.

5.    **Applicability.**  This Agreement is binding on the Parties and each of their respective owners, employees, agents, subsidiaries, parent companies and companies under common ownership with a Party, and any person working on behalf of a Party.

6.    **No Admission of Liability.**  The Parties acknowledge and agree that (i) this Agreement, (ii) the act of entering into it, and (iii) any act or omission pursuant to this Agreement, must not be construed as an admission of any nature, including without limitation of any liability, responsibility, fault, or wrongdoing by any Party or with respect to the appropriate scope of discovery or grounds to appeal the Order or any other discovery orders.  SCE expressly reserves and has not waived its right to appeal, and all grounds in support of its appeal, of the Order.  This Agreement shall not be admissible or otherwise provided in any court-proceeding between the Parties except an action to enforce the terms of the Agreement or seek further clarification from the Court about appropriate COVID-19 protocols and precautions related to any access of the facilities by Plaintiffs.

4

       **7.**      <u>**Severability.**</u>  If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

       **8.**      <u>**Notices**</u>.   Notice required by this Agreement shall be provided electronically as follows:

If to EcoRights:

      Fredric Evenson
      Ecology Law Center
      P.O. Box 1000
      Santa Cruz, CA 95061
      E-mail: ecorights@earthlink.net

With a copy to:

      Christopher Sproul
      Environmental Advocates
      5135 Anza St.
      San Francisco, CA 94121
      E-mail: csproul@enviroadvocates.com

If to SBCK:

      Ben Pitterle
      Santa Barbara Channelkeeper
      714 Bond Avenue
      Santa Barbara, CA 93103
      Email: ben@sbck.org

With a copy to:

      Christopher Sproul
      Environmental Advocates
      5135 Anza St.
      San Francisco, CA 94121
      E-mail: csproul@enviroadvocates.com

      and

5

If to SCE:

Shannon K. Oldenburg
Southern California Edison
2244 Walnut Grove Avenue
Rosemead, CA 91770
Email: Shannon.oldenburg@sce.com

With a copy to:

J. Tom Boer
Hogan Lovells US LLP
3 Embarcadero Center, Suite 1500
San Francisco, CA 94111
Email: tom.boer@hoganlovells.com

9.    **No Implied Waiver and Reservation of Rights.**  Any Party's failure to insist in any one or more instances upon strict performance of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.  Moreover, the Parties reserve the right to seek further intervention from the court in the event they are unable to reach agreement if new information or developments, after the Effective Date, related to the pandemic results in SCE's request for additional COVID-19 precautions.

10.    **Headings**.    Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

11.    **Counterparts.**    This Agreement may be executed in multiple counterparts, and by facsimile or electronic mail by PDF or other read-only electronic file, each of which shall be deemed an original, but which together shall constitute one and the same agreement.

12.    **Governing Law.**  This Agreement is governed by and interpreted in accordance with the law of the State of California.

13.    **Subject Matter.**    This Agreement solely addresses COVID-19 precautions and other restrictions to be followed during any access to the facilities by Plaintiffs pursuant to the Order (subject to any appeal).  This Agreement does not provide any independent basis for Plaintiffs to access SCE's facilities in any manner.

14.    **Entire Agreement.**  This Agreement constitutes the entire agreement among the Parties concerning the subject matter hereof and supersedes any prior such agreements.  This Agreement may not be amended in any manner except in writing signed by the Parties.

6

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

On behalf of Ecological Rights Foundation, by its counsel Environmental Advocates

By: _____

Printed Name:  Christopher Sproul

Title:  Counsel for Plaintiffs

Date:  January 18, 2021


On behalf of Santa Barbara Channelkeeper, by its counsel Environmental Advocates

By: _____

Printed Name:  Christopher Sproul

Title:  Counsel for Plaintiffs

Date:  January 18, 2021


On behalf of Southern California Edison, by its counsel, Hogan Lovells US LLP

By: _____

Printed Name:  J. Tom Boer

Title:  Partner

Date:  January 12, 2021

7