Christopher Sproul (State Bar No. 126398)
csproul@enviroadvocates.com
Brian Orion (State Bar No. 239460)
borion@enviroadvocates.com
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Matthew C. Maclear (Bar No. 209228)
mcm@atalawgroup.com
ATA Law Group
4030 Martin Luther King, Jr. Way
Oakland, CA 94609
Telephone: (916) 202-3018

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HOT LINE CONSTRUCTION, INC., et al.,<br><br>Defendants. | Civil Case No. 5:20-cv-01108-AB-KK<br><br>**PLAINTIFFS' PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Trial Date: August 15, 2023<br>Location: 350 West First Street, Los Angeles, CA 9001, Courtroom 7B, Los Angeles, California<br>Judge: Hon. District Judge Andre Birotte |

## TABLE OF CONTENTS

I.    L.R. 16-4.1: PLAINTIFFS' CLAIM ........................................................................1

      A. Summary Statement of Plaintiffs' Claim ...................................................1

      B. Elements of Plaintiffs' Claim ....................................................................1

      C. Summary of the Key Evidence in Support of Plaintiffs' Claim ................1

            1. Background on Hot Line Facility Operations ....................................1

            2. Endangerment Risks Associated With Hot Line's Facility Operations ..........3

                  a. Background on Pentachlorophenol and Dioxins Chemistry and Toxicology ...............3

                  b. Fate and Transport of Pentachlorophenol and Dioxins Present at the Hot Line Facility. ...............4

                  c. Sensitivity of the Site and Goleta Slough Receiving Environment ...........6

                  d. Hot Line's Release of Pentachlorophenol and Dioxins at and Off-Site from the Facility Has Posed and Is Posing Environmental Risks. ............7

      D. Anticipated Evidentiary Issues ...............................................................8

      E. Issues of Law:Plaintiffs' Legal Argument ...............................................9

            1. Congress Intended RCRA To Comprehensively Regulate Waste Handling and Disposal and To Provide for Effective Citizens Suit Remedies. .............9

            2. Hot Line Has Handled, Stored, and/or Disposed of Solid Waste. ...............10

                  a. Hot Line's Materials in Issue Are RCRA Solid Waste. ...........10

                        i. TWW Stored and Disposed of at the Facility is RCRA Solid Waste. 12

                        ii. Wood Chip Debris Left at the Facility Is RCRA Solid Waste. .........12

                        iii. Pentachlorophenol Oil Dripping and Washing Off from TWW and the Poles Are RCRA Solid Waste. ......................................................12

                        iv. Stormwater and Sediments Disposed Off-Site from the Facility Are Solid Waste. ..................................................................................15

                  b. Hot Line's Pentachlorophenol Wastes Are Accumulating to Dangerous Levels in the Environment. ........................................................16

                  c. Hot Line Has Handled, Stored and Disposed of Solid Waste. ................17

      3. Hot Line's Handling, Storing And/or Disposing of Solid Waste May Present an Imminent and Substantial Endangerment to Health or the Environment. ...................................................................... 18

      4. Plaintiffs Are Entitled To Declaratory And Injunctive Relief To Address Hot Line's Imminent and Substantial Endangerment to Health or the Environment. ...................................................................... 22

II.   L.R. 16-4.4: Statement Concerning Jury Trial ........................................................ 24

III.   L.R. 16-4.4: Attorneys' Fees .................................................................................... 24

IV.   CONCLUSION ......................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,

632 F.3d 1127 (9th Cir. 2011) ................................................................................23

*American Mining Congress v. EPA*,

824 F.2d 1177 (D.C. Cir. 1987) ........................................................................11, 13

*Amoco Prod. Co. v. Village of Gambell*,

480 U.S. 531 (1987) ...............................................................................................23

*Ascon Properties, Inc. v. Mobil Oil Co.*,

866 F.2d 1149 (9th Cir. 1989) ..................................................................................9

*Biodiversity Legal Found. v. Badgley*,

309 F.3d 1166 (9th Cir. 2002) ................................................................................22

*Buchholz v. Dayton Int'l Airport*,

No. 94-435, 1995 U.S. Dist. LEXIS 9490 (S.D. Ohio 1995) ...............................15

*Cmty. Ass'n for Restoration of the Env't v. George & Margaret LLC*,

954 F. Supp. 2d 1151 (E.D. Wash. 2013) .............................................10, 11, 14, 15

*Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*,

989 F.2d 1305 (2d Cir. 1993).................................................................................11

*Cox v. City of Dallas*,

256 F.3d 281 (5th Cir. 2001) ............................................................................18, 19

*Crofton Ventures Ltd. Partnership v. G&H Partnership*,

258 F.3d 292 (4th Cir. 2001) ..................................................................................17

*Dague v. City of Burlington*,

935 F.2d 1343 (2d. Cir. 1991)......................................................................18, 19, 21

*Ecological Rights Foundation v. Pacific Gas and Elec. Co.*,

713 F.3d 502 (9th Cir. 2013) ...........................................................................passim

*Ethyl Corp. v. United States*,

541 F.2d 1 (D.C. Cir. 1976) ....................................................................................... 19

*Hinds v. Angioli*,

654 F.3d 846 (9th Cir. 2011) ..................................................................................... 18

*Inland Steel Co. v. U.S. Environmental Protection Agency*,

901 F.2d 1419 (7th Cir. 1990) ................................................................................... 15

*Interfaith Cmty. Org. v. Honeywell*,

399 F.3d 248 (3d. Cir. 2005), *cert. denied*, 545 U. S. 1129 (2005)............................. 20

*John's Organic Farm v. Gem County Mosquito Abatement Dist.*,

574 F.3d 1054 (9th Cir. 2009) ............................................................................. 24, 25

*L.E.A.D. Group of Berks v. Exide Corp.*,

No. 96-3030, 1999 U.S. Dist. LEXIS 2672 (E.D. Pa. Feb. 19, 1999).......................... 11

*Lincoln Properties v. Higgins*,

No. 91-760, 1993 U.S. Dist. LEXIS 1251 (E.D. Cal. 1993) .............................. 9, 19, 21

*Meghrig v. KFC Western, Inc.,*

516 U.S. 479 (1996).............................................................................................. 9, 20

*N. Cal. River Watch v. Honeywell Aero.*,

830 F. Supp.2d 760 (N.D. Cal. 2011) .................................................................. 16, 21

*Natural Res. Def. Council, Inc. v. U.S. Envt'l Prot. Agency*,

966 F.2d 1292 (9th Cir. 1992) ................................................................................... 22

*Nurad, Inc. v. William E. Hooper & Sons Co.*,

966 F.2d 837 (4th Cir. 1992) ..................................................................................... 17

*Olson v. Beck*,

No. 06-07487, 2011 U.S. Dist. LEXIS 114805 (N.D. Cal. Oct. 5, 2011) .........11, 20, 21

*Potomac Riverkeeper, Inc. v. Nat'l Capital Skeet & Trap Club, Inc.*,

388 F. Supp. 2d 582 (D. Md. 2005)..................................................................... 11, 17

*Price v. United States Navy*,

39 F.3d 1011 (9th Cir. 1994) ...........................................................................9, 18, 19

*Raritan Baykeeper Inc. v. NL Indus.*,

No. 09-4117, 2013 U.S. Dist. LEXIS 2628 (D. N.J. Jan. 8, 2013)................................15

*Reserve Mining Co. v. EPA*,

514 F.2d 492 (8th Cir. 1975) ................................................................................18, 19

*Resurrection Bay Conservation Alliance v. City of Seward*,

640 F.3d 1087 (9th Cir. 2011) .............................................................................24, 25

*REV 973 LLC v. Mouren-Laurens*,

2010 WL 383615, 2010 U.S. Dist. LEXIS 12514 (C.D. Cal. Jan. 25, 2010)..........23, 24

*Safe Air for Everyone v. Meyer et. al*,

373 F.3d 1035 (9th Cir. 2004) .............................................................................10, 11

*Steffel v. Thompson*,

415 U.S. 452 (1974)....................................................................................................22

*Sullins v. Exxon/Mobil Corp.*,

729 F. Supp. 2d 1129 (N.D. Cal. 2010) ......................................................................21

*U.S. v. Power Engineering Co.*,

191 F.3d 1224 (10th Cir. 1999) ...........................................................................11, 15

*Union Pac. R.R. Co. v. Hill*,

No. 21-03216, 2021 U.S. Dist. LEXIS 240524 (N.D. Cal., Dec.16, 2021) ............18, 19

*United States v. Alisal Water Corp.*,

326 F. Supp. 2d 1010 (N.D. Cal. 2002), *aff'd* 427 F.3d 597 (9th Cir. 2005) ................23

*United States v. Bethlehem Steel Corp.*,

38 F.3d 862 (7th Cir. 1994) ........................................................................................24

*United States v. Conservation Chemical Co.*,

619 F. Supp. 162 (D.C. Mo. 1985) ..............................................................................20

*United States v. Mendoza*,

244 F.3d 1037 (9th Cir. 2001) ....................................................................................19

*United States v. Northeastern Pharmaceutical*,

579 F. Supp. 823 (W.D. Mo. 1984), *aff'd* 810 F.2d 726 (8th Cir. 1986).......................20

*United States v. Oakland Cannabis Buyers' Coop.*,

    532 U.S. 483 (2001)...................................................................................................23

*United States v. Ottati & Goss, Inc.*,

    630 F. Supp. 1361 (D.N.H. 1985).............................................................................20

*United States v. Price,*

    688 F.2d 204 (3rd Cir. 1982) ...................................................................................22

*United States v. Vertac*,

    489 F. Supp. 870 (E.D. Ark. 1980)..........................................................................19

*Voggenthaler v. Md. Square LLC*,

    724 F.3d 1050 (9th Cir. 2013) .................................................................................17

*Winter v. NRDC, Inc.*,

    555 U.S. 7 (2008).....................................................................................................23

*Zands v. Nelson*,

    779 F. Supp. 1254 (S.D. Cal. 1991).................................................................11, 14

**Statutes**

42 U.S.C. § 6903 ...........................................................................................................17

42 U.S.C. § 6903(3) .......................................................................................................17

42 U.S.C. § 6903(27) ...............................................................................................10, 15

42 U.S.C. § 6972(a)(1)(B) ...............................................................................................1

42 U.S.C. § 6972(e) .......................................................................................................24

42 U.S.C. § 9601(29) .....................................................................................................17

**Other Authorities**

H.R. Rep No. 1491, 94th Cong., 2d Sess. 4,

    *reprinted in* 1976 U.S.C.C.A.N. 6238, 6241 ..........................................................9

H.R. Rep. No. 198, 98th Cong., 2d Sess. 53-54,

*reprinted in* 1984 U.S. Code Cong. & Admin. News 5576, 5612-13 .............................9

H.R. Rep. No. 94-1491(I) at 2 (1976),

*reprinted in* 1976 U.S.C.C.A.N. 6238, 6240 .............................................................11

House Conference Report at 5688-89................................................................................9

S. Rep. No. 98-284 (1983) .............................................................................................22

**Rules**

Local Rule 16-4..............................................................................................................1

Pursuant to the Central District's Local Rule 16-4, Plaintiffs Santa Barbara Channelkeeper ("SBCK") and the Ecological Rights Foundation ("EcoRights") hereby submit this Pretrial Memorandum of Contentions of Fact and Law.

## I.    L.R. 16-4.1: PLAINTIFFS' CLAIM

### A. Summary Statement of Plaintiffs' Claim

Plaintiffs SBCK and EcoRights have brought a claim against Hot Line Construction, Inc. ("Hot Line") under the Resource Conservation and Recovery Act ("RCRA")'s citizen suit provision, section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). Plaintiffs claim that Hot Line has violated RCRA section 7002(a)(1)(B) by having contributed to the past and present handling, storage, treatment, transportation or disposal of solid waste at Hot Line's former service yard facility located at 701 Robert Keister Road, Santa Barbara, California ("the Hot Line Facility" or "the Facility") in a manner that may present an imminent and substantial endangerment to human health and the environment. *See* Second Amended Complaint ("SAC") (Dkt.19).[1]

### B. Elements of Plaintiffs' Claim

Plaintiffs' RCRA claim has the following elements: (1) Hot Line has contributed to the past handling, storage, treatment, transportation, or disposal of solid waste. (2) Hot Line's past present handling, storage, treatment, transportation, or disposal of solid waste may present an imminent and substantial endangerment to health or the environment.

### C.  Summary of the Key Evidence in Support of Plaintiffs' Claim

#### 1.  Background on Hot Line Facility Operations

Hot Line leased the Facility site from the City of Santa Barbara in May 2014 and operated the Facility from 2014 through 2019 as a service facility to provide various services to Southern California Edison ("SCE") as a high voltage electrical contractor.

---

[1] On March 23, 2021, the parties filed a Stipulation whereby Plaintiffs dismissed their First Claim for Relief for Hot Line violations of the Clean Water Act. (Dkt. 86). Accordingly, the remaining claim in this case is Plaintiffs' Second Claim for Relief for violations of RCRA.

PLTS. MEM. OF FACT & LAW CONTENTIONS            1            No. 5:20-cv-01108-AB-KK

Plaintiffs' Proposed Trial Findings of Fact and Conclusions of Law ("FOF"), ¶¶ 11, 12. Hot Line stored and handled utility poles ("Poles") that SCE used in its electrical supply grid that were treated with the wood preservative pentachlorophenol. Hot Line also received treated wood waste ("TWW") from SCE, *i.e.*, wood waste left over from discarded utility poles and utility pole crossarms. FOF, ¶ 12. While Hot Line leased the Facility, Hot Line stored Poles at the Facility near the northern and southern edges of the Facility, parallel to the Facility boundaries adjoining the Hayward Lumber facility to the north and Robert Keister Road to the south. FOF, ¶ 13. Hot Line also placed TWW into waste bins at the located at the center of the Facility and stored such TWW until it was transported for off-site landfill disposal. FOF, ¶ 14. While operating the Facility, Hot Line's handling of the Poles and TWW at the Facility dislodged wood chip slivers/debris from the Poles and TWW which then became widely deposited on the unpaved ground surface of the Facility, where it largely still remains. FOF, ¶¶ 19, 22, 23, 33, 82, 101.

Pentachlorophenol oil is used as a heavy-duty wood preservative (for telephone poles and railroad ties). The pentachlorophenol used to treat the Poles and TWW stored at the Facility contained polychlorinated dibenzo-p-dioxins ("PCDDs") and polychlorinated dibenzo furans ("PCDFs") (collectively referred to as "dioxins"). FOF, ¶¶ 20, 21. As discussed further below, this pentachlorophenol oil tends to drip from or wash off the Poles and TWW and become entrained in stormwater runoff from the Poles and TWW storage areas and from the Facility generally. FOF, ¶¶ 20, 21.

When Hot Line operated the Facility, Hot Line did not employ any method to capture stormwater runoff from its TWW or Poles storage areas and prevent such stormwater runoff from contacting the soils around and downstream from these areas. FOF, ¶ 34. Hot Line also did not employ any best management practices or treatment methods designed to prevent pentachlorophenol or dioxins from becoming entrained in stormwater runoff from the Facility. Stormwater runoff generated by rainfall at the Facility flows toward a low spot at the Facility's southeastern corner about 15 to 20 feet away from the driveway entrance to the Facility, along Robert Keister Road. FOF, ¶¶ 36-

38. Stormwater runoff from the Facility then flows off-site and into the City of Santa Barbara's municipal separate storm sewer system ("MS4") inlet on Robert Keister Road. The City's MS4 drains and routes stormwater in this part of the City into the Goleta Slough. FOF, ¶ 39. In early 2020, Hot Line's consultant Lacey Harston advised Hot Line that "chemicals" could leak out of its stored Poles during rainstorms, that stormwater from the Facility "appears to drain straight to the street," and "Power poles will need to be covered and we can discuss options." FOF, ¶¶ 40-42. Ms. Harston subsequently wrote a memo to Hot Line with advice for methods to cover Poles at the Facility. FOF, ¶ 42. However, Hot Line did not implement these suggestions and continued to store Poles without cover and exposed to rainfall. FOF, ¶ 14.

### 2. Endangerment Risks Associated With Hot Line's Facility Operations

#### a. Background on Pentachlorophenol and Dioxins Chemistry and Toxicology

As noted above, the Poles and TWW that Hot Line stored at the Facility were treated with pentachlorophenol. Dioxins are present in pentachlorophenol as an impurity. FOF, ¶ 44. Dioxins are comprised of a suit of isomers (also called congeners) of related chemical compounds. FOF, ¶ 45. One of these isomers/congeners is well known to be the most toxic, 2,3,7,8-TCDD. *Id*. To facilitate both ecological and human risk assessment the World Health Organization ("WHO") assembled a panel of experts to develop "Toxicity Equivalent Factors (TEFs)" which are applied to dioxins isomers to provide a "Toxicity Equivalent Quotient (TEQ)" for each dioxin isomer compared to 2,3,7,8-TCDD. The TEF for each dioxins isomer is summed to give a total toxicity equivalency quotient (TEQ), which is an appropriate measurement of the total amount of dioxins in a given substance for risk assessment purposes. FOF, ¶ 45. Dioxins are highly toxic and are known to the State of California, the federal government and WHO to cause cancer, immunotoxicity, birth defects and other reproductive toxicity. FOF, ¶¶ 46, 50-57. Dioxins degrade extremely slowly and bind to fatty substances. Due to their hydrophobic nature and resistance toward metabolism, dioxins have been shown to accumulate in fatty

tissues of animals and humans following animal or human exposures to dioxins in diet or the environment. FOF, ¶ 47. Dioxins are well known to "bioaccumulate" and then to "biomagnify," *i.e.*, to accumulate and remain in the tissues of organisms that absorb dioxins from the environment or from their food sources and to reach higher and higher levels of concentration up the food chain. FOF, ¶¶ 48, 49.

### b. Fate and Transport of Pentachlorophenol and Dioxins Present at the Hot Line Facility.

The pentachlorophenol oil used to treat the Poles and TWW at the Facility dripped and was washed off by rainfall from the Poles and TWW onto the soils below and adjoining areas where Hot Line handled and stored Poles and TWW, contaminating the soils with pentachlorophenol and dioxins in the process. In addition, stormwater runoff from the Poles and TWW storage areas picked up pentachlorophenol and dioxins and then further spread pentachlorophenol and dioxins to soils on the Facility within the downstream flow path of stormwater runoff. Additionally, stormwater runoff from the Facility has transported dioxins into the City's MS4 that in turn conveys stormwater runoff from this portion of Santa Barbara into the Goleta Slough. FOF, ¶¶ 58, 60.

The pentachlorophenol released from the Poles and TWW has contaminated soils on the Facility with extremely high levels of dioxins. FOF, ¶ 59. The Plaintiffs have taken extensive soil samples at the Facility, in a series of 18 samples in six sampling events over three years' time, that has repeatedly confirmed this dioxins contamination. FOF, ¶¶ 25-29, 76. Plaintiffs took their samples from the top few centimeters of soil, the pertinent level for measuring potential environmental risk to organisms that contact the top surface layer of soil at the Facility and for evaluating the risk of stormwater runoff flowing across the Facility's surface picking up and transporting dioxins off-site. Plaintiffs followed appropriate protocols in gathering these samples and the results reliably indicate the levels of dioxins present in surface materials at the Facility. FOF, ¶ 76. Plaintiffs' sample results were corroborated by Hot Line's contractor Sespe Consulting, Inc. which also took soil samples on March 11, 2020, that also revealed

PLTS. MEM. OF FACT & LAW CONTENTIONS          4          No. 5:20-cv-01108-AB-KK

extremely high levels of dioxins in soils on the Facility. FOF, ¶¶ 31, 77. Hot Line's additional contractor, Environmental Engineering, Consulting & Remediation, Inc. ("E2C"), took soil samples from the Facility in October 2020 at eleven locations and again in October 2021 at five locations. Whereas Plaintiffs and Sespe Consulting took their samples from the Facility's surface, E2C took its October 2020 samples at one foot and three feet below the ground surface and its October 2021 samples at 2 feet below the original ground surface. FOF, ¶ 32. Predictably, E2C's samples had much lower levels of dioxins given that they were not taken at the surface, but some of its samples nonetheless revealed elevated levels of dioxins. FOF, ¶¶ 87, 90.

The dioxins levels found in both Plaintiffs', Sespe Consulting's and even some of E2C's soil samples taken at the Facility revealed levels of dioxins that exceeded by extreme levels numerous applicable environmental screening levels ("ESLs") for dioxins established by several different regulatory agencies, including the U.S. Environmental Protection Agency ("EPA"), the California Regional Water Quality Control Board, Region 2 ("Regional Board 2"), the National Oceanic and Atmospheric Administration and the Oregon Department of Environmental Quality ("Oregon DEQ"). FOF, ¶ 73. Regulatory agencies and experts in the field of environmental risk assessment routinely use ESLs to evaluate ecological risks from contaminated sites and to set cleanup levels in remedial actions designed to remove contamination from sites. FOF, ¶ 72.

Stormwater runoff from the Facility has also been contaminated with extremely high levels of dioxins. Plaintiffs have taken four samples of stormwater runoff from the Facility into sampling events in December 2019, January 2021, and December 2022 that documented that the levels of dioxins in stormwater runoff from the Facility have been and remain highly elevated. FOF, ¶¶ 78, 79, 99. EPA and Regional Board 2 have set ESLs for water that can be relied upon to reasonably indicate the level of dioxins TEQ in water that poses environmental risks. Notably, stormwater runoff samples from the Facility have exceeded relevant agency ESL benchmarks by thousands of times. FOF, ¶ 79. As noted above, stormwater runoff at the Facility flows from areas where Hot Line

PLTS. MEM. OF FACT & LAW CONTENTIONS          5          No. 5:20-cv-01108-AB-KK

stored Poles and TWW across the Facility and onto Robert Keister Road, where it then flows into a City of Santa Barbara storm drain inlet into the City's MS4. FOF, ¶ 61. As also noted, the City's MS4 transports stormwater from this portion of Santa Barbara into the Goleta Slough. FOF, ¶ 62. Accordingly, contaminated storm water runoff from the Facility is risking contaminating Goleta Slough with dioxins.

Because dioxins adhere to soils and sediments and are very slow to degrade once they are adsorbed onto soils and sediments, soils and sediments represent a significant "sink" where dioxins contamination will linger long after dioxins have been released to the environment. FOF, ¶ 64. Soils and sediments contaminated with dioxins will, without remediation, remain significantly contaminated with dioxins for decades. *Id.* Based on these characteristics, dioxins would be expected to adhere to sediment or soils particles at the Facility and to be then transported via stormwater flow during rainfall and flood events into the City's MS4--and from this MS4 into Goleta Slough where the City's MS4 ultimately discharges stormwater. *Id.* Due to dioxins' long degradation half-life and thus persistence, the transport of sediments and soils from the Facility into the City's MS4 during repeated rainstorms over several years poses a significant risk of transporting elevated levels of dioxins into Goleta Slough, *i.e.*, rainstorm after rainstorm falling upon the Facility and creating stormwater flow into the City's MS4 system will have a propensity to continually entrain and move contaminated sediments downstream toward and eventually into Goleta Slough. FOF, ¶¶ 63, 64.

### c. Sensitivity of the Site and Goleta Slough Receiving Environment

The Goleta Slough is a highly sensitive and important ecological resource, a large estuarine marsh in Southern California where little of such important habitat remains intact. FOF, ¶ 65. The Goleta Slough provides critical habitat for endangered species and numerous other sensitive wildlife. It is also a popular location for kayaking, paddle boarding, swimming, bird watching, walking, hiking, bike riding, and other outdoor recreational activities. It is also used extensively by faculty and students at the nearby University of California, Santa Barbara for research and study. FOF, ¶¶ 66. 67. Waters in

the Goleta Slough flow into the Pacific Ocean at Goleta Beach. FOF, ¶ 66. Goleta Beach is heavily used for swimming, fishing, surfing, walking, and bird watching. FOF, ¶ 68.

The Facility site itself also has its own ecological value. It is an unpaved parcel that is inhabited by gophers and other burrowing rodents and insects, is occasionally inhabited by birds, and is occasionally utilized by domestic pets such as dogs. FOF, ¶¶ 69-71.

### d. Hot Line's Release of Pentachlorophenol and Dioxins at and Off-Site from the Facility Has Posed and Is Posing Environmental Risks.

As noted above, Hot Line's release of pentachlorophenol and dioxins has contaminated soils at the Facility site with extremely high levels of dioxins and has further contaminated stormwater runoff from the Facility also with extremely high levels of dioxins well in excess of regulatory agency ESLs. FOF, ¶¶ 72, 73, 74, 79.  Some soil samples from the Hot Line Facility have exceeded the relevant ESL benchmarks by hundreds to upwards of hundreds of thousands of times, or in a few cases, well over a million times. To illustrate, the dioxins TEQ levels in one of Plaintiffs' soil samples taken in April 2023 of 2,068 picograms program ("pg/g") dioxins TEQ was 1,880,000 times over the Oregon DEQ Settlement Quality Value for the Protection of Human Consumers (of 0.0011 picograms pg/g). Dioxins levels in a series of soil samples Plaintiffs took in March 2022 were similarly elevated. These soil samples were also 143 to 460 times over the applicable Regional Board 2's ESL. FOF, ¶ 74. Samples taken from stormwater runoff from the Facility have also revealed levels of dioxins well exceeding applicable ESLs. For example, the dioxins TEQ levels in Plaintiffs' stormwater runoff sample taken on December 4, 2019, of 156.44 pg/L dioxins TEQ was more than 12,000 times EPA's California Toxics Rule standard for protection against cancer due to exposure to dioxins contaminated water and organisms. FOF, ¶ 79.

While all the agency ESLs referred to above provide reliable guidance as to what levels of dioxins in soils pose ecological and human health risks, the most widely used standard in California is the Regional Board 2 "residential" standard of 4.8 pg/g. Notably,

this Regional Board 2 standard of 4.8 pg/g dioxins in soils is followed by the County of Santa Barbara Environmental Health Services department ("Santa Barbara County EHS"), which has jurisdiction over contaminated site cleanup projects within the County. FOF, ¶ 75. The Santa Barbara County EHS uses the Regional Board 2 residential ESL value as the benchmark for determining the adequacy of cleanup projects. *Id.* The Santa Barbara County EHS relies on this screening level to ensure that land is remediated to a level that is safe for any potential future residential development. *Id.* Absent the use of a residential cleanup level, it is Santa Barbara County EHS policy that a deed restriction must be recorded that prohibits developing the land for residential purposes. *Id.* Plaintiffs' soil samples from the Facility have demonstrated that the levels of dioxins in soils at the Facility exceed Regional Board 2 residential ESLs by well over two orders of magnitude. FOF, ¶ 67.

By contaminating the Facility site's soils and stormwater runoff from the Facility with dioxins, Hot Line has risked substantial harm to wildlife inhabiting the Goleta Slough, the sensitive estuarine marsh where stormwater runoff from the Facility is routed via the City of Santa Barbara's MS4. FOF, ¶¶ 63-65, 80, 81. In addition, Hot Line has risked adverse human health impacts to people recreating in the Goleta Slough or utilizing the Slough for academic research and study. FOF, ¶¶ 67, 68. Hot Line has further risked harm to the wildlife using the soils at the Facility's site itself. FOF, ¶¶ 69-71, 99. While Hot Line has conducted some limited soil remediation at the Facility, this remediation has not been comprehensive and dioxins contaminated soils and wood chip material remains widely dispersed at the Facility. FOF, ¶¶ 82, 83.

### D. Anticipated Evidentiary Issues

Plaintiffs are contemporaneously filing several motions *in limine* to: (1) exclude or limit proposed expert testimony from Hot Line's identified expert witness, Philip Goalwin, (2) to bar Hot Line from introducing into evidence exhibits that Hot Line did not disclose in accord with Local Rule 16-2.3, and (3) establish that Plaintiffs may introduce certain evidence and documents concerning Mr. Goalwin's criminal conviction

for fraud related to his past contaminated sites investigation work, his probation violations, the revocation of his Professional Geologist's license for his fraudulent conduct and the suspension of his corporation from doing business in California related to failure to respect California Franchise Tax Board requirements.

### E. Issues of Law: Plaintiffs' Legal Argument

**1. Congress Intended RCRA To Comprehensively Regulate Waste Handling and Disposal and To Provide for Effective Citizens Suit Remedies.**

"RCRA is a comprehensive statute that governs the treatment, storage, and disposal of solid and hazardous waste...so as to minimize the present and future threat to human health and the environment." *Meghrig v. KFC Western, Inc*., 516 U.S. 479, 483 (1996). As the Ninth Circuit has pointed out, Congress enacted RCRA in 1976:

> to close "the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes….." RCRA's waste management requirements for disposal facilities are designed not only to prevent, but also to mitigate, endangerments to public health and the environment.

*Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) (*citing* H.R. Rep No. 1491, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S.C.C.A.N. 6238, 6241).

Congress amended RCRA in 1984 to add the citizen suit right to bring suit to address solid waste handling and disposal that may present an endangerment to health or the environment expressly "in an effort to invigorate citizen litigation." *Ascon Properties, Inc. v. Mobil Oil Co*., 866 F.2d 1149, 1158 (9th Cir. 1989) (citing H.R. Rep. No. 198, 98th Cong., 2d Sess. 53-54, *reprinted in* 1984 U.S. Code Cong. & Admin. News 5576, 5612-13; House Conference Report at 5688-89). RCRA section 7002(a)(1)(B)'s citizen suit provision is "designed to provide a private means of obtaining the same relief that the EPA Administrator has previously been authorized to seek under RCRA." *Lincoln Properties v. Higgins*, No. 91-760, 1993 U.S. Dist. LEXIS 1251, at *30 (E.D. Cal. 1993).

**2.  Hot Line Has Handled, Stored, and/or Disposed of Solid Waste**.

As discussed below, Hot Line has handled, stored, and/or disposed of various forms of RCRA solid waste: (1), TWW, (2), wood chip debris/slivers material dislodged from the TWW and new Poles that Hot Line stored at the Facility, (3) pentachlorophenol and dioxins-laden oil dripped or washed off of the TWW and new Poles that Hot Line stored at the Facility, and (4), contaminated stormwater flowing from the areas where Hot Line stored TWW and new Poles at the Facility.

**a.  Hot Line's Materials in Issue Are RCRA Solid Waste.**

The TWW that Hot Line handles, stores and then hauls away from the Facility for landfill disposal, the wood chip debris dislodged from the TWW and Poles that Hot Line stored and handled at the Facility and that remains scattered on the ground at various locations throughout the Facility, the pentachlorophenol and dioxin-laden waste oil that drips from the TWW and new Poles stored at the Facility, and the contaminated stormwater generated at the Facility and routed by Hot Line for off-site disposal through the City of Santa Barbara's engineered stormwater system all constitute RCRA solid waste.

RCRA solid waste, as defined by RCRA § 1004(27), 42 U.S.C. § 6903(27), is material that has been "discarded," *i.e.*, "disposed of, thrown away, or abandoned." *Safe Air for Everyone v. Meyer et. al*, 373 F.3d 1035, 1041-42 (9th Cir. 2004) (grass residue left in field was not solid waste because it was reused for useful purpose rather than discarded); *Cmty. Ass'n for Restoration of the Env't v. George & Margaret LLC*, 954 F. Supp. 2d 1151, 1156 (E.D. Wash. 2013) *("CARE").*[2] The typically determinative factor for whether material is discarded, hence solid waste, is whether it is still likely to be used by its owner. If not, it is solid waste. *Safe Air*, 373 F.3d at 1041-43; *EcoRights I*, 713 F.3d

---

[2] For Plaintiffs' RCRA claim brought under RCRA § 7002 (a)(1)(B), the definition of solid waste is only that provided by the statute itself, not EPA's narrower regulatory definition relating to hazardous waste. *E.g.*, *Ecological Rights Foundation v. Pacific Gas and Elec. Co.*, 713 F.3d 502, 516 n.9 (9th Cir. 2013) ("*EcoRights I*").

PLTS. MEM. OF FACT & LAW CONTENTIONS          10          No. 5:20-cv-01108-AB-KK

at 514-15 (citing H.R. Rep. No. 94-1491(I) at 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6240)); *see also Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1314 (2d Cir. 1993); *American Mining Congress v. EPA*, 824 F.2d 1177, 1185 (D.C. Cir. 1987); *CARE*, 954 F. Supp.2d at 1156.

Defendants need not consciously intend to throw material away nor take affirmative actions to discard it for material to constitute RCRA solid waste. *See CARE*, 954 F. Supp.2d at 1156-1158 (liquid manure unintentionally leaked from containment areas or accidentally over applied to fields constitutes solid waste when fertilizer levels exceed level useful for fertilizing crops); *Zands v. Nelson*, 779 F. Supp. 1254, 1262 (S.D. Cal. 1991) (gasoline accidentally leaking from storage tank is solid waste); *Olson v. Beck*, No. 06-07487, 2011 U.S. Dist. LEXIS 114805, at *56-57 (N.D. Cal. Oct. 5, 2011) (same); *U.S. v. Power Engineering Co.*, 191 F.3d 1224, 1231 (10th Cir. 1999) (liquid incidentally leaking out of and running down the side of a building is solid waste).

Furthermore, materials that will not be reused that are incidentally deposited into the environment as an expected, inevitable consequence during the intended use of a product can be solid waste when "left to accumulate long after they ha[ve] served their intended purpose" and create "dangerous accumulations." *EcoRights I*, 713 F.3d at 518 (citing *Connecticut Coastal,* 989 F.2d at 1316, which held that lead shot and clay targets dispersed into the environment, the expected incidental result from firing weapons at a shooting range, are solid waste); *Safe Air*, 373 F.3d at 1042, n.5; *Potomac Riverkeeper, Inc. v. Nat'l Capital Skeet & Trap Club, Inc.*, 388 F. Supp. 2d 582, 587 (D. Md. 2005) (lead shot accumulating in waterways near a shooting range are discarded solid waste); *L.E.A.D. Group of Berks v. Exide Corp.*, No. 96-3030, 1999 U.S. Dist. LEXIS 2672, at *19-21 (E.D. Pa. Feb. 19, 1999) (spent lead-acid batteries and lead scrap are solid waste).

Hot Line's TWW, pentachlorophenol-laden waste oil, contaminated stormwater and contaminated sediments at issue in this case are all materials discarded by Hot Line, *i.e.*, abandoned by Hot Line into the ambient environment without intention of future use, and are therefore solid waste. Additionally, even if any of Hot Line's wastes at issue were

somehow seen as a material incidentally deposited into the environment as an unavoidable consequence during Hot Line's intended use of a product, they would still be RCRA solid wastes because they have repeatedly been discarded over years to accumulate to dangerous levels in the surrounding environment.

### i.  TWW Stored and Disposed of at the Facility is RCRA Solid Waste.

As noted in the Summary of the Key Evidence in Support of Plaintiffs' Claim, Hot Line for years accepted TWW at the Facility for handling and disposal. Hot Line did not use TWW for any useful purpose at the Facility or elsewhere. Hot Line stored TWW in waste bins until a contractor picked up the TWW and took it off site for landfill disposal. TWW placed into waste bins for off-site disposal served no useful purpose for Hot Line or anyone else. Given that the TWW was and has remained a discarded substance (i.e., material thrown away or abandoned) lacking any utility to Hot Line, the TWW at the Facility is RCRA solid waste. *E.g.*, *EcoRights I*, 713 F.3d at 514-15.

### ii.  Wood Chip Debris Left at the Facility Is RCRA Solid Waste.

As discussed in the Summary of the Key Evidence in Support of Plaintiffs' Claim, Hot Line handled TWW and new Poles in a fashion that created wood chip debris/wood slivers material that was dislodged from the TWW and new Poles and has then been spread around the Facility--where it remains. Given that Hot Line has plainly discarded (i.e., abandoned) this wood chip debris, a substance which has no utility to Hot Line, this wood chip debris left at the Facility is RCRA solid waste. *E.g.*, *EcoRights I*, 713 F.3d at 514-15.

### iii. Pentachlorophenol Oil Dripping and Washing Off from TWW and the Poles Are RCRA Solid Waste.

As discussed in the Summary of the Key Evidence in Support of Plaintiffs' Claim above, pentachlorophenol and/or dioxins-laden oil dripped and leaked from both the TWW that Hot Line stored in waste bins and the new Poles that Hot Line stored in racks on the Facility. This waste oil dripped onto the ground underneath waste bins used to

store TWW and onto the ground under the stacks of new Poles, thus contaminating the sediments near the waste bins and stacked Poles with pentachlorophenol and/or dioxins. Furthermore, rainwater that fell on these TWW waste bins and stacks of new Poles picked up pentachlorophenol and/or dioxins-laden waste oil as well as sediments previously contaminated with this waste oil and transported this waste oil and the sediments away in stormwater flow into the ambient environment. Contaminated waste oil that drips off TWW and/or is carried away from TWW by stormwater flows clearly serves no useful function for Hot Line. Hot Line made no effort to recover or recycle this waste oil for any useful purpose, but instead simply abandoned it to the ambient environment. Accordingly, this waste oil is RCRA solid waste. *E.g.*, *EcoRights I*, 713 F.3d at 514-15; *American Mining Congress*, 824 F.2d at 1190-1193 (while materials held for future recycling are not RCRA solid waste, materials discarded without intention for recovery and reuse are solid waste).

Hot Line might argue that *EcoRights I* instructs that pentachlorophenol-laden waste oil that drips from Hot Line's stored Poles or TWW is not RCRA solid waste. This would be erroneous. *EcoRights I* found that the pentachlorophenol oil that drips from Pacific Gas & Electric Co. ("PG&E")'s utility poles "while those poles are in use" in PG&E's electrical grid serves a useful purpose. 713 F.3d at 515. *EcoRights I* found that such oil "still serves its intended purpose by inhibiting the growth of vegetation, fungi, and other organisms" at the base of these in-use poles--thus extending the life of these actively used poles. *Id.* at 516. For this reason, *EcoRights I* found that PG&E had not abandoned and discarded this oil. *Id.* By contrast, TWW has no useful life to extend: it is a waste material awaiting off-site disposal in a landfill.

Similarly, pentachlorophenol-laden waste oil that dripped onto the ground from stacks of new Poles stored away from the ground on racks did nothing to extend the life of these Poles. Given that these Poles are not making ground contact when stored in racks, their life is not extended by contaminating the soils below the Pole storage racks with pentachlorophenol and dioxins. Even if there were pests residing in the soils below

the racks, such pests pose no threat to the Poles stored above the soil in racks. Moreover, while arguably the leaking of waste oil from utility poles stored in the electrical grid into the soils into which the utility poles are dug into is an unavoidable consequence during the intended use of that product, this is not the case for stacks of new utility Poles stored in a service yard as inventory for future field use. Stacks of new Poles stored at the Facility are not serving any active use, and it is not inevitable that their intended "use," as stored inventory, inevitably involves ground contact and the migration of pentachlorophenol-laden oil into surrounding soils. Hot Line could perhaps be seen as having had an inevitable need to store new Poles at its Facility to have them on hand to install in SCE's electrical grid as needed, but Hot Line certainly had no inevitable need to store these Poles outdoors in the rain and without measures to either avoid exposing these Poles to the outdoor elements, including rainfall, or to capture the waste oil that dripped from and washes off of the Poles. The Poles could have served their intended purpose, as inventory for Hot Line to turn to as needed to replace Poles in the field, equally well if they were stored undercover or even in outdoor areas surrounded by berms where stormwater runoff was captured and treated to be free from contaminants before being released to the ambient environment. Indeed, as noted in the Summary of the Key Evidence in Support of Plaintiffs' Claim above, these were possible measures identified by Hot Line's own stormwater management consultant.

In sum, oil that dripped or was washed off by rainfall from TWW and the new Poles is unmistakably material that had no use to Hot Line and that Hot Line had abandoned into the ambient environment. Under these circumstances, Hot Line's waste oil has been passively "discarded" in the same way that the following substances were held to be "discarded," hence RCRA solid waste: liquid manure unintentionally leaked from containment areas or accidentally over applied to fields (*CARE*, 954 F. Supp. 2d at 1156-1158), gasoline accidentally leaked from a storage tank (*Zands*, 779 F. Supp. at 1262); a liquid polluted with various contaminants leaking out of and running down the side of a building and a mist contaminated with hexavalent chromium floating from air

scrubber treatment devices onto adjoining soil (*Power Engineering*, 191 F.3d at 1231). Following the guidance of these cases, Hot Line's waste oil dripping or washed off from TWW constitutes discarded RCRA solid waste.

### iv. Stormwater and Sediments Disposed Off-Site from the Facility Are Solid Waste.

As discussed in the Summary of the Key Evidence in Support of Plaintiffs' Claim above, falling rain has repeatedly generated stormwater runoff on and offsite from the Facility. Stormwater runoff on the Facility has spread dioxins associated with pentachlorophenol waste oil throughout the soils on the Facility site. In addition, stormwater runoff has flowed off-site from the Facility into a storm drain inlet for the City of Santa Barbara's MS4 that in turn routes stormwater runoff from this portion of Santa Barbara into the Goleta Slough. This stormwater has contained elevated levels of pentachlorophenol and dioxins that have washed off TWW and new Poles stored at the Facility. This contaminated wastewater stream serves no useful purpose for Hot Line. Hot Line made no efforts to capture and reuse this contaminated wastewater stream. Instead, Hot Line allowed this stormwater to flow off-site for disposal into the City's MS4 and from there into the ambient environment. Such pollutant-laden wastewater discarded into the ambient environment constitutes RCRA solid waste analogous to any other liquid, solid or gaseous waste discarded via an intentionally engineered disposal system. *Raritan Baykeeper Inc. v. NL Indus.*, No. 09-4117, 2013 U.S. Dist. LEXIS 2628, at *85-86 (D. N.J. Jan. 8, 2013) (stormwater contaminated with suspended metals, sediments, etc. is "solid waste"); *Buchholz v. Dayton Int'l Airport*, No. 94-435, 1995 U.S. Dist. LEXIS 9490, at *56-57 (S.D. Ohio 1995) (stormwater from unlined detention basin that received deicing chemicals is "solid waste"); *Inland Steel Co. v. U.S. Environmental Protection Agency*, 901 F.2d 1419, 1423-24 (7th Cir. 1990) (wastewater disposed via deep injection wells constitutes RCRA solid waste); *CARE*, 954 F. Supp. 2d at 1156-1158 (liquid manure leaking from holding ponds constitutes RCRA solid waste); 42 U.S.C. § 6903(27) (defining solid waste to include any "solid, *liquid*, semisolid, or contained

gaseous material resulting from industrial, commercial, mining, and agricultural operations" that has been discarded (emphasis added)).

### b. Hot Line's Pentachlorophenol Wastes Are Accumulating to Dangerous Levels in the Environment.

For the reasons articulated above, all of Hot Line's wastes are subject to RCRA regulation consistent with *EcoRights I* and other case law given that all of the wastes at issue have plainly been "abandoned" and are not serving nor will serve any beneficial use. However, Hot Line's waste materials would be discarded RCRA solid waste even if they were somehow still useful materials released into the environment as a natural consequence during a product's intended use. *EcoRights I* carefully instructs that such materials are "*not automatically* a RCRA 'solid waste'" but that they are still solid waste if left in the environment for an extended time to accumulate to "dangerous" levels. *EcoRights I*, 713 F.3d at 518 (emphasis added). As discussed in the Summary of the Key Evidence in Support of Plaintiffs' Claim above and in the following section below, dioxins in Hot Line's various solid wastes have accumulated and are continuing to accumulate to dangerous levels on the Facility site and likely in Goleta Slough as well. Hot Line's solid waste disposal activity has led to the transportation of stormwater and sediments into the City of Santa Barbara's MS4 contaminated with dioxins at levels vastly exceeding the levels established by regulatory agencies as risking substantial environmental harms. Discharging waste that causes contaminants to be present in the environment above such regulatory agency levels *per se* equates to placing the environment in danger. *E.g.*, *N. Cal. River Watch v. Honeywell Aero.*, 830 F. Supp.2d 760, 769-770 (N.D. Cal. 2011) (solid waste disposal causing pollutant levels to exceed EPA "Maximum Contaminant Levels" necessarily endangers the environment within the meaning of 42 U.S.C. § 6972). By risking environmental harms, Hot Line's waste disposal is necessarily "dangerous," as cases discussed in the next section have long established.

### c.  Hot Line Has Handled, Stored and Disposed of Solid Waste.

Hot Line has "contributed to the handling, storage, [or] disposal" of the solid waste in issue. Tossing TWW into waste bins and having this TWW hauled away for off-site disposal in landfills, handling TWW and new Poles in a fashion that created wood chip debris/slivers to be dislodged from the TWW and new Poles and to be spread around the Facility where it still remains, allowing pentachlorophenol and dioxins-laden oil to drip from TWW or new Poles to the ground or into stormwater at the Facility, discharging stormwater off-site which picked up and transported dioxins in soils and wood chip material left over from Hot Line's activities, all constitutes "disposal" of solid waste. *Voggenthaler v. Md. Square LLC*, 724 F.3d 1050, 1064 (9th Cir. 2013) (citing 42 U.S.C. § 6903 and holding that "disposal" includes any discharge or spill of waste "into or on any land or water so that [the waste] may enter the environment"; actionable RCRA disposal includes dumping materials on one's own property that may later enter the environment); *Potomac Riverkeeper, Inc.*, 388 F. Supp. 2d at 587 (placing solid waste in area where it would be subject to "washout," *i.e.*, the "carrying away of solid waste by waters" even without ongoing human conduct constitutes disposal of solid waste); *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 846 (4th Cir. 1992) (leakage from underground storage tanks constitutes disposal of solid waste); *Crofton Ventures Ltd. Partnership v. G&H Partnership*, 258 F.3d 292, 297 (4th Cir. 2001) (person held liable as "disposer" who only owned property at time underground drums leaked into soil). "The movement of previously disposed solid waste may constitute a violation of RCRA." *Potomac Riverkeeper*, 388 F. Supp. 2d at 587 (citing *United States v. Waste Industries, Inc.*, 734 F.2d 159, 164-65 (4th Cir. 1984) and *Nurad*, 966 F.2d at 845).[3] Holding TWW in waste bins constitutes the handling and storing of solid waste as well. Furthermore,

---

[3] *Voggenthaler* adjudicated a claim under the Comprehensive Environmental Remediation Cleanup and Liability Act (CERCLA), but CERCLA utilizes RCRA's definition of "disposal." 42 U.S.C. § 9601(29). Thus, *Voggenthaler* interpreted RCRA's "disposal" definition set forth in 42 U.S.C. § 6903(3).

there is no doubt that Hot Line had the requisite "measure of control over the waste at the time of its disposal or was otherwise actively involved in the waste disposal process." *Hinds v. Angioli*, 654 F.3d 846, 852 (9th Cir. 2011) (manufacturer lacked requisite control over solid waste disposal for RCRA liability when it merely designed equipment which generated waste that was improperly disposed of by others). All of the waste generating, handling, storing, and disposal activity in issue occurred solely on a Facility leased and controlled by Hot Line and was carried out or was allowed to occur by Hot Line employees. There is no other relevant actor responsible for the waste activity in issue.

### 3. Hot Line's Handling, Storing And/or Disposing of Solid Waste May Present an Imminent and Substantial Endangerment to Health or the Environment.

Hot Line's handling, storing and/or disposing of solid waste "may present an imminent and substantial endangerment" and thus violates RCRA section 7002(a)(1)(B). The term endangerment in environmental statutes is construed "in a precautionary or preventive sense:"

> Endanger, . . . is not a standard prone to factual proof alone. Danger is a risk, and so can only be decided by assessment of risks. . . A risk may be assessed from suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections from imperfect data, or from probative preliminary data not yet certifiable as 'fact.'

*Reserve Mining Co. v. EPA*, 514 F.2d 492, 529 (8th Cir. 1975) (*en banc*) (citation omitted). The operative word is "*may*" present endangerment, "'expansive language' which is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk*" posed by solid waste handling, storage, or disposal. *Dague v. City of Burlington*, 935 F.2d 1343, 1355 (2d. Cir. 1991) (emphasis original), *rev'd in part on other grounds*, 502 U.S. 1071 (1992); *see also Price*, 39 F.3d at 1019; *Cox v. City of Dallas*, 256 F.3d 281, 299-01 (5th Cir. 2001); *Union Pac. R.R. Co. v. Hill*, No. 21-03216, 2021 U.S. Dist. LEXIS 240524, at *15 (N.D.

Cal., Dec.16, 2021) (agreeing that in using the word "may" to precede the standard of liability, RCRA section 7002(a)(1)(B) grants "expansive" authority to District Courts "to eliminate any risk posed by toxic wastes."). Endangerment means "a threatened or potential harm and does not require proof of actual harm." *Price,* 39 F.3d at 1019; *accord United States v. Mendoza*, 244 F.3d 1037, 1042-1043 (9th Cir. 2001) (citing and quoting *Price v. United States Navy* analysis of the term "endanger" with approval). Endangerment can be established even absent proof "that the probability of harm is more likely than not." *Reserve*, 514 F.2d at 520. Reasonable public health concern stemming from "an acceptable but unproved medical theory" may suffice to establish endangerment. *Reserve*, 514 F.2d at 529; *see also United States v. Vertac*, 489 F. Supp. 870, 880-885 (E.D. Ark. 1980). Under statutory prohibitions on "endangerment," "[r]egulatory action may be taken before the threatened harm occurs; indeed, the very existence of such precautionary legislation would seem to *demand* that regulatory action precede, and, optimally, prevent, the perceived threat." *Ethyl Corp. v. United States*, 541 F.2d 1, 17-18 (D.C. Cir. 1976) (*en banc*) (emphasis original), *cert. denied*, 426 U.S. 941; *accord Price,* 39 F.3d at 1019. Reflecting this above case law, "[d]istrict courts in the Ninth Circuit have interpreted 'imminent and substantial endangerment' liberally." *Union Pac. R.R. Co.*, 2021 U.S. Dist. LEXIS 240524, at *15 (quoting *Sullins v. Exxon/Mobil Corp.*, 729 F. Supp. 2d 1129, 1136 (N.D. Cal. 2010)).

Applying RCRA section 7002(a)(1)(B)'s principles, courts have found the following poses "endangerment" without proof of actual harm: dumping mining tailings that might pose risk of carcinogens being present in drinking water (*Reserve*); lead in tailpipe emissions without proof of actual lead poisoning (*Ethyl Corp.*); unlined landfills posing future risks of migration of contaminants into nearby creek and groundwater (*Cox*); chemicals migrating from landfill that may in the future "have a dramatic, adverse impact on the food chain" in a nearby marsh (*Dague*, 935 F.2d at 1356); a groundwater contamination plume that "may continue" to migrate in the future, threatening drinking water wells (*Lincoln Properties*, 1993 U.S. Dist. LEXIS 1251, at *45-49); and dioxins

contamination migrating 30 inches below the surface in conditions conducive to further migration of the contamination to the water table below without actual groundwater contamination (*United States v. Northeastern Pharmaceutical*, 579 F. Supp. 823, 846 (W.D. Mo. 1984), *aff'd* 810 F.2d 726 (8th Cir. 1986)).

RCRA § 7002(a)(1)(B)'s requirement that endangerment be "imminent" is met if the factors giving rise to the endangerment are present, even though the harm may not be realized for years. *Meghrig,* 516 U.S. at 485; *United States v. Conservation Chemical Co.*, 619 F. Supp. 162, 193-94 (D.C. Mo. 1985); *Northeastern Pharmaceutical*, 579 F. Supp. at 846 n.28; *United States v. Ottati & Goss, Inc.*, 630 F. Supp. 1361, 1394 (D.N.H. 1985) ("An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public. It is not necessary that the final anticipated injury actually have occurred prior to a determination that an 'imminent hazard' exists.").

The requirement that endangerment be "substantial" also does not require proof of actual harm, a reasonable cause for concern about risk exposure suffices:

> "'Substantial' does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree). . . .endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken.

*Olson*, 2011 U.S. Dist. LEXIS 114805, at *58-59 (N.D. Cal. Oct. 5, 2011) (citations omitted). Given RCRA's language and purpose, "if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment." *Interfaith Cmty. Org. v. Honeywell*, 399 F.3d 248, 259 (3d. Cir. 2005), *cert. denied*, 545 U. S. 1129 (2005).

Hot Line's solid waste disposal is easily an imminent and substantial endangerment of human health and environment under this case law. As discussed in the Summary of the Key Evidence in Support of Plaintiffs' Claim above, (1) the Poles and TWW handled and stored at the Facility were treated with pentachlorophenol, (2) both

circumstantial evidence (information that pentachlorophenol-treated wood notoriously contains and releases dioxins) and Plaintiffs' soil and stormwater runoff samples at the Facility establish that these Poles and TWW have released pentachlorophenol and dioxins to the soils on the Facility and into stormwater runoff from the Facility, (3) the levels of dioxins in soils at the Facility vastly exceed regulatory agency ESLs that are widely used by regulatory agencies and environmental risk assessors as measures of the levels of dioxins that pose environmental hazards, (4) various wildlife and domestic pets access the Facility site, which is not fenced, and are at risk of being exposed to and harmed by the extremely high levels of dioxins remaining in the surface soils at the Facility, (5) stormwater from the Facility flows off-site directly into the City's MS4 system which intentionally routes stormwater runoff into the nearby Goleta Slough, the only water body downstream of the Facility, and (6) this stormwater transports dioxins and pentachlorophenol at levels vastly exceeding regulatory agency contaminant guidelines into the Goleta Slough, a large estuarine marsh that provides important habitat for sensitive and even endangered wildlife and which is heavily used for wildlife viewing and academic study. That Hot Line's solid waste handling and disposal associated with its handling and storage of Poles and TWW at the Facility has left soils at the Facility site and stormwater runoff from the Facility to have levels of dioxins vastly above regulatory agency ESL environmental protection standards is *per se* proof of endangerment. *N. Cal. River Watch*, 830 F. Supp.2d at 769-770; *Olson*, 2011 U.S. Dist. LEXIS 114805 at*14-15 (relying in part on a showing that soil samples collected at a site exceed California Regional Water Quality Control Board ESLs in granting summary judgment under RCRA section 7002(a)(1)(B)); *Sullins*, 729 F. Supp. 2d at 1136; *Lincoln Properties*, 1993 U.S. Dist. LEXIS 1251, at *45-49; *see Dague,* 935 F.2d at 1356 (endangerment finding bolstered by allegedly endangering chemicals and compounds being found on EPA toxic list).

**4. Plaintiffs Are Entitled To Declaratory And Injunctive Relief To Address Hot Line's Imminent and Substantial Endangerment to Health or the Environment.**

The Court should grant a declaratory judgment establishing that Hot Line's solid waste disposal violates RCRA § 7002(a)(1)(B). Declaratory judgment will "delineate important rights and responsibilities" and thus will be of "significant educational and lasting importance" by helping to ensure that Hot Line curbs its RCRA violations. *See Natural Res. Def. Council, Inc. v. U.S. Envt'l Prot. Agency*, 966 F.2d 1292, 1299 (9th Cir. 1992); *see also Steffel v. Thompson*, 415 U.S. 452, 468-69 (1974) (courts properly presume that litigants will act in accord with declaratory judgments, even though such judgments are non-coercive). Declaratory relief is appropriately granted to address substantial controversy between parties having adverse legal interests, as is the case here. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174-75 (9th Cir. 2002). Declaratory relief vindicates the purposes of environmental statutes such as RCRA by promoting improved compliance with these laws. *See Natural Res. Def. Council, Inc.*, 966 F.2d at 1299; *see also Steffel*, 415 U.S. at 468-69.

Additionally, the Court should grant injunctive relief requiring Hot Line to (1) perform additional soil sampling to delineate the vertical and horizontal extent of dioxins contamination at the Facility and in surrounding areas, including the Goleta Slough; (2) analyze the results of this added soil sampling in a detailed report to the Court and Plaintiffs; (3) develop a remedial plan (including a schedule) for cleaning up contaminated soil to ensure that all dioxins dispersed by Hot Line are eliminated from the environment to the 4.8 pg/g dioxins TEQ level established by Regional Board 2's residential ESL, and (4) once approved by the Court, implement the remedial plan and thus remedy its dioxins contamination. Notably, RCRA § 7002(a)(1)(B) empowers the courts to grant injunctive relief "to the extent necessary to eliminate any risks posed by toxic waste." *United States v. Price,* 688 F.2d 204, 213-14 (3rd Cir. 1982); *see also* S. Rep. No. 98-284, at 59 (1983). Moreover, in evaluating whether to grant injunctive relief,

the Court must respect the Supreme Court's admonition that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.... [T]herefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545, (1987); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-1135 (9th Cir. 2011) (same).

In keeping with *Amoco*, EcoRight's showing that Hot Line's solid waste disposal presents an imminent and substantial endangerment necessarily establishes EcoRights' entitlement to injunctive relief: when solid waste disposal endangers human health or the environment, (1) such disposal is necessarily causing irreparable harm and (2) the balance of hardships will necessarily weigh in favor of an injunction to curb the endangerment. *REV 973 LLC v. Mouren-Laurens*, 2010 WL 383615 at \*5-6, 2010 U.S. Dist. LEXIS 12514 (C.D. Cal. Jan. 25, 2010) ("[t]he same facts the Movants offer to establish the likelihood of being able to prove an imminent and substantial harm under RCRA also establish the likelihood of irreparable harm in the absence of preliminary relief required to grant a[n] injunction under *Winter* [*v. NRDC, Inc.*, 555 U.S. 7 (2008)]."); *Wild Rockies*, 632 F.3d at 1135, 1138 (noting the well-established "public interest in preserving nature and avoiding irreparable environmental injury"); *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001) ("Once Congress, exercising its delegated powers has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute."). As another court observed in a similar circumstance of addressing a requested remedy to protect public health and the environment, the Court's responsibility is "crafting a remedy that is protective of public health and this responsibility necessarily takes preeminence over all other considerations." *United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010, 1027 (N.D. Cal. 2002), *aff'd* 427 F.3d 597, 601 (9th Cir. 2005) (balancing of equities is shaped by necessary acknowledgment "that there is no question that the

PLTS. MEM. OF FACT & LAW CONTENTIONS          23          No. 5:20-cv-01108-AB-KK

public interest at stake here, the quality of public drinking water and the health and safety of the consumers, is fundamental."), *cert. denied*, 547 U.S. 1113 (2006). Accordingly, just as *Mouren-Laurens* granted an injunction to curb endangering leaks of contaminated water into surrounding soil and groundwater, so the Court should issue injunctive relief to curtail the discharge of alarmingly contaminated stormwater from the former Hot Line Facility to the highly sensitive Goleta Slough environment and to require Hot Line to eliminate extreme levels of dioxins contamination on the Hot Line Facility site. *See*, *e.g.*, *United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867-68 (7th Cir. 1994) (defendant enjoined to develop and implement plan to prevent waste liquid from contaminating groundwater).

## II.    L.R. 16-4.4: Statement Concerning Jury Trial

No party has requested a jury and thus this matter will be heard as a bench trial.

## III.    L.R. 16-4.4: Attorneys' Fees

If they prevail, Plaintiffs will seek to recover their attorneys' fees and costs pursuant to RCRA § 7002(e), 42 U.S.C. § 6972(e), which provides that the Court "may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate." District Courts must generally award attorneys' fees to prevailing environmental citizen suit plaintiffs "to encourage the achievement of statutory goals" as fee shifting is typically required for public interest groups to secure representation. *St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1061 (9th Cir. 2009); *see also Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1091 (9th Cir. 2011). In environmental citizen suit cases, the "court's discretion to deny a fee award to a prevailing plaintiff is narrow, and a denial of fees on the basis of 'special circumstances' is 'extremely rare.'" *Resurrection Bay*, 640 F.3d at 1092 (citations omitted). Fee awards to prevailing environmental citizen suit plaintiffs should be "the rule rather than the exception." *St. John's*, 574 F.3d at 1062.

With respect to Plaintiffs being entitled to attorney fee and cost recovery as prevailing or substantially prevailing parties, "The threshold for sufficient relief to confer prevailing party status is not high. 'If the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind.'" *St. John's*, 574 F.3d at 1059 (citations omitted); *see also Resurrection Bay*, 640 F.3d at 1091. Accordingly, Plaintiffs will be entitled to recover attorneys fees and costs if they secure declaratory judgment that Hot Line has violated RCRA section 7002(a)(1)(B) and/or if they are awarded injunctive relief that addresses Hot Line's violation of RCRA.

## IV.  CONCLUSION

Hot Line should be found liable under RCRA section 7002(a)(1)(B) for storing, handling, and disposing of solid waste in a manner that may present an imminent and substantial endangerment to health and/or the environment. The Court should award Plaintiffs declaratory judgment to this effect and should further enjoin Hot Line to take remedial actions to abate this imminent and substantial endangerment.

Respectfully Submitted,

Dated: July 7, 2023

Christopher Sproul
Counsel for Plaintiffs