Christopher Sproul (State Bar No. 126398)
csproul@enviroadvocates.com
Brian Orion (State Bar No. 239460)
borion@enviroadvocates.com
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

Matthew Maclear (State Bar No. 209228)
mcm@atalawgroup.com
ATA Law Group
4030 Martin Luther King, Jr. Way
Oakland, CA 94609
Telephone: (415) 568-5200

Attorneys for Plaintiffs
ECOLOGICAL RIGHTS FOUNDATION and
SANTA BARBARA CHANNELKEEPER

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, et al.,<br><br>  Plaintiffs,<br><br>      v.<br><br>HOT LINE CONSTRUCTION, INC., et al.,<br><br>        Defendants. | Case No. 5:20-cv-01108-AB-KK<br><br>**PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>Date/Time:  February 16, 2024, 10:00am<br>Location: Courtroom 7B, Los Angeles, California<br>Judge: Hon. District Judge Andre Birotte |

# **TABLE OF CONTENTS**

I.      Introduction ................................................................................................1

II.     Statement of Facts .....................................................................................4

III.    Argument. ................................................................................................11

A. Hot Line Multiplied the Litigation Costs. .........................................11

B. Plaintiffs Are Entitled to Recover Attorneys' Fees Under RCRA. .................12

    1. Plaintiffs Meet the RCRA Standard for Fee Entitlement. ...........................12

        a. Plaintiffs Achieved Significant Success on the Merits..........................13

        b. No Special Circumstances Justify Denial of a Fee Award. ...................13

C. Plaintiffs Are Entitled to A Fully Compensatory Attorneys' Fee Award........14

    1. Plaintiffs Are Entitled to Full Recovery of Their Lodestar. .......................14

    2. Plaintiffs' Hours Are Reasonable Given the Length and Complexity of the Case..............................................................................................15

    3. The *Kerr* Factors Support a Fully Compensatory Fee Award....................21

    4. Plaintiffs' Hourly Rates Are Reasonable................................................23

        a. Plaintiffs' Claimed Rates Accord with Prevailing Los Angeles/Orange County Rates.................................................................................23

        b. Counsel Should Be Awarded Their 2024 Rates To Compensate for Delay in Payment.............................................................................24

D. Plaintiffs Are Entitled to Recover Reasonable Costs of Litigation. ...............25

IV.     Conclusion ..............................................................................................25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*A.D. v. State Highway Patrol*,
 2013 U.S. Dist. LEXIS 169275 (N.D. Cal. 2013)....................................................21

*Alliance for the Wild Rockies v. Kruger*,
 2014 U.S. Dist. LEXIS 2825 (D. Mont. Jan. 3, 2014) ...........................................14

*Armstrong v. Brown*,
 805 F. Supp. 2d 918, 922 (N.D. Cal. 2011) ........................................................19

*Bartlett v. Mut. Pharm. Co.*,
 742 F. Supp. 2d 182 (D.N.H. 2010) ....................................................................18

*Bosca v. Astrue*,
 No. 06-2364, 2009 U.S. Dist. LEXIS 24736 at *4 (N.D. Cal. Mar. 11, 2009) .....19

*Bouman v. Block*,
 940 F.2d 1222 (9th Cir. 1991)..............................................................................24

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep'. of Health and Human Res.*,
 532 U.S. 598, 610 ................................................................................................13

*Camacho v. Bridgeport Financial, Inc.*,
 523 F.3d 973 (9th Cir. 2008).........................................................................21, 23

*Chloe SAS v. Sawabeh Info. Servs. Co.*,
 2015 U.S. Dist. LEXIS 186838 (C.D. Cal. June 22, 2015) ...................................23

*City of Burlington v. Dague*,
 505 U.S. 557 (1992)........................................................................................21, 22

*City of Riverside v. Rivera*,
 477 U.S. 561 (1986)...........................................................................................2, 12

*Davis v. City and Cnty. of S.F.*,
 976 F.2d 1536 (9th Cir. 1992)....................................................................18, 24, 25

*Dixon v. City of Oakland*,
 2014 U.S. Dist. LEXIS 169688 (N.D. Cal. Dec. 8, 2014) ...................................17

*Farrar v. Hobby*,

    506 U.S. 103, 112 (1992) ...................................................................................13

*Fischer v. SJB-P.D. Inc.*,

    214 F.3d 1115 (9th Cir. 2000) ..........................................................................14

*Flores v. City of Westminster*,

    2014 U.S. Dist. LEXIS 200551 (C.D. Cal Oct. 23, 2014) ...................................22

*Gates v. Deukmejian*,

    987 F.2d 1392 (9th Cir. 1992) ..........................................................................23

*Golden Gate Audubon Soc., Inc. v. U.S. Army Corps of Engineers*,

    732 F. Supp. 1014 (N.D. Cal. 1989) .............................................................18, 21

*Grove v. Wells Fargo Fin. Cal., Inc.*,

    606 F.3d 577 (9th Cir. 2010) ...........................................................................25

*Habitat Educ. Ctr., Inc. v. Bosworth*,

    2006 U.S. Dist. LEXIS 21922 (E.D. Wis. Mar. 28, 2006) ..................................15

*Heard v. District of Columbia*,

    2006 U.S. Dist. LEXIS 62912 (D.C.D.C. Sept. 5, 2006) ....................................17

*Hensley v. Eckerhart*,

    461 U.S. 424 (1983) .........................................................................................14

*Hirsch v. Compton Unified Sch. Dist.*,

    2013 U.S. Dist. LEXIS 64556 (C.D. Cal. May 3, 2013) .....................................18

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,

    2016 U.S. Dist. LEXIS 102408 (N.D. Cal. Aug. 3, 2016)...................................24

*Intamin, Ltd. v. Magnetar Technologies Corp.*,

    2009 U.S. Dist. LEXIS 123604 (C.D. Cal. Dec. 28, 2009) .............................18, 19

*Kerr v. Screen Guild Extras, Inc.*,

    526 F.2d 67 (9th Cir. 1975).............................................................................21

*Marbled Murrelet v. Babbitt*,

    182 F.3d 1091 (9th Cir. 1999)..........................................................................22

*Marbled Murrelet v. Pac. Lumber Co.*,
    163 F.R.D. 308 (N.D. Cal. 1995)........................................................................24, 25

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)....................................................................................18, 19, 24

*Moreno v. City of Sacramento*,
    534 F.3d 1106 (9th Cir. 2008)............................................................................15, 17

*Nat'l Wildlife Fed'n v. Hanson,*
    859 F.2d 313 (4th Cir. 1988)...................................................................................2

*Oberfelder v. City of Petaluma*,
    2002 U.S. Dist. LEXIS 8635 (N.D. Cal. Jan. 29, 2002) .................................17, 24

*Our Children's Earth Found. v. U.S. Envtl. Prot. Agency*,
    2016 U.S. Dist. LEXIS 40626 (N.D. Cal. Mar. 25, 2016).....................................21

*Pacificans For A Scenic Coast v. Cal. DOT*,
    2017 U.S. Dist. LEXIS 199145 (N.D. Cal. Nov. 22, 2017)...................................24

*P.C. v. City of L.A.*,
    2012 U.S. Dist. LEXIS 187549 (C.D. Cal. Sept. 14, 2012)...................................17

*Pa. v. Del. Valley Citizens' Council*,
    478 U.S. 546 (1986)...............................................................................................22

*Perfect 10, Inc. v. Giganews, Inc.*,
    2015 U.S. Dist. LEXIS 54063 (C.D. Cal. Mar. 24, 2015) ...................19, 23, 24, 25

*Pierce v. County of Orange*,
    905 F. Supp. 2d 1017 (C.D. Cal. 2012) .................................................................18

*PIRG of N.J. v. Windall,*
    51 F.3d 1179 (3rd Cir. 1994) .................................................................................18

*Prison Legal News v. Schwarzenneger*,
    608 F.3d 446 (9th Cir. 2010).................................................................................24

*Resurrection Bay Conservation Alliance v. City of Seward*,
    640 F.3d 1087 (9th Cir. 2011).........................................................................13, 14

*Ruckelshaus v. Sierra Club*,

463 U.S. 680, 694 (1983) ...................................................................................13

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,

2012 U.S. Dist. LEXIS 42287 (E.D. Cal. Mar. 26, 2012),

*aff'd* 2014 U.S. App. LEXIS 12450 (9th Cir. July 1, 2014)..........................13, 22

*Sierra Club v. Chevron U.S.A., Inc.*,

834 F.2d 1517 (9th Cir. 1987)............................................................................2

*Sierra Club v. EPA*,

625 F. Supp. 2d 863 (N.D. Cal. 2007) ...............................................................18

*Sorenson v. Mink*,

239 F.3d 1140 (9th Cir. 2001)............................................................................14

*Spence v. Wells Fargo Bank, N.A.*,

No. 10-2057, 2012 U.S. Dist. LEXIS 32838, 2012 WL 844713, at *5

(E.D. Cal. Mar. 12, 2012) ...............................................................................19

*Sw. Ctr. for Biological Diversity v. Bartel*,

2007 U.S. Dist. LEXIS 64232 (S.D. Cal. Aug. 30, 2007) ...................................14

*St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*,

574 F.3d 1054 (9th Cir. 2009)..................................................................1, 13, 14

*Stetson v. Grissom*,

821 F.3d 1157 (9th Cir. 2016).............................................................................21

*Stonebrae, L.P. v. Toll Bros.*,

2011 U.S. Dist. LEXIS 39832 (N.D. Cal. Apr. 7, 2011) ......................................24

*Trs. of the Constr. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*,

460 F.3d 1253 (9th Cir. 2006)............................................................................18

*UM Corp. v. Tsuburaya Prods. Co.*,

2018 U.S. Dist. LEXIS 241753 (C.D. Cal. Aug. 1, 2018)....................................22

*Watson v. Cnty. of Riverside*,

300 F.3d 1092, (9th Cir. 2002) ..........................................................................13

*Wishtoyo Found. v. United Water Conservation Dist.*,

    2019 U.S. Dist. LEXIS 39927 (C.D. Cal. Mar. 5, 2019) ...................... 14-18, 20-24

**CODES**

42 U.S.C. § 1988 ...............................................................................................22

42 U.S.C. § 6902(b) ...........................................................................................4

42 U.S.C. § 6972(e)...............................................................................1, 12, 24

## I.    Introduction

Through this Resource Conservation and Recovery Act ("RCRA") citizen suit, Plaintiffs Ecological Rights Foundation and Santa Barbara Channelkeeper (collectively, "Plaintiffs") sought to address environmental problems associated with dioxins and pentachlorophenol contamination of Hot Line Construction Inc. ("Hot Line")'s utility pole storage and service facility in Santa Barbara, California ("the Facility"). Plaintiffs were concerned that this contamination threatened wildlife and people who might be exposed to the contamination at the Facility in further threatened wildlife and human health when stormwater runoff from the Facility conveyed dioxins and pentachlorophenol to sensitive off-site areas, including the nearby Goleta Slough, an ecologically sensitive estuary that provides unique and rare habitat in Southern California. Through the application of considerable expertise and skill, Plaintiffs obtained a comprehensive Consent Decree obligating Hot Line to complete full characterization of the extent of contamination of the Facility and surrounding off-site areas and then clean up this contamination as directed by either the California Regional Water Quality Control Board for the Central Coast Region or the California Department of Toxic Substances Control. *See* Dkt. 252 ¶¶ 3-4 ("Consent Decree"). This excellent result equates to the requisite success for Plaintiffs to be awarded attorneys' fees and costs in full against Hot Line under RCRA's fee shifting provision, RCRA section 7002(e), 42 U.S.C. § 6972(e).

Courts must generally award attorneys' fees to prevailing environmental citizen suit plaintiffs "to encourage the achievement of statutory goals" as fee shifting is typically required for public interest groups to secure representation. *St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1061 (9th Cir. 2009). As one court pointed out:

> [I]t is important to distinguish between traditional civil cases and environmental litigation . . . . The legislative history of the fee shifting provisions indicates that they were enacted to encourage litigation to ensure proper administrative implementation of the environmental statutes . . . . [I]t is appropriate for courts to award fees to partially prevailing parties where the action served to promote the

> purposes of the Act. Unlike plaintiffs in traditional civil actions, plaintiffs in environmental suits do not seek to vindicate personal rights and they obtain no financial benefit if they win.

*Nat'l Wildlife Fed'n v. Hanson,* 859 F.2d 313, 316-17 (4th Cir. 1988); *see also Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1525 (9th Cir. 1987) (acknowledging environmental suit citizens obtain no financial benefit from winning).

Plaintiffs have striven to streamline the litigation via requests for admission, requested stipulations, and earnest pursuit of settlement. Moreover, Plaintiffs have exercised extensive billing judgment by not seeking fees recovery for a significant portion of the hours billed in this case, cutting over 578 hours of their attorney and paralegal work on this case and reducing their lodestar by about $440,000. Plaintiffs are mindful that the award they seek is nonetheless a large sum. However, Hot Line's litigation approach of taking this matter to the literal eve of trial before settling greatly increased the time spent on this case. A defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986).

This case's factual and legal complexity has also inevitably led to Plaintiffs' large lodestar. As the 255 entries in the case docket attest, this case required extensive time and effort from Plaintiffs. As further described in the Statement of Facts below, this effort included: (1) litigating numerous contested motions; (2) drafting and responding to voluminous written discovery; (3) taking and defending numerous depositions; (4) extensive factual evidence gathering including multiple field visits to gather the critically needed soil and stormwater runoff samples to establish that Hot Line had caused extensive environmental contamination (5) significant expert discovery, including working with Plaintiffs' expert to prepare multiple expert reports from Plaintiffs' expert and reviewing and assisting Plaintiffs' expert to respond to multiple expert reports from Hot Line; (6) extensive efforts to settle the case, including nine formal mediations; (7) submitting extensive trial related pleadings, such as memoranda of contentions of fact

and law, and trial briefs; (8) preparing 172 trial exhibits; and (9) preparing to call 19 witnesses for trial, including submitting seven witness direct testimony declarations, preparing witnesses for cross-examination, and preparing direct examination outlines for additional witnesses.

Performing these tasks was essential to finally convincing Hot Line to settle on the eve of trial. Surely without facing a thoroughly and well developed Plaintiffs' case, Hot Line would not have concluded that its success at trial was sufficiently unlikely that settlement binding it to the further investigation and site cleanup work that it had resisted agreeing to for years was the preferred option. Notably, Plaintiffs performed these tasks in the complex setting of needing to prove that dioxins and pentachlorophenol contamination associated with Hot Line's years of storage and handling of pentachlorophenol-treated utility poles ("Poles") and treated wood waste ("TWW") posed cognizable human health and environmental harm risk. Making such a showing required a great deal of expertise, skill, and hours of work in addressing such issues as the toxicology of dioxins and pentachlorophenol, the propensity of dioxins and pentachlorophenol to be transported once released in the environment, and the sensitivity of the areas where dioxins and pentachlorophenol originating from the Facility could be transported to—*i.e.*, the nature of the wildlife using the Hot Line Facility and adjoining downstream areas and the nature of human exposures to dioxins and pentachlorophenol originating from the Facility. Performing these tasks necessarily and inevitably took a great deal of time, especially given Hot Line's consistent opposition and consistent resistance to agreeing to any significant narrowing of the issues. In all, Plaintiffs devoted over 3,600 hours in attorney and paralegal time to their ultimately successful effort. As noted, however, Plaintiffs have exercised substantial billing judgment to reduce their requested hours to just over 3,000 hours. After their nearly $440,000 in billing judgment reductions, Plaintiffs' reasonable attorney fees lodestar that should be awarded is $2,511,095.09 and their additional case costs for expert witness fees and other essential case expenditures that should be awarded amount to $101,843.24.

## II.    Statement of Facts

Plaintiffs are nonprofit environmental organizations dedicated to the public interest purposes of environmental laws such as RCRA, which is to ensure the handling of hazardous waste so "as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). Declaration of Fredric Evenson ("Evenson Decl.") ¶ 17. Plaintiffs brought this action against Hot Line to remedy pollution from highly toxic contaminants from Hot Line's storage of Poles and TWW generated by disposal of used Poles and utility pole crossarms at the Facility. Declaration of Christopher Sproul ("Sproul Decl.") ¶ 18. Plaintiffs were particularly concerned about preventing the ongoing migration of these contaminants into nearby Goleta Slough, a rare and sensitive Southern California estuary. *Id*. ¶ 19.

In the course of the case, the parties litigated multiple contested motions brought by both parties, including three motions by Plaintiffs to compel discovery responses (Dkt. 133, 161, 164); three motions in limine brought by Plaintiffs (Dkt. 195, 197, 198); four motions in limine brought by Hot Line (Dkt. 190, 191, 192, 193); and two Hot Line *ex parte* applications to continue the trial (Dkt. 214, 214-2, 233, 233-1). *Id*. ¶¶ 73-77, 85-86, 101-103, 106-107, 110-111.

The parties engaged in extensive fact discovery, totaling 121 separate fact discovery deliverables, including: 13 depositions (12 by Plaintiffs, one by Hot Line); 18 written discovery requests (12 from Plaintiffs, six from Hot Line), 35 separate document productions (16 by Hot Line, 19 by Plaintiffs), 37 separate written discovery responses (26 by Hot Line, 11 by Plaintiffs), and 18 discovery-related subpoenas from Plaintiffs to third parties (and review of multiple rounds of document productions in response). *Id*. ¶¶ 34, 37-50.

In addition, Plaintiffs conducted 10 separate sampling trips to gather evidence of the contamination at the Facility and the impact in downstream environments. *Id*. ¶¶ 22-23. Plaintiffs collected a total of 27 samples, including 24 samples of soils or storm water at the Facility, and three samples of soil in an offsite location known as Firestone Ditch, a

wetland feature where storm water from the Facility runs on its way to Goleta Slough. *Id*. ¶ 24. This sampling was necessary to establish the core facts need for Plaintiffs' RCRA claim. *Id*. Plaintiffs needed to return to the Facility for additional sampling to rebut Hot Line's contentions that its investigation and limited soil cleanup at the Facility removed the contamination and to establish Plaintiffs' counter contention that Hot Line's actions had left the site substantially contaminated. *Id*. ¶¶ 25-29.

In addition to Plaintiffs' sampling, Hot Line and the City of Santa Barbara conducted six sampling trips during which they took an additional 48 soil samples at the Facility. *Id*. ¶ 30. This required Plaintiffs to incur time propounding discovery requests seeking sampling notes, photos, and laboratory reports, reviewing those records to assess their impact on the case, and working with Plaintiffs' expert to prepare supplemental expert reports to address the new material facts necessarily generated by additional site sampling work done by Hot Line and the City late in the case, a few months before trial. *Id*. ¶ 31.

In addition, Plaintiffs engaged in significant expert discovery in this case. The ultimate issue in this case was whether the contaminants at the Facility may present an imminent and substantial endangerment to human health or the environment in violation of RCRA. Establishing this ultimate issue required proving: (1) the existence of dioxins and pentachlorophenol contamination at the Facility; (2) the fate and transport of this contamination in storm water posed substantial risks that dangerous levels of dioxins and pentachlorophenol would reach the sensitive environment of Goleta Slough, and the wetlands in the Firestone Ditch tributary to Goleta Slough; (3) the mechanisms by which birds, fish, and others, including humans, were at risk of being harmed by dioxins and pentachlorophenol that originated at the Facility; and (4) the toxicology of dioxins and pentachlorophenol and risk of harm to the environment and human health posed by dioxins and pentachlorophenol that originated at the Facility. Making this showing required the development of potential trial testimony by Plaintiffs' expert witness, Dr. William Rogers, on intricate environmental risk assessment issues associated with

dioxins and pentachlorophenol toxicology, how these contaminants are transported in the environment, and the vulnerability of wildlife and humans to dioxins and pentachlorophenol exposure. *Id*. ¶ 87. As such, Plaintiffs prepared an opening expert report and a rebuttal report responding to the report from Hot Line's expert Philip Goalwin. *Id*. ¶ 88. Thereafter, Plaintiffs worked with Dr. Rogers to prepare a total of three supplemental expert reports to address new material facts arising from: (1) Hot Line's belated, partial site soil cleanup activity in the summer of 2022, new site soil sampling by Hot Line and the City of Santa Barbara in the summer of 2023, and a further (plainly inadequate) site remediation proposal made by Hot Line in the runup to trial. *Id*. ¶¶ 89-92. Further work with Plaintiffs' expert and the development of his supplemental expert reports were needed to demonstrate that Hot Line's limited site cleanup activity in the summer of 2022 had not succeeded in cleaning up the site--as corroborated by subsequent site sampling done both by Plaintiffs and by the City of Santa Barbara. *Id*. ¶ 92. In addition, further work with Plaintiffs' expert and another supplemental report was needed to establish that Hot Line's late proposed remedial effort was not well-designed and would not succeed in cleaning up the site--a position corroborated by an in-depth critique developed by a consultant to the City of Santa Barbara. *Id*.

Plaintiffs repeatedly sought to settle this case with Hot Line. These efforts began before the case was even filed, with Plaintiffs sending Hot Line a draft consent decree setting forth a proposed settlement on May 13, 2020, two weeks before filing the original complaint on May 29, 2020. *See* Dkt. 1; Sproul Decl. ¶ 119. Plaintiffs and Hot Line held numerous settlement discussions at various junctures during this case, including nine settlement mediation sessions--eight sessions mediated by Magistrate Judge Wilner (*see* Dkt. 99, 112, 115, 130, 131, 132, 182, 183), and one mediation in September 2023 before a private mediator. Sproul Decl. ¶ 120.

The parties had a very good opportunity to settle in early 2022, following Plaintiffs' successful settlement with Southern California Edison ("SCE") in November 2021. Plaintiffs made a concerted effort to settle the case with Hot Line at this time. *Id*. ¶

121. In particular, on November 9, 2021—the same day the Court entered the SCE consent decree—Plaintiffs sent a message to counsel for Hot Line and Magistrate Judge Wilner, along with a copy of the SCE consent decree, requesting the Court's assistance to recommence settlement discussions, which had stalled. *Id*. ¶ 122. Following this request, the parties held three mediation sessions before Judge Wilner in February 2022. *Id*. ¶ 123. Following the last session, on February 24, 2022, Plaintiffs sent Hot Line a formal settlement offer, laying out the specific terms that Plaintiffs would accept in settlement for Hot Line's remediation of the Facility. *Id*.

Hot Line never made a formal response to Plaintiffs' February 2022 settlement offer. *Id*. ¶ 124. Nonetheless, Plaintiffs continued working to pursue settlement, among other things, sending further formal settlement proposals on March 17, 2022 and April 1, 2022. *Id*. ¶ 124. However, once again, Hot Line did not accept these proposals nor respond with its own comprehensive settlement counterproposals. *Id*. ¶ 125.

Unfortunately, rather than settle on reasonable terms, Hot Line pursued a litigation approach of trying to establish that Plaintiffs' RCRA claims should be dismissed because Hot Line had adequately cleaned up the Facility. *Id*. Hot Line purported to rely upon site remediation work directed by its expert Philip Goalwin in the summer of 2022. *Id*. ¶ 126. Notably, Mr. Goalwin was criminally convicted for fraudulently seeking payment from the state of California for site cleanup work he did not actually do and for falsifying site sample results and had his professional license provisionally revoked as a result. *Id*. ¶¶ 126-129. Based on this and their own in-depth investigation, Plaintiffs were convinced that Mr. Goalwin's contentions that the site had been cleaned up could be shown to not be accurate and that they should press forward with their case. *Id*. ¶ 130. Plaintiffs developed extensive evidence in December 2022 and again in the spring of 2023, corroborated by the City of Santa Barbara, that Mr. Goalwin and his firm did not conduct the removal of pentachlorophenol contaminated woodchip debris left over from Poles and TWW storage and handling at the Facility that Mr. Goalwin's site remediation plan proposed he would do in the summer of 2022--and that such contaminated woodchip

material remain widely dispersed throughout the Facility. *Id*. Plaintiffs further developed evidence in extensive further site sampling in the spring of 2023 that soils at the Facility site remained heavily contaminated with dioxins, evidence that the City of Santa Barbara corroborated through the work of its own separately retained consultant in the summer of 2023. *Id*. ¶¶ 28, 33. Additionally, at the end of December 2022, Plaintiffs collected storm water runoff samples from the Facility which corroborated that stormwater runoff from the Facilities still contained extremely high levels of dioxins—levels exceeding regulatory agencies' environmentally protective standards by orders of magnitude. *Id*. ¶ 131. Finally, to rebut Hot Line's continued contentions, including in a June 2023 supplemental expert report from Mr. Goalwin, that the Facility site was cleaned up in a fashion that no longer presented risk of harm to off-site locations and that Plaintiffs could not prove that dioxins contamination at the Facility had moved to any off-site location, Plaintiffs took some additional soil samples in August 2023 in an off-site location known as the Firestone Ditch, as noted a wetland tributary feature that flows into the Goleta Slough. *Id*. ¶ 29. These soil samples, like Plaintiffs' soil samples taken from the Facility site itself, showed extremely high levels of dioxin well above regulatory agency guidance levels used to design cleanup activity. *Id*. Plaintiffs worked with their expert Dr. Rogers to prepare supplemental expert reports in the winter and spring of 2023 and then a final supplemental expert report in September 2023 disclosing Dr. Rogers' supplemental expert analysis of pertinent developments, including the extensive additional storm water and soil sampling and site reconnaissance that demonstrated that the Facility did indeed remain heavily contaminated with dioxins and pentachlorophenol and that dioxins and pentachlorophenol present at the Facility likely had been transported off-site by stormwater into the Firestone Ditch and from there into the Goleta Slough. *Id*. ¶¶ 89-92.

Having marshalled this new evidence, Plaintiffs renewed their settlement effort via an August 16, 2023 filing with the Court. *See* Dkt. 221. In this new filing, Plaintiffs set out that their new evidence in the form of deposition testimony from a City of Santa Barbara witness had confirmed Plaintiffs' contention that storm water runoff from the

Facility flows into the Goleta Slough and had further corroborated Plaintiffs' contention that Hot Line's limited remedial efforts had not cleaned up the Facility--which remained heavily contaminated with dioxins. Plaintiffs posited that this new evidence could and should convince Hot Line to settle and requested that the Court order the parties to attend, along with their principles, an additional settlement mediation to be conducted by a third party mediator by no later than mid-September 2023. Dkt. 221 at 7-8. The Court adopted Plaintiffs' suggestion in a sharply worded Minute Order:

> Plaintiffs have proposed attempting mediation once again in light of new evidence disclosed in the Letter. The Court agrees that further settlement efforts would be a good use of the parties' time. It is frankly puzzling that Plaintiffs' claims against Southern California Edison Company settled (despite being vigorously litigated), while similar if not identical claims against Hot Line Construction, Inc. have not settled despite the extraordinary efforts of Magistrate Judge Wilner, one of the Court's most effective mediators. Defendant has not expressed an opinion about a further mediation on the terms Plaintiffs describe. The Court therefore concludes that the parties should make further efforts at settlement before further taxing the parties' and the Court's resources. And Plaintiffs' proposal seems reasonable. Given the nature of this case, the additional evidence, and the prior settlement, this case should settle.

Dkt. 224.

Hot Line continued to drag its feet and did not agree to a mediator and to a time for the mediation until Plaintiffs repeatedly urged Hot Line to comply with the Court's directive. Sproul Decl. ¶¶ 141-142. The parties finally conducted an all-day mediation with a third party mediator on September 12, 2023. However, consistent with its past approaches, Hot Line did not present a serious and complete settlement counterproposal in this mediation and the matter did not settle. *Id*. ¶ 144. Meanwhile, Hot Line pursued three attempts to have the Court delay the trial, which the Court first set for August 15, 2023 and then moved to October 10, 2023. *See* Dkts. 214, 221, 233. It was only when the Court denied Hot Line's two requests to move the October 10, 2023 trial (*see* Dkt. 239) to an indefinite date months in the future that Hot Line finally became willing, late on October 9, 2023, the day before trial, to enter into a Consent Decree resolving Plaintiffs'

request for further site investigation and remediation, Plaintiffs' central goal in bringing this RCRA citizen suit. Sproul Decl. ¶¶ 18-19, 118.

Given the delay in securing a settlement from Hot Line, Plaintiffs necessarily had to engage in extensive pretrial preparation, including submitting 21 significant pretrial filings: five major first round pretrial filings on July 7, 2023 (Pretrial Memorandum of Contentions of Fact and Law (Dkt. 196); Proposed Trial Findings of Fact and Conclusion of Law (Dkt. 201); Joint Exhibit List (Dkt. 194); Plaintiffs' Witness List (Dkt. 200); and a joint Stipulation to Facts, Evidentiary Matters and Conclusions of Law (Dkt. 199) (not including the motions in limine mentioned above)); a Proposed Joint Pretrial Order filed July 14, 2023 (Dkt. 211-1); a Notice of Filing of Written Trial Direct Testimony and Lodging of Proposed Written Direct Trial Testimony, along with Plaintiffs' seven written direct examination declarations (Plaintiffs later filed a response to Hot Line's objections to the declarations); and Plaintiffs prepared and served dozens of trial subpoenas on third parties (many of which had to be re-served when the trial was continued to October 10, 2023). Sproul Decl. ¶¶ 99-104, 112-117. Plaintiffs also engaged in other trial preparation tasks, including coordinating with and preparing trial witnesses, creating demonstrative exhibits, drafting examination and cross-examination questions, drafting opening statements and points to make in closing argument, and similar tasks. *Id*. ¶ 101.

Before filing this fees motion, Plaintiffs engaged in extended efforts to settle with Hot Line on a mutually acceptable payment of attorneys fees and costs to Plaintiffs. *Id*. ¶ 145. Plaintiffs provided their detailed daily attorney time records and detailed cost itemization to Hot Line along with an attorney fee and cost recovery proposal in September 2023. *Id*. Hot Line provided a fees and costs settlement counter proposal, but the parties remain far apart on this issue and mutually agreed to just settle the injunctive relief portion of Plaintiffs' claims while further agreeing to continue to attempt to negotiate resolution of the fees and costs matter in the Consent Decree approved by the Court on October 11, 2023. *Id*.; *see* Dkt. 252. In accord with the parties' Stipulation RE: Consent Decree and accompanying court order (Dkt. 252), Plaintiffs provided an update

of its attorneys time records and cost itemization in October 2023 along with an updated attorneys fees and costs settlement proposal. Sproul Decl. ¶ 146. Though obligated by the Stipulation and accompanying court order (Dkt. 252) to provide a counter offer response by December 8, 2023, Hot Line did not do so until December 12, 2023. *Id*. When it did, Hot Line's fee proposal was lower than the proposal it had made during the September mediation. *Id*. After Hot Line failed to respond to multiple requests for an explanation of this backwards movement, Plaintiffs provided Hot Line with yet another fees and costs settlement counterproposal on December 22, 2023. *Id*. However, Hot Line has never responded to this settlement counterproposal and Plaintiffs have proceeded to file this Motion given the apparent impasse and the court ordered deadline for this motion. *Id*.

## III.    Argument

### A.    Hot Line Multiplied the Litigation Costs.

Hot Line multiplied the litigation costs in numerous ways:

One, Hot Line compounded the time needed for discovery, trial briefing, and witness/evidence presentation at trial by either ignoring or rebuffing Plaintiffs' attempts to work out any more than minimal fact and law stipulations. This complicated Plaintiffs' development of their trial presentation and forced Plaintiffs to prepare very lengthy trial exhibits and find alternative means to develop the evidence to establish important facts, including how to authenticate and otherwise establish the admissibility of documents. Sproul Decl. ¶¶ 98, 115.

Two, while Plaintiffs served extensive discovery on Hot Line, Hot Line compounded Plaintiffs' discovery time by withholding or otherwise failing to produce documents, interrogatory answers, and request for admission responses when due and/or providing plainly inadequate/incomplete responses. This necessitated many hours and repeated requests for conferral over discovery disputes (which Hot Line typically ignored until finally jogged into action via repeated imploring and warnings that Plaintiffs would bring additional motions to compel) and multiple Plaintiffs' motions to compel Hot Line discovery responses. *See* Sproul Decl. ¶¶ 51-86; Declaration of Brian Orion ("Orion

Decl.") ¶ 10. Hot Line repeatedly made, and then broke, agreements with Plaintiffs, requiring inordinate efforts to follow up to obtain basic discovery that Hot Line had already agreed to provide. Sproul Decl. ¶¶ 55-65, 71-72. Hot Line also violated representations made to Magistrate Judge Kato and twice violated Judge Kato's orders. *Id.* ¶¶ 51, 75-83, n. 1.

Three, although Plaintiffs sought to settle this action without the need for dispositive motions or a trial, Hot Line repeatedly rebuffed Plaintiffs' concerted efforts over the years to settle this case. Hot Line had multiple opportunities to settle this case before Plaintiffs expended significant fees or costs: before Plaintiffs filed this case, before extensive discovery had been conducted, and before the parties had fully prepared their respective trial presentations. Sproul Decl. ¶¶ 119-125, 139-140. Hot Line failed to communicate Plaintiffs' settlement proposals to its principals and failed, despite repeated requests from Plaintiffs, to have a principal with settlement authority attend any mediation until ordered by the Court to do so at the final mediation just before trial. *Id.* ¶¶ 132-138. Hot Line's conscious decision to litigate to the eve of trial rather than settle—made at multiple points over several years—and to continue this approach by not meaningfully engaging in attorneys fees and costs settlement negotiation, is the reason why Plaintiffs and the Court have expended such extensive resources bringing this matter to the eve of trial and now conducting briefing and preparing for a hearing on the still unresolved issue of Plaintiff's recovery of attorneys' fees and costs.

Hot Line now faces large fees and costs, but, by multiplying the time Plaintiffs have had to spend to prevail, Hot Line has only itself to blame. *See, e.g., City of Riverside*, 477 U.S. at 580 n.11.

**B.     Plaintiffs Are Entitled To Recover Attorneys' Fees Under RCRA.**

**1.     Plaintiffs Meet the RCRA Standard for Fee Entitlement.**

Under RCRA, a court "may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 42 U.S.C. § 6972(e). Fee

awards are "appropriate" where plaintiffs are prevailing or substantially prevailing parties, *i.e.*, have achieved "some degree of success on the merits" and there are no "special circumstances" rendering a fee award unjust. *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983) (interpreting similar attorneys fee shifting provision in Clean Air Act); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 2012 U.S. Dist. LEXIS 42287, at *9 (E.D. Cal. Mar. 26, 2012), *aff'd* 2014 U.S. App. LEXIS 12450 (9th Cir. July 1, 2014) ("*SYRCL*"). Here, Plaintiffs are substantially prevailing parties and no "special circumstances" make a fee award unjust.

> **a.   Plaintiffs Achieved Significant Success on the Merits.**

"The threshold for sufficient relief to confer prevailing party status is not high. 'If the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind.'" *St. John's*, 574 F.3d at 1059; *see also Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1091 (9th Cir. 2011). As noted, the Consent Decree mandates that Hot Line perform additional site characterization and site remediation in accord with regulatory agency oversight that will eliminate the ongoing environmental risk to important ecological resources, including the rare and sensitive habitat provided by the Goleta Slough, posed by Hot Line's substantial contamination of the Facility. *See* Dkt. 252. By prevailing in winning this important Consent Decree relief, Plaintiffs achieved the requisite merits success. *See, e.g.*, *Watson v. Cnty. of Riverside*, 300 F.3d 1092, (9th Cir. 2002) (consent decree is paradigm example of judicial relief that conveys prevailing party status); *see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep'. of Health and Human Res.*, 532 U.S. 598, 610 (same); *Farrar v. Hobby*, 506 U.S. 103, 112 (1992) (finding prevailing party status where plaintiffs sought $17 million in damages and received $1).

> **b.   No Special Circumstances Justify Denial of a Fee Award.**

In environmental cases, the "court's discretion to deny a fee award to a prevailing plaintiff is narrow, and a denial of fees on the basis of 'special circumstances' is

'extremely rare.'" *Resurrection Bay*, 640 F.3d at 1092 (citations omitted). Fee awards to prevailing environmental citizen suit plaintiffs should be "the rule rather than the exception." *St. John's*, 574 F.3d at 1062. Here, Plaintiffs' diligent pursuit of this complex matter led to winning extensive injunctive relief in a Consent Decree that will secure Plaintiffs' environmental protection goals in bringing this action. Awarding Plaintiffs their fees is thus mandatory under *St. John's* and *Resurrection Bay*.

### C.   Plaintiffs Are Entitled to a Fully Compensatory Attorneys' Fee Award.

#### 1.   Plaintiffs Are Entitled to Full Recovery of Their Lodestar.

In winning the Consent Decree, Plaintiffs have achieved their environmental protection aims in bringing this case, "excellent results" that warrant recovery of fully compensatory attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983) ("substantial relief" equivalent to "excellent results"); *see also Sorenson v. Mink*, 239 F.3d 1140, 1147 (9th Cir. 2001) ("excellent result" occurred when the lawsuit represented "sustained legal effort to bring about a common good.").

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Sorenson*, 239 F.3d at 1145 (*citing Hensley*, 461 U.S. at 433); *see also Wishtoyo Found. v. United Water Conservation Dist.*, No. 16-3869, 2019 U.S. Dist. LEXIS 39927, at *15-16 (C.D. Cal. Mar. 5, 2019). This approach presumably results in a reasonable fee award, so the lodestar should only be adjusted in "rare and exceptional cases." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 n.4 (9th Cir. 2000). This is not such a case. Litigating this factually complex case, with over 255 docket entries, while countering steadfast opposition from Hot Line, and achieving substantial relief on the merits fully justifies an award of all of Plaintiffs' attorneys' fees. *See Alliance for the Wild Rockies v. Kruger*, 2014 U.S. Dist. LEXIS 2825, at *13 (D. Mont. Jan. 3, 2014) ("the amount of time spent by Plaintiffs' counsel was reasonable, particularly in light of the fees awarded in other environmental litigations. These cases are time-consuming and the process is arduous."); *Sw. Ctr. for Biological Diversity v. Bartel*, 2007 U.S. Dist.

LEXIS 64232, at *26 (S.D. Cal. Aug. 30, 2007) (defendants' active opposition and challenging legal issues justified substantial time expenditure); *Habitat Educ. Ctr., Inc. v. Bosworth*, 2006 U.S. Dist. LEXIS 21922, at *11 (E.D. Wis. Mar. 28, 2006) (case involved time-consuming analysis of complex, extensive records).

Nonetheless, Plaintiffs has exercised substantial billing judgment by eliminating lodestar recovery request for several attorneys and paralegals and substantially reducing the hours claimed by others for an overall reduction in their lodestar of about $435,000 (approximately 15.2%). Another District Judge in this District credited similar billing judgment cuts in an environmental public interest case as supporting the overall reasonableness of the plaintiffs' fee request. *Wishtoyo*, 2019 U.S. Dist. LEXIS 39927, at *17-18.

### 2.   Plaintiffs' Hours Are Reasonable Given the Length and Complexity of the Case.

This case has extended over more than three years. Plaintiffs necessarily expended significant time and effort to achieve the excellent results described above in this hard-fought case, which their counsel took on contingency at considerable risk of not being compensated for what ended up being thousands of hours of work. Sproul Decl. ¶ 193.

When considering the number of hours expended in another environmental case, a District Judge in this District explicitly recognized the Ninth Circuit's teaching that:

> [L]awyers are not likely to spend unnecessary time on contingency fee cases ... the payoff is too uncertain, as to both the result and the amount of the fee. Accordingly, by and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case.

*Wishtoyo*, 2019 U.S. Dist. LEXIS 39927, at *19 (citing *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008)) (cleaned up). Without "specific reasons for reducing the fee request that the district court finds persuasive, it should normally grant the award in full, or with no more than a haircut." *Moreno*, 534 F.3d at 1116.

In *Wishtoyo*, the Court, applying Los Angeles/Orange County attorney market rates prevailing in 2018, awarded the plaintiffs $2,922,974.25 in fees in an environmental

case spanning two years in which the plaintiffs prevailed at trial on one claim. 2019 U.S. Dist. LEXIS 39927, at *13, 17, 26. In that case, the Court found that the plaintiffs' overall lodestar was reasonable, subject to deductions, due to "the complexity and time-consuming nature of this case, as well as the diligence and expertise of Plaintiffs' counsel ..." *Id*. at *16. The facts of this case compare favorably. One, as noted, this case spanned well over three years, substantially longer than the two years in *Wishtoyo*. Two, while this case did not actually go to trial, it did not settle until the eve of trial at which point Plaintiffs had necessarily done the lion's share of the work needed for trial. Three, this case required extensive factual and expert discovery of comparable complexity, including the use of experts on technical subjects pertinent to the merits. Four, lead counsel in *Wishtoyo,* Christopher Sproul (Sproul Decl. ¶¶ 198-199) also served as lead counsel in this case and his diligence and expertise were equally necessary to the successful outcome here. *Id*. Finally, as discussed below, counsel's reasonable hourly rates have increased since the 2018 rates at issue in *Wishtoyo*.

Plaintiffs' declarations review the major litigation tasks performed in the case, summarized in the Statement of Facts above. Sproul Decl. ¶¶ 20-146; Orion Decl. ¶¶ 9-16; Evenson Decl. ¶ 14; Declaration of Jason R. Flanders ¶¶ 13-30; Declaration of Matthew M. Maclear ¶¶ 12-20; Declaration of Stuart Wilcox ¶ 10; Declaration of Christopher Hudak ¶¶ 7-9; Declaration of Marla Fox ¶ 15; Declaration of Austin J. Sutta ¶¶ 7-12; Declaration of James T. Brett ¶¶ 9-14; Declaration of Julie Kaplan ¶¶ 13; Declaration of Harrison Beck ¶ 8; Declaration of Kenya S. Rothstein ¶¶ 11-14; Declaration of Jodene Isaacs ¶ 9; Declaration of Theresa M. Trillo ¶¶ 9-15; Declaration of Esmeralda Bustos ¶¶ 9-17; Declaration of Amy Mar ¶¶ 8-10.[1] To handle the substantial work of litigating this case, Plaintiffs reasonably employed multiple attorneys. It is well-recognized that effective representation in complex civil litigation requires a

---

[1] Exhibit 1 in each of these attorney declarations sets forth a copy of the individual attorney's billing records in the case (except for Mr. Evenson's declaration, which attaches the records as Exhibit 2).

team of attorneys:

> [C]ourts have declined to reduce hours simply because plaintiffs' attorneys kept each other informed about the case and double-checked each other's work; indeed, many motions this Court denies would have benefitted from a second read and more strategizing by the attorneys involved.

*Wishtoyo*, 2019 U.S. Dist. LEXIS, at *19-20 (internal quotations, citations, and alterations omitted). Here, Plaintiffs' lead counsel closely directed the legal team to ensure timely and efficient production of winning argument, assigning tasks to avoid duplication and frequently delegating tasks to junior attorneys billing at lower rates. Sproul Decl. ¶ 8. Complete elimination of duplication is not necessary to full recovery. *See, e.g.*, *Moreno*, 534 F.3d at 1112 (some duplication necessary when litigation extends over years); *see also P.C. v. City of L.A.*, 2012 U.S. Dist. LEXIS 187549, at **17-18 (C.D. Cal. September 14, 2012) (finding that the presence of multiple attorneys at depositions, hearings or trial is not unreasonable or atypical as having multiple viewpoints allows for effective discussion of case strategy and division of labor); *Dixon v. City of Oakland*, 2014 U.S. Dist. LEXIS 169688, at **39-41 (N.D. Cal. Dec. 8, 2014) (attendance of multiple attorneys not *per se* duplicative) (citing *Oberfelder v. City of Petaluma*, 2002 U.S. Dist. LEXIS 8635, 2002 WL 472308, at *7-8 (N.D. Cal. Jan. 29, 2002); *Heard v. District of Columbia*, 2006 U.S. Dist. LEXIS 62912, at **49-51 (D.D.C Sept. 5, 2006) ("having a senior associate and a partner work in collaboration on a brief during the week prior to its filing is not presumptively excessive...[and] having two attorneys attend a deposition is standard practice"). Accordingly, Plaintiffs are entitled to recovery for *all* their attorneys' time, as adjusted by their billing judgment.

Counsel in fee shifting cases are entitled to compensation for the same tasks attorneys bill their paying clients including: pre-filing case development work; developing the factual and legal basis for the claims; drafting the sixty-day citizen suit notice letter; developing litigation strategy; drafting pleadings, motions, discovery, and other documents; helping experts prepare their reports; court appearances; necessary travel; settlement negotiations; trial preparation, including mandatory pretrial filing such

as a trial brief and proposed findings of fact and conclusions of law, exhibit preparation, subpoenaing witnesses, preparing witnesses to testify, and preparing opening and closing statements and witness questioning; and preparing attorney fee argument. *Wishtoyo*, 2019 U.S. Dist. LEXIS, *16-17; *Davis v. City and Cnty. of S.F.*, 976 F.2d 1536, 1543-45 (9th Cir. 1992); *PIRG of N.J. v. Windall,* 51 F.3d 1179, 1189 (3d Cir. 1994); *Sierra Club v. EPA*, 625 F. Supp. 2d 863, 871 (N.D. Cal. 2007); *Golden Gate Audubon Soc. v. Army Corps of Eng'rs*, 732 F. Supp. 1014, 1018 (N.D. Cal. 1989); *Bartlett v. Mut. Pharm. Co.*, 742 F. Supp. 2d 182 (D.N.H. 2010).

Additionally, Plaintiffs' time on paralegal tasks, either by paralegals or attorneys, is compensable at prevailing paralegal market rates. *Wishtoyo*, 2019 U.S. Dist. LEXIS, at *21-22 (citing *Missouri v. Jenkins*, 491 U.S. 274 (1989)); *Hirsch v. Compton Unified Sch. Dist.*, 2013 U.S. Dist. LEXIS, 64556 at *9 (C.D. Cal. May 3, 2013); *Trs. of the Constr. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006); *Intamin, Ltd. v. Magnetar Technologies Corp.*, 2009 U.S. Dist. LEXIS 123604, at *3 (C.D. Cal. Dec. 28, 2009); *Pierce v. County of Orange*, 905 F. Supp.2d 1017, 1031 (C.D. Cal. 2012) (rejecting arguments that lawyers should be denied compensation for performing relatively routine tasks when they were necessary and there was no other lesser paid staff to perform them).

Additionally, Plaintiffs are entitled to recover at reduced secretarial rates for even the clerical work necessary to support this litigation. "[E]ven purely clerical or secretarial work is compensable if it is customary to bill such work separately…." *Trs. of the Constr. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006); *see also Missouri v. Jenkins by Agyei*, 491 U.S. 274, 289, (1989) ("Such separate billing appears to be the practice in most communities today."). Recognizing that it is customary in the Central District of California (and elsewhere in California) for clerical/support staff work that directly supports substantive litigation, as opposed to routine overhead secretarial work, to be separately billed and recovered, a District Judge in this District awarded Environmental Advocates fees for secretarial/clerical support

staff work at 50% of paralegal rates in an environmental citizen suit. *Wishtoyo*, 2019 U.S. Dist. LEXIS 39927, at *22; *see also Perfect 10, Inc. v. Giganews, Inc.*, No. 11-07098, 2015 U.S. Dist. LEXIS 54063, at *83 (C.D. Cal. Mar. 24, 2015); *Intamin, Ltd. v. Magnetar Technologies Corp.*, No. 04-0511, 2009 U.S. Dist. LEXIS 123604, 2009 WL 5215393, at *3 (C.D. Cal. Dec. 28, 2009); *see also Armstrong v. Brown*, 805 F. Supp. 2d 918, 922 (N.D. Cal. 2011) (awarding fees for non-paralegal "support staff"); *Spence v. Wells Fargo Bank, N.A.*, No. 10-2057, 2012 U.S. Dist. LEXIS 32838, 2012 WL 844713, at *5 (E.D. Cal. Mar. 12, 2012) (awarding fees for "support staff"); *Bosca v. Astrue*, No. 06-2364, 2009 U.S. Dist. LEXIS 24736 at *4 (N.D. Cal. Mar. 11, 2009) (citing *Missouri*, 491 U.S. at 288 n.10) (clerical work done by an attorney lacking other available help "may command a lesser rate"); Sproul Decl. ¶ 200 (noting practice to bill for clerical work and calculating recovery for clerical tasks at 50% of Plaintiffs' paralegal rates).

The most time-consuming aspect of this case for Plaintiffs was the extensive work needed to prepare for trial. Sproul Decl. ¶ 94. This required review of an extensive documentary record to identify trial exhibits, subpoenaing several witnesses, many hours working with Plaintiffs' expert to prepare him to testify on factually and analytically complex material, many hours spent in preparation sessions with multiple other witnesses, preparation of numerous pretrial pleading filings--including briefs on multiple motions in limine brought by both Plaintiffs and Hot Line, preparation of opening and closing statements, and development of trial counsel's planned witness questioning. Plaintiffs further had to review, consider and be prepared to respond to Hot Line's various trial filings. *Id.* ¶¶ 93-118.

Before bringing this case, Plaintiffs' counsel necessarily had to engage in extensive initial case development work which included gathering and analyzing evidence supporting the potential claims and remedies in the case, investigating issues regarding standing, conducting legal research and developing the legal theories of the case, strategizing with clients and co-counsel on litigation goals, drafting the requisite 60-day notice letter, and drafting the complaint. Sproul Decl. ¶ 19.

Further, mandatory case management matters, including settlement negotiations, required Plaintiffs' counsel to confer with Hot Line's counsel, orally and in writing, numerous times.

As outlined in the Introduction and Statement of Facts, developing their evidence required Plaintiffs to propound extensive written discovery and take several depositions. *Id*. ¶¶ 34-45. Review and analysis of the voluminous document productions from Hot Line (made in a serial fashion over 16 occasions) and from agencies via California Public Records Act requests required significant counsel time. *Id*. ¶¶ 46-48; Orion Decl. ¶ 12. Plaintiffs also had to respond to Hot Line's written discovery and defend Hot Line's deposition. Sproul Decl. ¶¶ 49-50.

As outlined in the Introduction and Statement of Facts, Plaintiffs and Hot Line brought numerous contested motions, necessitating the expenditure of substantial amounts of Plaintiffs' attorneys' time. As detailed in Plaintiffs' declarations, Plaintiffs generally prevailed on most of these motions. Motion practice with Hot Line substantially added to the hours on this case.

Plaintiffs' counsel have tried diligently to minimize the hours spent on this litigation through the pursuit of request for admission responses, stipulations to resolve case management matters (including the admissibility of exhibits) and/or establish certain facts/resolve certain claims, and via repeated settlement communications. *See Wishtoyo*, 2019 U.S. Dist. LEXIS, at *17 (finding that the plaintiffs' counsel, including Mr. Sproul, "attempted to minimize the hours spent on the action" in similar ways, supporting reasonableness of overall hours). Plaintiffs' counsel were obligated by the FRCP and Local Rules to work with opposing counsel to attempt to narrow the issues, avoid litigation to the extent possible, and to achieve settlement. As noted, the extensive effort that Plaintiffs put into settlement of eventually, on the eve of trial, finally succeeded.

After efforts to settle their fee recovery with Hot Line failed, Plaintiffs have spent considerable time drafting this fee motion. Sproul Decl. ¶ 146. A fee motion is necessarily a complex and time-consuming endeavor as "plaintiffs have the burden of

supporting the rates sought and time spent, and [are] required to review pertinent legal authority, obtain declarations, gather and present time records, research current hourly rates for...attorneys, and prepare the motion papers." *A.D. v. State Highway Patrol*, 2013 U.S. Dist. LEXIS 169275, at *24 (N.D. Cal. Nov. 27, 2013). Plaintiffs are fully entitled to recover for their "fees on fees" sought here. *See, e.g.*, *Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 981 (9th Cir. 2008); *Highway Patrol*, 2013 U.S. Dist. LEXIS 169275, at *23-24 (awarding $120,970 in fees on fees); *Golden Gate*, 732 F. Supp. at 1022 (300 hours of fees on fees work reasonable given difficult issues concerning entitlement and appropriate fees amount).

### 3.    The *Kerr* Factors Support a Fully Compensatory Fee Award.

In determining a reasonable fee, the Court should also consider the factors articulated in *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *abrogated on other grounds, City of Burlington v. Dague*, 505 U.S. 557 (1992); *see also Wishtoyo*, 2019 U.S. Dist. LEXIS 39927, at *16. These factors include: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) time limitations imposed by the client or the circumstances, (6) the results obtained, (7) the experience, reputation, and ability of the attorneys, (8) the 'undesirability' of the case, and (9) awards in similar cases. *See, e.g., Our Children's Earth Found. v. EPA*, 2016 U.S. Dist. LEXIS 40626, at **16-17 (N.D. Cal. Mar. 25, 2016); *Stetson v. Grissom*, 821 F.3d 1157, 1166-67 (9th Cir. 2016).

These factors support the reasonableness of Plaintiffs' lodestar. As their declarations attest, counsel are experienced environmental attorneys who demonstrated considerable skill in prosecuting this case through: dogged pursuit of discovery, including deposing numerous witnesses, including Hot Line's expert witness, on complex technical issues in the field of environmental risk assessment; preparing pretrial briefing on complex issues of fact and law concerning the merits of specialized environmental claims; and briefing multiple pre-trial motions, including mostly defeating Hot Line's

motion in limine attempts to limit Plaintiffs' trial evidence.[2] While counsel's time invested was reasonable, it was substantial, which limited the availability of the attorneys to work on other cases, in some instances requiring them to forgo other work. Sproul Decl. ¶ 193.

Finally, the amount of fees sought here is commensurate with attorney fee awards in complex civil litigation. For example, in an environmental citizen suit case decided several years ago, a District Judge in this District, relying on attorney market rates prevailing five years ago, in 2018, awarded Mr. Sproul's Environmental Advocates firm and associated co-counsel $2,922,974.25 in attorneys' fees and $297,328.76 in case costs, *i.e.*, over $3.2 million in fees and costs. *Wishtoyo*, 2019 U.S. Dist. LEXIS 39927, at *24. While that decision arose under the fee shifting provisions of the Endangered Species Act ("ESA"), the case law on reasonable attorneys' fees developed in connection with other attorneys' fees statutes applies to this case. *See Pa. v. Del. Valley Citizens' Council*, 478 U.S. 546, 559 (1986) ("the purposes behind [the fee shifting provisions of federal environmental statutes] and [42 U.S.C.] § 1988 are nearly identical,...they should be interpreted in a similar manner."); *see also Dague*, 505 U.S. at 561-62 (noting environmental statutes' fee shifting provisions are "similar to that of many other federal fee-shifting statutes;" "our case law construing what is a "reasonable" fee applies uniformly to all of them."); *Marbled Murrelet v. Babbitt*, 182 F.3d 1091, 1095 (9th Cir. 1999).

Plaintiffs' requested fee recovery is reasonable when compared to Central District fee awards in other comparable complex civil litigation. In *Flores v. City of Westminster*, 2014 U.S. Dist. LEXIS 200551 (C.D. Cal Oct. 23, 2014), a case that went to trial under the civil rights statutes, the Court awarded $3,285,673.00 in attorneys' fees nine years ago in 2014. *Id*. at *38. Adjusted for inflation, this would be substantially higher in 2023

---

[2] Plaintiffs' counsel has unique expertise in litigating cases alleging human health and environmental risks posed by dioxins-contaminated sites like the Facility, resulting in efficiencies in litigating this case. Sproul Decl. ¶ 10; Evenson Decl. ¶ 12.

dollars. *See also* Sproul Decl., Ex. 13 (January 19, 2024 decision in Central District of California in case on which Mr. Sproul, Mr. Orion, Mr. Flanders, Mr. Wilcox, and Ms. Fox worked, awarding $3,464,257.23 in fees under 2023 rates and $306,557.19 in costs in CWA case); *SYRCL*, 2012 U.S. Dist. LEXIS 42287, at *20 (awarding $1,875,951.20 under the ESA (a case in which Environmental Advocates' Mr. Sproul was lead counsel)); *UM Corp. v. Tsuburaya Prods. Co.*, 2018 U.S. Dist. LEXIS 241753, at *2, 42-46 (C.D. Cal. Aug. 1, 2018) (awarding $3,938,227.22 in attorneys' fees and $567,118.13 in costs in case involving one trial where the sole issue presented to the jury was the authenticity of a contract); *Chloe SAS v. Sawabeh Info. Servs. Co.*, 2015 U.S. Dist. LEXIS 186838, at *98 (C.D. Cal. June 22, 2015) (awarding $4,842,113.16 in attorneys' fees and $144,868.02 in costs in case without any trial where plaintiffs obtained minimum statutory damages pursuant to stipulation and injunctive relief); *Perfect 10*, 2015 U.S. Dist. LEXIS 54063, at **86-87 (awarding attorneys' fees of $5,213,117.06, noting that Central District fee awards have been as high as $105 million).

### 4.   Plaintiffs' Hourly Rates Are Reasonable.

#### a.   Plaintiffs' Claimed Rates Accord with Prevailing Los Angeles/Orange County Rates.

In this RCRA citizen suit, counsel are entitled to the hourly rates "prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Camacho*, 523 F.3d at 979. The relevant community in this case is the Los Angeles metropolitan area, given that this is where the Court sits. *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992). Plaintiffs have supported in detail that their rates accord with prevailing Los Angeles area legal market rates for attorneys or paralegals with comparable skill, experience, and reputation working on comparable legal tasks. Sproul Decl. ¶¶ 147-189 (noting data and opinions supporting prevailing market rates determinations); *Id*. ¶ 153, Exs. 6, 7, 8, 9 (attorney declarations supporting rates of $1,500 for partner to $710 for first year associate); Flanders Decl. ¶¶ 31-36.

Following case law supporting this methodology, Plaintiffs have set their rates

commensurate with rates awarded by courts in the Los Angeles metropolitan area in a broad array of complex civil litigation. *See, e.g.*, Sproul Decl. ¶¶ 147-189. Indeed, in an order issued today, January 19, 2024, a judge in the Central District of California found the 2023 rates of five of the attorneys on this case (Mr. Sproul, Mr. Orion, Mr. Flanders, Mr. Wilcox, and Ms. Fox) to be reasonable Los Angeles/Orange County area market rates. Sproul Decl. ¶ 148, Ex. 13. Plaintiffs used the same rates awarded in that case, adjusted for inflation between 2023 and 2024, for this fee petition. *Id.*; *see also Wishtoyo*, 2019 U.S. Dist. LEXIS 39927, at *25 (effectively crediting this methodology, used in that case (*see* Sproul Decl. ¶ 199), finding "Plaintiffs have demonstrated that courts in the Central District have awarded attorneys with comparable experience a similar rate..."); *Prison Legal News v. Schwarzenneger*, 608 F.3d 446, 455 (9th Cir. 2010) ("the proper scope of [attorney rate] comparison ... extends to all attorneys in the relevant community engaged in equally complex Federal litigation, no matter the subject matter"); *Perfect 10*, 2015 U.S. Dist. LEXIS 54063, at *45; *Stonebrae, L.P. v. Toll Bros.*, 2011 U.S. Dist. LEXIS 39832, at *9-13 (N.D. Cal. Apr. 7, 2011).

**b.** **Counsel Should Be Awarded Their 2024 Rates To Compensate for Delay in Payment.**

As the Court held in *Wishtoyo*, attorney fee awards in public interest litigation should be appropriately adjusted to reflect the delay between when work is performed and when payment is received because "compensation received several years after the services were rendered...is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case..." 2019 U.S. Dist. LEXIS 39927, at *24-25 (citing *Missouri*, 491 U.S. at 283). "[T]he Ninth Circuit uses current billing rates to compensate for the delay in receiving payment." *Oberfelder*, 2002 U.S. Dist. LEXIS 8635, at *13 (citing *Davis*, 976 F.2d at 1548; *Bouman v. Block*, 940 F.2d 1222, 1235 (9th Cir. 1991)); *see also Pacificans For A Scenic Coast v. Cal. Dep't of Transp.*, 2017 U.S. Dist. LEXIS 199145, at *4 (N.D. Cal. Nov. 22, 2017) (awarding 2017 rates for all work done in case); *In re Cathode Ray Tube (CRT) Antitrust*

*Litig.*, 2016 U.S. Dist. LEXIS 102408, at \*\*73-75 (N.D. Cal. Aug. 3, 2016). Accordingly, Plaintiffs' fee recovery should be determined utilizing their attorneys' 2023 rates.

### D.    Plaintiffs Are Entitled To Recover Reasonable Costs of Litigation.

Plaintiffs are entitled to recover reasonable costs under RCRA, including expert witness costs. *See* 42 U.S.C. § 6972(e); *Wishtoyo*, 2019 U.S. Dist. LEXIS 39927, at \*26-27 (awarding $297,328.76 in costs, including substantial expert costs); *Marbled Murrelet v. Pac. Lumber Co.*, 163 F.R.D. 308, 328 (N.D. Cal. 1995) (citing *Davis*, 976 F.2d at 1556). Plaintiffs incurred $101,843.24 in costs for court filing fees, court courtesy copies, postage and other document delivery charges, deposition transcripts, attorney travel, electronic legal research, and expert witness costs. Sproul Decl. ¶¶ 194-197 (costs incurred by Environmental Advocates firm) & Exs. 4, 5(a), 5(b), 5(c), and 5(d) (cost records); Maclear Decl. ¶ 22-23 (costs incurred by ATA firm); Evenson Decl. ¶ 16 (costs incurred by EcoRights and Ecology Law Center). These costs are typical expenses normally charged to a paying client, were necessarily incurred, and are recoverable in full. *Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 579-82 (9th Cir. 2010); *Perfect 10*, 2015 U.S. Dist. LEXIS 54063, at \*89-91; *Marbled Murrelet*, 163 F.R.D. at 328-29.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court award $2,511,095.09 in attorneys' fees and $101,843.24 in costs for a total of $2,612,938.33 against Hot Line.[3] To ensure timely payment, the Court should mandate that Hot Line tender this sum to Plaintiffs within 30 days of the Court's order.

Respectfully submitted,

Dated:  January 19, 2024

Christopher a. Sproul

Christopher Sproul, Attorney for Plaintiffs

---

[3] Plaintiffs will incur additional fees and costs in completing this fee motion, reviewing Hot Line's opposition, and replying to this opposition. Plaintiffs will seek these additional fees and costs in their reply briefing.